

FILED

2017 SEP 21  AM 11: 48

# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA

| | |
|---|---|
| SHILPI KAVRA, Individually and on Behalf of All Others Similarly Situated, | CIVIL ACTION NO. |
| Plaintiff, | 8:17 cv 2186 T 17 MAP |
| v. | CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS |
| HEALTH INSURANCE INNOVATIONS, INC., PATRICK R. MCNAMEE; GAVIN D. SOUTHWELL and MICHAEL D. HERSHBERGER, | JURY TRIAL DEMANDED |
| Defendants. | |

By and through its undersigned counsel, Plaintiff Shilpi Kavra ("Plaintiff"), alleges the following against Health Insurance Innovations, Inc. ("Health Insurance" or the "Company") and certain of the Company's executive officers and/or directors. Plaintiff makes these allegations upon personal knowledge as to those allegations concerning Plaintiff and, as to all other matters, upon the investigation of counsel, which included, without limitation: (a) review and analysis of public filings made by Health Insurance and other related parties and non-parties with the U.S. Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and other publications disseminated by certain of the Defendants and other related non-parties; (c) review of news articles, shareholder communications, and postings on Health Insurance 's website concerning the Company's public statements; and (d) review of other publicly available information concerning Health Insurance and the Individual Defendants.

JRA-15958
#460

## NATURE OF THE ACTION

1.       This is a federal securities class against Health Insurance and certain officers and/or directors for violations of the federal securities laws. Plaintiff brings this action on behalf of all persons or entities that purchased or otherwise acquired the publicly traded shares of Health Insurance common stock between March 4, 2016 and September 11, 2017, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

## JURISDICTION AND VENUE

2.       The federal law claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

3.       This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, Section 27 of the Securities Act (15 U.S.C. §78aa).

4.       Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. §78aa(c)). The Company's principal executive office is located in this district.

5.       In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including but not limited to the mails, interstate telephone communications, and the facilities of a national securities exchange.

## PARTIES

6.     Plaintiff, as set forth in the accompanying certification, incorporated by reference herein, acquired Health Insurance common stock at artificially inflated prices during the Class Period, and suffered damages as a result of the revelation of the alleged corrective disclosure.

7.     Defendant Health Insurance Innovations operates as a developer, distributor, and administrator of cloud-based individual health and family insurance plans, and supplemental products in the United States. The Company is incorporated in Delaware and its principal executive offices are located at 15438 North Florida Avenue Suite 201 Tampa, Florida 33613. The Company's securities are traded on The Nasdaq Global Market ("NASDAQ") under the ticker symbol "HIIQ."

8.     Defendant Patrick R. McNamee ("McNamee") served as the Company's Chief Executive Officer ("CEO") from the beginning of the Class Period until November 15, 2016.

9.     Defendant Gavin D. Southwell ("Southwell") serves as the Company's CEO since November 15, 2016 to date. Southwell has also been the Company's President from July, 2016 to date.

10.     Defendant Michael D. Hershberger ("Hershberger") has been the Company's Chief Financial Officer throughout the Class Period.

11.     Defendants McNamee, Southwell and Hershberger are sometimes referred to herein as the "Individual Defendants."

12.     The Company and the Individual Defendants are collectively referred to herein as "Defendants."

13.     During the Class Period, the Individual Defendants, as senior executive officers and/or directors of Health Insurance , were privy to confidential, proprietary and material adverse

3

non-public information concerning Health Insurance , its operations, finances, financial condition and present and future business prospects via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or board of directors meetings and committees thereof, and via reports and other information provided to them in connection therewith. Because of their possession of such information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

14.     The Individual Defendants are liable as direct participants in the wrongs complained of herein. In addition, the Individual Defendants, by reason of their status as senior executive officers and/or directors, were "controlling persons" within the meaning of §20(a) of the Exchange Act, and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein. Because of their positions of control, the Individual Defendants were able to and did, directly or indirectly, control the conduct of Health Insurance's business.

## SUBSTANTIVE ALLEGATIONS

### *Company Background*

15.     Health Insurance was incorporated in 2012 and is based in Tampa, Florida. The Company identifies itself as a developer, distributor and cloud-based administrator of individual health and family insurance plans, and supplemental products in the United States.

16.     As of March 31, 2016, Health Insurance is the primary beneficiary of Health Plan Intermediaries Holdings, LLC ("HPIH") that constitutes a variable interest entity ("VIE") pursuant to the Financial Accounting Standards Board ("FASB") guidance. Health Insurance owns 100% of the voting power in HPIH.

*Material Misstatements and Omissions during the Class Period*

17.    The Class Period begins on March 04, 2016. On March 3, 2016, after the market closed, the Company issued a press release, also attached as exhibit 99.1 to the Form 8-K filed with the SEC announcing the Company's financial and operating results for the fourth quarter and fiscal year ended December 31, 2015 ("the 2015 Press Release"). For the quarter, the Company reported revenue of $33.6 million, or $0.02 per diluted share, compared to revenue of $26.5 million in the previous year's comparable quarter. For the year, the Company reported a revenue of $104.7 million, or $0.08 per diluted share, an 18% increase in its revenue from the previous year. The press release stated in relevant part:

> TAMPA, Fla., March 03, 2016 (GLOBE NEWSWIRE) -- Health Insurance Innovations, Inc. (HII) (NASDAQ:HIIQ), a leading developer, distributor, and virtual administrator of affordable health plans, today announced financial results for the fourth quarter ended December 31, 2015. The Company will host a live conference call on Friday, March 4, 2016 at 8:30 a.m. EST.
>
> **Fourth Quarter 2015 Consolidated Financial Highlights**
>
> - Record revenue was $33.6 million, an increase of 26.7% over $26.5 million in the fourth quarter of 2014.
> - Record total collections from customers, which our industry refers to as premium equivalents, of $55.6 million, an increase of 21.7% over $45.7 million in the fourth quarter of 2014.
> - Adjusted EBITDA (earnings before interest, taxes, depreciation and amortization) was $2.6 million, compared to $2.8 million in the fourth quarter of 2014.
> - Adjusted EPS, also referred to as Adjusted Net Income per Share, was $0.10 in the fourth quarter of 2015 compared to $0.12 in the fourth quarter of 2014.
> - Net Income per diluted share for the fourth quarter of 2015 was $0.02, compared to $0.01 in the fourth quarter of 2014.
> - Record policies in force as of December 31, 2015, totaled approximately 195,100, an 84% increase from 106,200 as of December 31, 2014.
>
> **2016 Full Year Guidance**

For the full year 2016 we expect Revenue to grow 24% to 30% year-over-year ($130 million to $136 million) and Adjusted EPS to grow 26% to 41% ($0.34 to $0.38).

"We were pleased that we exceeded our annual revenue and adjusted earnings per share guidance with a record revenue quarter and strong profit growth as well. Our sales accelerated in the 2016 open enrollment period, driven by our strong sales effort across our existing and new channels. Our on-line ecommerce site, AgileHealthInsurance.com, delivered strong volume and is rapidly becoming our top distributor," said Patrick McNamee, HII's Chief Executive Officer and President.

"We had record policies in force at the end of 2015 – 195,100 policies, representing an 84% YOY increase. During the quarter, we also had our all-time record of submitted policies – 153,300, representing a 174% YOY increase. Our strategy to diversify our distribution is working; open enrollment is now a tailwind to our growth," said McNamee.

**Full Year 2015 Consolidated Financial Highlights**

- Record annual revenues of $104.7 million, representing an 18.0% increase from fiscal year 2014, exceeding guidance of $98 to $103 million.
- Record total collections from customers, which our industry refers to as premium equivalents of $175.8 million, representing a 12.7% increase from fiscal year 2014.
- Adjusted EPS or Net Income per Share was $0.27 for the year ended in 2015, exceeding guidance of $0.18 to $0.25 per share.
- Adjusted gross margin of $48.7 million, representing 10% growth from $44.1 million in 2014.
- Net Income per diluted share of $0.08, compared to $(0.06) for the fiscal year ended 2014.
- Adjusted EBITDA of $6.6 million, with $2.6 million contributed in the fourth quarter.
- Record policies in force as of December 31, 2015, totaled approximately 195,100, an 84% increase from 106,200 as of December 31, 2014.

18.     On March 8, 2016 the Company filed a Form 10-K with the SEC announcing the Company's financial and operating results for the fourth fiscal quarter and year ended December 31, 2015 ("the 2015 10-K"), which was signed and certified under the Sarbanes Oxley Act of 2002 by the Individual Defendants. Throughout the 2015 10-K the Company reapproved the previous statements and added in relevant part:

*State Insurance Laws*

Some of the states in which we operate have laws prohibiting unlicensed persons or business entities, including corporations, from making certain direct and indirect payments or fee-splitting arrangements with licensed insurance agents and brokers. Possible sanctions for violation of these restrictions include loss of license and civil penalties. These statutes vary from state to state, are often vague, and have seldom been interpreted by the courts or regulatory agencies.

*State insurance laws also require us to maintain an insurance agency or broker license in each state in which we transact health insurance business and adhere to sales, documentation and administration practices specific to that state.* In addition, each of our employees who solicits, negotiates, sells or transacts health insurance business for us must maintain an individual insurance agent or broker license in one or more states. Because we transact business in the majority of states, compliance with health insurance-related laws, rules and regulations is difficult and imposes significant costs on our business.

Emphasis added.

19.     On March 1, 2017 after the market close, Health Insurance issued a press release, also attached as exhibit 99.1 to the Form 8-K filed with the SEC announcing the Company's financial and operating results for the fourth fiscal quarter and year ended December 31, 2016 ("the 2016 Press Release"). For the quarter, the Company reported a revenue of $51.4 million, or a loss of $0.04 per diluted share, compared to a consolidated revenue of $33.6 million in the previous year's comparable quarter. For the year, the Company reported a revenue of $184.5 million, or $0.57 per diluted share, compared to a consolidated revenue of $104.7 million in the previous year. The press release stated in relevant part:

**Tampa, FL** — March 1, 2017 — (GLOBE NEWSWIRE) -- Health Insurance Innovations, Inc. (NASDAQ:HIIQ), a leading developer, distributor, and cloud-based administrator of affordable health insurance and supplemental plans announced financial results for the fourth quarter ended December 31, 2016. The Company will host a live conference call on Thursday, March 2, 2017 at 8:30 A.M. E

**2016 Consolidated Financial Highlights**

- Revenue was $184.5 million, an increase of 76.2% over $104.7 million in 2015.

- Total collections from customers, which our industry refers to as premium equivalents, of $311.6 million, an increase of 77.3% over $175.8 million in 2015.

- Net Income attributable to Health Insurance Innovations, Inc was $4.5 million, compared to $0.6 million in 2015.

- Adjusted EBITDA (earnings before interest, taxes, depreciation and amortization) was $27.8 million, compared to $6.6 million in 2015.

- GAAP diluted earnings per share was $0.57, compared to $0.08 in 2015.

- Adjusted earnings per share also referred to as Adjusted Net Income per Share, was $1.12 in 2016 compared to $0.27 in 2015.

**2017 Full Year Guidance**

*For the full year 2017 we expect Revenue to grow 15% to 20% year-over-year ($210 million to $220 million), Adjusted EBITDA to grow 20% to 30% year-over-year ($33 million to $36 million) and Adjusted EPS to grow 20% to 30% ($1.35 to $1.45).*

"We are pleased with record revenue and profit in 2016 and that we exceeded our annual revenue and adjusted earnings per share guidance. Sales accelerated in the 2017 open enrollment period, across all our distribution channels. Record policies in force at the end of 2016 – 290,100 policies, is a 49% year-over-year increase," said Gavin Southwell, HIIQ's Chief Executive Officer and President.

"*We have also invested in our customer service and compliance functions* - both by adding resource and technology solutions. These market-leading support functions along with our enhanced use of data and strong carrier relationships, mean *we are well positioned for future growth, whilst succeeding in our mission of providing affordable health insurance and related products to the consumer,*" said Southwell.

**Fourth Quarter 2016 Consolidated Financial Highlights**

- Revenue was $51.4 million, an increase of 53.0% over $33.6 million in the fourth quarter of 2015.

- Premium Equivalents of $85.3 million, an increase of 53.6% over $55.6 million in the fourth quarter of 2015.

- Net Income attributable to Health Insurance Innovations, Inc for the fourth quarter was a loss of $0.2 million. compared a profit of $0.2 million in the fourth quarter of 2015.

- Adjusted EBITDA was $8.9 million, compared to $2.6 million in the fourth quarter of 2015.

- GAAP diluted earnings per share for the fourth quarter of 2016 was a loss of $0.04, compared to $0.02 of income in the fourth quarter of 2015; One-time items totaling $0.25 impacted Q4 2016 diluted earnings per share.

- Adjusted earnings per share was $0.35 in the fourth quarter of 2016 compared to $0.10 in the fourth quarter of 2015.

- Policies in force as of December 31, 2016, totaled approximately 290,100, a 49% increase from 195,100 as of December 31, 2015.

Emphasis added.

20.     On March 2, 2017 the Company filed a Form 10-K with the SEC announcing the Company's financial and operating results for the fourth fiscal quarter and year ended December 31, 2016 ("the 2016 10-K"), which was signed and certified under the Sarbanes Oxley Act of 2002 by the Individual Defendants. Throughout the 2016 10-K the Company reapproved the previous statements and added in relevant part:

*State Insurance Laws*

Some of the states in which we operate have laws prohibiting unlicensed persons or business entities, including corporations, from making certain direct and indirect payments or fee-splitting arrangements with licensed insurance agents and brokers. Possible sanctions for violation of these restrictions include loss of license and civil penalties. These statutes vary from state to state, are often vague, and have seldom been interpreted by the courts or regulatory agencies.

***State insurance laws also require us to maintain any combination of insurance agency, broker, and third party administrator licenses in each state in which we transact health insurance business and adhere to sales, documentation and administration practices specific to that state.*** In addition, each of our employees who solicits, negotiates, sells or transacts health insurance business for us must maintain an individual insurance agent or broker license in one or more states. Because we transact business in the majority of states, compliance with

health insurance-related laws, rules and regulations is difficult and imposes significant costs on our business.

Emphasis added.

21.     On August 3, 2017, the Company issued a press release also attached as exhibit 99.1 to the Form 8-K filed with the SEC announcing the Company's financial and operating results for the Second Quarter 2017 ("the Q2 2017 Press Release"), stating in relevant part:

> **TAMPA, Fla.,** Aug. 02, 2017 (GLOBE NEWSWIRE) -- Health Insurance Innovations, Inc. (NASDAQ:HIIQ), a leading developer, distributor, and cloud-based administrator of affordable health insurance and supplemental plans announced financial results for the second quarter ended June 30, 2017. The Company will host a live conference call on Thursday, August 3, 2017 at 8:30 A.M. EDT.
>
> **Second Quarter 2017 Consolidated Financial Highlights**
>
> - Record revenue was $61.8 million, an increase of 38.9% over $44.5 million in the second quarter of 2016.
>
> - Record total collections from customers (premium equivalents) of $98.9 million, an increase of 28.5% over $77.0 million in the second quarter of 2016.
>
> - Record adjusted EBITDA (earnings before interest, taxes, depreciation and amortization) was $12.5 million, compared to $6.5 million in the second quarter of 2016, an increase of 92.3%.
>
> - GAAP diluted earnings per share was $0.35, compared to $0.24 in the second quarter of 2016, an increase of 45.8%.
>
> - Record adjusted earnings per share also referred to as Adjusted Net Income per Share, was $0.46 compared to $0.27 in the second quarter of 2016, an increase of 70.4%.
>
> - Record policies in force as of June 30, 2017, totaled approximately 359,500, a 39.1% increase from 258,400 as of June 30, 2016.
>
> - Premium equivalents, adjusted EBITDA, and adjusted EPS are non-GAAP financial measures. See the reconciliations of these measures to their respective most directly comparable GAAP measure below in this press release.

**Revised 2017 Full Year Guidance**

*We are revising our guidance upwards for the full year 2017. We expect Revenue to grow 22% to 25% year-over-year ($225 million to $230 million), Adjusted EBITDA to grow 41% to 51% year-over-year ($39 million to $42 million) and Adjusted EPS to grow 29% to 38% ($1.45 to $1.55). Previously we guided to Revenue of $212 million to $22 million, Adjusted EBITDA of $36 million to $39 million and Adjusted EPS of $1.40 to $1.50.*

"In our record second quarter results, we continue to drive top line growth and bottom line results with disciplined execution of our strategy. In the second half of 2017, we will continue to focus on our product and technology innovation to meet consumers' affordable health care needs" said Gavin Southwell, HIIQ's Chief Executive Officer and President.

Emphasis added.

22.     The statements referenced in ¶17-21 above were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operational and financial results, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) the Company had unsuccessfully applied for its third-party administrators ("TPA") licensure ("TPA Application") with the Florida's Office of Insurance Regulation; (2) the Company was intentionally omitting material information and disregarding the Florida's Office of Insurance Regulation instructions to complete the TPA Application; (3) the Company's TPA Application had been denied, adversely affecting existing other licenses and future applications; (4) the forenamed denial was substantially harming the Company's ability to conduct its core business; and (5) as a result, the Company's public statements were materially false and misleading at all relevant times.

### The Truth Begins to Emerge

23.     On August 4, 2017, the Company filed a Form 10-Q with the SEC announcing the Company's financial and operating results for the second fiscal quarter and six month ended June

30, 2017 (the "Q2 2017 10-Q"). The Q2 2017 10-Q was signed by the Individual Defendants and contained signed certifications pursuant to the Sarbanes Oxley Act of 2002 attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

24.     The Q2 2017 10-Q reapproved the Q2 2017 Press Release statements and stated the following regarding the Company's application for a third-party insurance administrator's license with the Florida Office of Insurance Regulation:

TPA Licensure

Many states have statutes that require the licensure of third-party insurance administrators ("TPA"). The statutes and applicable regulations vary from state- to-state with respect to the nature of the business activities that may require licensure. Where the Company believes that statutes are unclear or open to interpretation, it takes the prudent approach of applying for a TPA license. Therefore, the Company applied for a TPA license with the Florida Office of Insurance Regulation ("OIR"). *In June 2017, the OIR denied the Company's application based on its determination that the Company had not yet provided all information required to process the application.* In June 2017, the Company appealed the denial with the Florida Division of Administrative Hearings. A final hearing on the matters has been scheduled for October 17-20, 2017, but the Company is working with the OIR to reach a mutually agreeable resolution of the matter prior to the hearing, including discussing whether the OIR will require the Company to hold such a license at all.

Emphasis added.

### The Truth Emerges

25.     On September 11, 2017, a research report widely disseminated information in the market about the Company, including website links to access (1) the letter from Florida's Office of Insurance Regulation denying the Company's TPA Application ("Denial Letter"), dated June 01, 2017; and (2) the Company's appeal to challenge the TPA Application denial ("TPA Appeal"), dated June 16, 2017.

26.     The letter from Florida's Office of Insurance Regulation denying the Company's

TPA Application, dated June 01, 2017 provides a factual and procedural background, stating in

relevant part:

> Dear Mr. Birnbaum:
>
> The Office of Insurance Regulation ("Office") has reviewed the application for a Certificate of Authority ("Application") submitted by Health Plan Intermediaries Holdings, LLC ("Applicant") on April 19, 2017. Pursuant to sections 120.60 and 627.8805, Florida Statutes, and as set forth below, the Office hereby DENIES the Application.
>
> #### Factual Background
>
> Applicant originally applied with the Office for a Certificate of Authority to act as a Third-Party Administrator pursuant to Chapter 626, Part VII, Florida Statutes on July 18, 2016. The Office deemed that application incomplete and returned it to the Applicant on July 25, 2016.
>
> Applicant reapplied on October 28, 2016. The Office sent initial clarification letters to Applicant on November 28, 2016, with a response due date of December 5, 2016. On December 1, 2016, Applicant requested an extension to the response date until December 12, 2016, which was granted by the Office. Applicant did not timely file its response by the new deadline.
>
> On December 16, 2016, Applicant acknowledged that it had not timely responded to all the clarification items and requested an unspecified extension of time to gather the remaining
>
> *       *       *
>
> information. That same day, with no action from the Office granting or denying the request for an extension of time, Applicant withdrew the application. Applicant advised the Office it would refile the application once it received the necessary information. The Office acknowledged Applicant's withdrawal and provided instructions on how to resubmit an application.
>
> On April 19, 2017, the Applicant refiled with the Office by submitting some of the information originally requested in the clarification letters issued November 28, 2016. The Office reviewed this new submission and, on May 12, 2017, sent Applicant new clarification letters. The Office requested additional clarification regarding the Applicant's ownership interests in other insurance companies by separate email sent on May 18, 2017. All clarification responses were due not later than May 22, 2017.
>
> On May 22, 2017, Applicant requested a two-day extension to submit the items requested in the correspondence dated May 12 and May 18, 2017. The Office granted the request with an added day, establishing a new response due date of May 25, 2017. The Office informed the Applicant that a complete response should be submitted at that time.
>
> Applicant submitted a response on May 25, 2017, and advised the Office that the submission was still incomplete "despite the Office's extension."

27.     The Denial Letter also provides a two-page list of information the Company

continuously failed to provide in its three application filings over a period of eight months, along

with the basis for denial. In relevant part:

<u>Bases for Application Denial</u>

Based on a full review of the materials submitted by Applicant, the Office has determined that the Application should be DENIED for the following reasons:

> **1.  The Applicant failed to correct errors or omissions in the application and did not supply additional information when requested by the Office.**

The Application contained numerous, material errors and omissions. The Office timely notified Applicant of these errors and omissions. As detailed above, the Applicant failed to correct the errors and omissions. As further detailed above, the Applicant failed to supply additional information when requested by the Office.

Legal authority: §§ 120.60(1), 626.8805(2) & 626.8805(3), Fla. Stat.

> **2.  The Office has determined that the Applicant is not competent.**

Applicant failed to meet the deadlines established by the Office in its clarification letters. Applicant failed to meet deadlines that were extended pursuant to its requests. When Applicant has eventually submitted documents to the Office, that information has often been incomplete or non-responsive.

Legal authority: § 626.8805(4), Fla. Stat.

28.     In the Company's appeal to challenge the TPA Application denial, dated June 16, 2017, the Company, admittedly, describes the negative impact of the denial on its core business, stating in relevant part:

<u>PETITION FOR FORMAL ADMINISTRATIVE PROCEEDING TO CONTEST AGENCY DECISION AND PROPOSED APPLICATION DENIAL</u>

Pursuant to Sections 120.569 and 120.57(1), Florida Statutes and Rule 28-106.201, Florida Administrative Code, and in compliance with the content requirements set forth therein, Health Plan Intermediaries Holdings, LLC ("HPIH") hereby requests a formal administrative proceeding to challenge the agency action proposing to deny its application for licensure as a third-party administrator. In accordance with the form and content requirements of Rule 28-106.201, Florida Administrative Code, HPIH petitions as follows:

1. The Florida Office of Insurance Regulation ("FLOIR") is the agency affected by HPIH's Petition for Formal Administrative Proceeding. Its address is 200 Gaines Street, Tallahassee, FL 32399-4206. To HPIH's knowledge, there is no identifying associated agency file or identification number associated with its application for licensure as a third-party administrator and none is evident on FLOIR's notice proposing to deny HPIH's application.

*          *          *

HPIH's substantial interests will be affected by a final agency determination denying HPIH's application for third-party administrator licensure. As an initial matter, as of the date of this Petition, HPIH is already a licensed third-party administrator in over twenty states where such licensure is required. Denial of its application for licensure in Florida would trigger a duty to report that denial in many, if not all, of those states, both at the time of the final denial and at future renewals. There is the distinct possibility that a denial of its Florida application would adversely affect one or more of its existing licenses, which would hamper or substantially harm HPIH's ability to conduct its core business. Additionally, HPIH is in the midst of the application process with several other states, and denial of its Florida application would similarly complicate those license applications by triggering a duty to report the Florida denial. There is an associated risk that a state license would not be granted based on FLOIR's denial, thus presenting additional possibility of substantial harm.

29.     On release of these news, the Company's share price fell *$6.55 per share,* from a closing price of $29.90 per share on September 8, 2017 to a close of $23.35 per share on September 11, 2017, *a drop of approximately 21.91%.*

## CLASS ACTION ALLEGATIONS

30.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all those that purchased or otherwise acquired the publicly traded shares of Health Insurance common stock during the Class Period, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

31.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Health Insurance's securities were actively traded on the NASDAQ (an open and efficient market) under the symbol "HIIQ." While the exact number

of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. As of August 01, 2017 the Company had over 12.6 million shares outstanding. Millions of Health Insurance shares were traded publicly during the Class Period on the NASDAQ. Record owners and the other members of the Class may be identified from records maintained by Health Insurance or its transfer agent, and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

32.     Plaintiff's claims are typical of the claims of the other members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

33.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

34.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)     Whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)     Whether Defendants participated in and pursued the common course of conduct complained of herein;

(c)     Whether documents, press releases, and other statements disseminated to the investing public with the Company's shareholders during the Class Period misrepresented material facts about the business, finances, financial condition and prospects of Health Insurance ;

(d)   Whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of Health Insurance;

(e)   Whether the market price of Health Insurance common stock during the Class Period was artificially inflated due to the material misrepresentations and failures to correct the material misrepresentations complained of herein; and

(f)   To what extent the members of the Class have sustained damages and the proper measure of damages.

35.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

### UNDISCLOSED ADVERSE FACTS

36.   The market for Health Insurance's common stock was open, well-developed and efficient at all relevant times. As a result of these materially false and/or misleading statements, and/or failures to disclose, Health Insurance common stock traded at artificially inflated prices during the Class Period. Plaintiff and the other members of the Class purchased or otherwise acquired Health Insurance's common stock relying upon the integrity of the market price of the Company's securities and market information relating to Health Insurance, and have been damaged thereby.

37.   During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Health Insurance 's securities, by publicly issuing false and/or misleading

statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading. Said statements and omissions were materially false and/or misleading in that they failed to disclose material adverse information and/or misrepresented the truth about Health Insurance's business, operations, and prospects as alleged herein.

38.     At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and the other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Health Insurance's financial well-being and prospects.

39.     These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its financial well-being and prospects, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and the other members of the Class purchasing the Company's common stock at artificially inflated prices, thus causing the damages complained of herein.

## LOSS CAUSATION

40.     During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the prices of Health Insurance common stock and operated as a fraud or deceit on Class Period purchasers of Health Insurance's common stock by failing to disclose to investors that the Company's financial results were materially misleading and misrepresented material information. When Defendants' misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the

prices of Health Insurance's common stock fell precipitously as the prior inflation came out of the Company's stock price. As a result of their purchases of Health Insurance's common stock during the Class Period, Plaintiff and the other Class members suffered economic loss, *i.e.* damages, under the federal securities law.

41.     By failing to disclose the true state of the Company's business prospects and operations, investors were not aware of the true state of the Company's financial status. Therefore, Defendants presented a misleading picture of Health Insurance's business and prospects. Thus, instead of truthfully disclosing during the Class Period the true state of the Company's business, Defendants caused Health Insurance to conceal the truth.

42.     Defendants' false and misleading statements caused Health Insurance's common stock to trade at artificially inflated levels throughout the Class Period. However, as a direct result of the Company's problems coming to light, Health Insurance's common stock price fell precipitously from its Class Period high. The stock price drop discussed herein caused real economic loss to investors who purchased the Company's securities during the Class Period.

43.     The decline in the price of Health Insurance's common stock after the truth came to light was a direct result of the nature and extent of Defendants' fraud finally being revealed to investors and the market. The timing and magnitude of Health Insurance 's common stock price decline negates any inference that the loss suffered by Plaintiff and the other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to the Defendants' fraudulent conduct. The economic loss suffered by Plaintiff and the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the prices of Health Insurance's securities and the subsequent decline in the value of Health

Insurance 's securities when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

## SCIENTER ALLEGATIONS

44.     As alleged herein, Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding Health Insurance, their control over, and/or receipt and/or modification of Health Insurance's allegedly materially misleading statements and/or their associations with the Company which made them privy to confidential proprietary information concerning Health Insurance, participated in the fraudulent scheme alleged herein.

45.     The ongoing fraudulent scheme described herein could not have been perpetrated over a substantial period of time, as has occurred, without the knowledge and complicity of the personnel at the highest level of the Company, including the Individual Defendants.

## APPLICABILITY OF PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET DOCTRINE)

46.     At all relevant times, the market for Health Insurance 's common stock was an efficient market for the following reasons, among others:

(a)     Health Insurance's stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b)     As a regulated issuer, Health Insurance filed periodic public reports with the SEC and/or the NASDAQ;

20

(c)     Health Insurance regularly communicated with public investors *via* established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services, and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

(d)     Health Insurance was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

47.     As a result of the foregoing, the market for Health Insurance's securities promptly digested current information regarding Health Insurance from all publicly available sources and reflected such information in Health Insurance's stock price. Under these circumstances, all purchasers of Health Insurance common stock during the Class Period suffered similar injury through their purchase of Health Insurance common stock at artificially inflated prices and a presumption of reliance applies.

48.     A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because Plaintiff's fraud claims are grounded in Defendants' omissions of material fact of which there is a duty to disclose. As this action involves Defendants' failure to disclose material adverse information regarding Health Insurance 's business practices, financial results and condition and internal controls-information that Defendants were obligated to disclose during the Class Period but did not-positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered such

21

information important in the making of investment decisions.

## NO SAFE HARBOR

49.    The federal statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

50.    In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Health Insurance who knew that the statement was false when made.

## COUNT I

### Violation of Section 10(b) and Rule 10b-5 Against All Defendants

51.    Plaintiff repeats and realleges the allegations set forth above as though fully set forth herein. This claim is asserted against all Defendants.

52.    During the Class Period, Health Insurance and the Individual Defendants, and each of them, carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and the other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Health

Insurance common stock; and (iii) cause Plaintiff and the other members of the Class to acquire or otherwise purchase Health Insurance stock at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

53.    These Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers of the Company's Securities in an effort to maintain artificially high market prices for Health Insurance securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged herein.

54.    In addition to the duties of full disclosure imposed on Defendants as a result of their making of affirmative statements and reports, or participation in the making of affirmative statements and reports to the investing public, they each had a duty to promptly disseminate truthful information that would be material to investors in compliance with the integrated disclosure provisions of the SEC as embodied in SEC Regulation S-X (17 C.F.R. § 210.01 et seq.) and S-K (17 C.F.R. § 229.10 et seq.) and other SEC regulations, including accurate and truthful information with respect to the Company's operations, financial condition and performance so that the market prices of the Company's publicly traded securities would be based on truthful, complete and accurate information.

55.    Health Insurance and the Individual Defendants, individually and in concert, directly and indirectly, by the use of means or instrumentalities of interstate commerce and/or of

the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, business practices, performance, operations and future prospects of Health Insurance as specified herein. These Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Health Insurance 's value and performance and substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Health Insurance and its business, operations and future prospects, in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of Health Insurance 's securities during the Class Period.

56. Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) each of the Individual Defendants was a high-level executive and/or director at the Company during the Class Period; (ii) each of the Individual Defendants, by virtue of his responsibilities and activities as a senior executive officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's operational and financial projections and/or reports; (iii) the Individual Defendants enjoyed significant personal contact and familiarity with each other and were advised of and had access to other members of the Company's management team, internal reports, and other data and information about the Company's financial condition and performance at all relevant times; and (iv) the Individual Defendants were aware of the Company's dissemination of

information to the investing public which they knew or recklessly disregarded was materially false and misleading.

57.     These Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were readily available to them. Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Health Insurance's operating condition, business practices and future business prospects from the investing public and supporting the artificially inflated price of its stock. As demonstrated by their overstatements and misstatements of the Company's financial condition and performance throughout the Class Period, the Individual Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were severely reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

58.     As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Health Insurance's common stock was artificially inflated during the Class Period. In ignorance of the fact that market prices of Health Insurance 's publicly-traded securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the Securities trades, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired Health Insurance 's Securities during the Class Period at artificially high prices and were or will be damaged thereby.

59.     At the time of said misrepresentations and omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiff and the other members of the Class and the marketplace known the truth regarding Health Insurance's financial results, which was not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their Health Insurance securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices that they paid.

60.     By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

61.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's Securities during the Class Period.

## COUNT II

### The Individual Defendants Violated Section 20(a) of the Exchange Act

62.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

63.     The Individual Defendants acted as controlling persons of Health Insurance within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, agency, ownership and contractual rights, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various

statements that Plaintiff contends are false and misleading. The Individual Defendants provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to have been misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or to cause the statements to be corrected.

64.     In addition, each of the Individual Defendants had direct involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

65.     As set forth above, Health Insurance and the Individual Defendants each violated §10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their controlling positions, the Individual Defendants are liable pursuant to §20(a) of the Exchange Act. As a direct and proximate result of these Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment as follows:

(a)     Declaring this action to be a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

(b)     Awarding Plaintiff and the other members of the Class damages in an amount which may be proven at trial, together with interest thereon;

(c)     Awarding Plaintiff and the other members of the Class pre-judgment and

post-judgment interest, as well as their reasonable attorneys' and experts' witness fees and other costs; and;

(d)    Awarding such other and further relief as the Court deems appropriate.

## JURY TRIAL DEMANDED

Plaintiff demands a trial by jury.

Dated: September 20, 2017

**Cullin O'Brien Law, P.A.**

/s/ Cullin O'Brien
Cullin O'Brien
6541 NE 21st Way
Ft. Lauderdale, Florida 33308
Tel: (561) 676-6370
Fax: (561) 320-0285
Email: cullin@cullinobrienlaw.com

**LEVI & KORSINSKY, LLP (Trial Counsel)**
Eduard Korsinsky
30 Broad Street, 24th Floor
New York, NY 10004
Tel: (212) 363-7500 ext. 102
Fax: (212) 363-7171
Email:ek@zlk.com

*Counsel for Plaintiff and Proposed Lead Counsel for the Class*