**UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION**

IN RE HEALTH INSURANCE INNOVATIONS
SECURITIES LITIGATION

Master Case No.: 8:17-cv-02186-EAK-MAP

(**Consolidated**)

JURY TRIAL DEMANDED

**CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATION OF FEDERAL SECURITIES LAWS**

## TABLE OF CONTENTS

I.      NATURE OF THE ACTION .................................................................................. 1

II.     SUMMARY OF THE ACTION .............................................................................. 3

III.    JURISDICTION AND VENUE ............................................................................ 13

IV.     PARTIES ............................................................................................................... 14

        A. Lead Plaintiff .............................................................................................. 14

        B. Defendants .................................................................................................. 14

V.      VIOLATIONS OF THE EXCHANGE ACT ........................................................ 20

        A. Company and Regulatory Background........................................................ 20

            1.    HIIQ's Business Model.................................................................... 20

            2.    HIIQ Has Been Repeatedly Accused of Making False and Misleading
                  Statements to State Regulators........................................................ 24

                  a. Beyond Florida........................................................................ 23

                  b. In Florida................................................................................. 32

        B. Defendants' Materially False and Misleading Class Period Statements and
           Omissions.................................................................................................... 32

            1.    Defendants' November 3, 2016 Materially Misleading Statements and
                  Omissions are Actionable ............................................................... 32

            2.    The Company's March 2, 2017 SEC Filings Contained Materially
                  Misleading Statements and Omissions ........................................... 34

            3.    The Company's March 8, 2017 Prospectus Contained Materially
                  Misleading Statements and Omissions ........................................... 36

            4.    The Company's May 4-5 2017 SEC Filings Contained Materially
                  Misleading Statements and Omissions ........................................... 37

            5.    The Company's August 3-4, 2017 SEC Filings Contained Materially
                  Misleading Statements and Omissions ........................................... 38

        C. Defendants' Class Period Sales of HIIQ Stock Were Suspicious in Timing and
           Amount ........................................................................................................ 41

VI.     LOSS CAUSATION............................................................................................. 44

        A. March 8, 2017 ............................................................................................. 45

B.  September 11-12, 2017 ....................................................................................................... 46

VII.   POST CLASS PERIOD EVENTS ........................................................................................ 49

VIII.   CLASS ACTION ALLEGATIONS ...................................................................................... 51

IX.   APPLICABILITY OF PRESUMPTION OF RELIANCE ..................................................... 53

X.   NO SAFE HARBOR ............................................................................................................. 54

XI.   PRAYER FOR RELIEF......................................................................................................... 58

XII.   JURY DEMAND ................................................................................................................... 58

*"[T]o say that the interests of [HIIQ] as an entity would be substantially affected is a radical understatement."*[1]

## I.    NATURE OF THE ACTION

1.    This is a putative class action for violation of the federal securities laws. Lead Plaintiff Robert Rector ("Plaintiff"), by and through his undersigned counsel, brings this action pursuant to the Securities Exchange Act of 1934 (the "Exchange Act"). Plaintiff's claims are brought on behalf of all persons who purchased or otherwise acquired the publicly-traded securities of Health Insurance Innovations, Inc. ("HIIQ" or the "Company") between November 3, 2016 and September 11, 2017, inclusive (the "Class Period"), and were damaged by the conduct asserted herein (the "Class").

2.    Plaintiff asserts violations of Sections 10(b) and 20(a) of the Exchange Act ("Exchange Act"), Securities and Exchange Commission ("SEC") Rule 10b-5(b) promulgated thereunder and Item 303 of Regulation S-K.  Defendants are: (i) HIIQ; (ii) HIIQ Chief Executive Officer ("CEO") Gavin T. Southwell; (iii) HIIQ Chief Financial Officer ("CFO") Michael D. Hershberger; and (iv) HIIQ Chairman and founder Michael W. Kosloske (the "Insider Defendants").

3.    Plaintiff's allegations are based upon Lead Counsel's investigation, except as to the allegations specifically pertaining to him, which are based upon his personal knowledge.  Lead Counsel's investigation included, *inter alia*, a review of: (i) HIIQ's public filings with the SEC; (ii) press releases and other public statements made by HIIQ

---

[1]    Robby H. Birnbaum, Esq., counsel for Health Insurance Innovations, Inc. (June 16, 2017).

and the Insider Defendants; (iii) analyst and media reports; (iv) publicly-available trading data regarding the Company; and (v) documents and information obtained from third parties.  Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.[2]

4.     As alleged throughout herein, during the Class Period, Defendants made materially misleading statements and/or failed to disclose, *inter alia*, that: (i) the Company had unsuccessfully applied for its critically important third-party administrator ("TPA") license ("TPA Application") with the Florida's Office of Insurance Regulation ("FLOIR") due to, *inter alia*, the state's discovery of undisclosed legal actions against HIIQ insiders; (ii) the Company privately warned FLOIR of the anticipated "domino  effect" that  the rejection would cause, by which the Company would subsequently either lose  or be denied licenses  in  other  states; (iii) the Company was omitting material information from FLOIR and disregarding FLOIR's instructions to complete the TPA Application; (iv) the TPA license denial was substantially harming the Company's ability to conduct its core business operations; (v) the Company had been accused of fraud by insurance regulators in Montana, and had suffered negative regulatory actions there as a result of the Company's misconduct; and (vi) as a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

---

[2]     Health Plan Intermediaries Holdings, LLC ("HPIH") is a subsidiary of Health Insurance Innovations, Inc. (the "Company").  "HIIQ" or the "Company" as used throughout herein includes HPIH.

## II.    SUMMARY OF THE ACTION

5.    HIIQ was founded by Defendant Kosloske in 2008 and is headquartered in Tampa, Florida.  The Company went public *via* an initial public offering ("IPO") in February 2013, and its securities trade on the NASDAQ Stock Market ("NASDAQ") under the ticker symbol "HIIQ."   The Company develops, distributes and administers short-term medical plans, hospital indemnity plans, and what the Company's filings with the SEC refer to as supplementary products such as pharmacy benefit cards, dental plans, vision plans, and life insurance policies.   HIIQ markets its products through an "internal distribution network" as well as an "external distribution network consisting of independently owned and operated" call centers. The Company describes its target market as the large and under-penetrated segment of the U.S. population who are uninsured or underinsured.

6.    A    third-party    administrator (TPA)    is    an    organization    that processes insurance claims or certain aspects of employee benefit plans for a separate entity.  The Company's Florida TPA Application, as well as its undisclosed compliance failures in other states, lies at the heart of this action.  The Company initially filed its Florida TPA Application on July 18, 2016.

7.    As HIIQ's Florida TPA application proceeded from its initial filing on July 18, 2016 to its ultimate denial on June 1, 2017, HIIQ simultaneously faced other regulatory scrutiny related to its core business operations outside of Florida.  Indeed, since 2016, the Company has come under intense public scrutiny for its relationships with third-party call centers, as consumers and state regulators have alleged that call

3

center sales agents have made false or deceptive representations to sell HIIQ's short-term insurance policies.

8.      The Company is under investigation for allegedly fraudulent business practices by **forty-two** (42) states, including Florida, involving credible allegations of serious misconduct.  According to the Company's Class Period filings with the SEC: "[t]he Indiana Department of Insurance is serving as the managing participant of the multistate examination, and the examination includes, among other things, a review of whether [ ] the Company has engaged in any unfair or **deceptive acts** or non-compliant insurance business practices. At present, forty-two states have joined the multistate examination."[3]

9.      Some of these state investigations have already culminated in public accusations of fraud and deception against HIIQ.  On March 28, 2016, for instance, the Arkansas Insurance Department issued a press release titled: "**[f]raudulent practices** alleged against Florida company" that announced a Cease and Desist Order again HIIQ. The Company was specifically accused of "**intentionally misrepresenting** the terms of an insurance contract or application for insurance" and using "**fraudulent and dishonest practices** in attempting to sell short-term health care plans" – *i.e.*, the Company's core business operation.

10.      Separately, on May 9, 2016, the Office of the Montana State Auditor, Commissioner of Securities & Insurance filed an action against the Company for "routinely" selling insurance policies "through **misinformation and deception**," and

---

[3]      All emphasis added unless otherwise noted.

characterized the Company's misconduct as a "scheme" to defraud Montana's residents. As a consequence, HIIQ's license to operate in Montana has been suspended since the Cease and Desist Order against it was entered in May 2016.

11.     Then, on July 20, 2016, buried at the bottom of a press release the Company filed on Form 8-K with the SEC announcing the departure of certain officers and/or directors, the Company disclosed that:

> In addition to the multistate examination led by Indiana, we are aware that several other states, including Arkansas, Florida, Kansas, Montana, Ohio, South Dakota, and Massachusetts, are reviewing the sales practices and potential ***unlicensed sale of insurance*** by third-party distributor call centers utilized by the Company.

12.     In an effort to reassure investors, and despite failing to disclose the sanctions against it in Montana and Arkansas in the July 20, 2016 8-K, the Company added that it was "proactively communicating and cooperating with all applicable regulatory agencies, and *[Defendant] Southwell*, with his strong skills and experience with insurance regulatory matters, ***will lead the Company's efforts in responding to and addressing any such regulatory matters***."

13.     Two days before Defendants' disclosure, the Company submitted its Florida TPA Application on July 18, 2016. Unbeknownst to investors, however, by July 25, 2016, FLOIR had ***already*** "deemed that application incomplete and returned it" to the Company.  The Company thereafter reapplied for its TPA License with FLOIR on October 28, 2016.

14.     Then, on November 18, 2016, after the start of the Class Period (on November 3, 2016), and for the first time since the Company went public in 2013,

Defendant Hershberger adopted a 10b5-1 stock trading plan.[4]  He and other insiders did so in an attempt to conceal the illicit nature of their Class Period stock sales as alleged in more detail in ¶¶ 112 - 121, *infra*.  Between November 17, 2016 and November 21, 2016, while the Company's share price was artificially inflated, Defendant Hershberger sold 39,500 shares of his personally-held common stock – about one-fifth of his holdings.

15.   On November 28, 2016, FLOIR sent HIIQ a clarification letter seeking additional material information that Defendants had omitted from their TPA Application with a response date of December 5, 2016.  On December 1, 2016, the Company requested an extension until December 12, 2016 to respond. FLOIR granted the Company's request. Inexplicably, and despite the material importance of the Company's TPA Application to HIIQ's business operations in Florida and across the country, particularly in light of Florida's investigation into the Company's "***unlicensed*** sale of insurance by third-party distributor call centers," the Company failed to timely file its response by December 12, 2016.

16.   On December 16, 2016, the Company admitted in a private letter to FLOIR that it had failed to timely reapply and "requested an unspecified extension of time to gather the remaining information."  As described in a subsequent June 1, 2017 letter from FLOIR to HIIQ, "[t]hat same day [December 16, 2016], with no action form

---

[4]      When trading plans are "entered into or strategically amended to take advantage of an inflated stock price or insider information . . . they are not a cognizable defense to scienter allegations." *La. Mun. Police Employees' Ret. Sys. v. Green Mt. Coffee Roasters, Inc.*, No. 2:11-cv-289, 2013 U.S. Dist. LEXIS 178759, at *44 (D. Vt. Dec. 20, 2013) (*quoting George v. China Auto. Sys.*, 2012 U.S. Dist. LEXIS 111730, at *25 (S.D.N.Y. Aug. 8, 2012)).

the Office granting or denying the request for an extension of time, *Applicant withdrew the application*."

17.     In response to the Company's withdrawal, FLOIR advised HIIQ in a letter dated December 16, 2016 that "until your application has been approved by the office and the appropriate licensure issued, the referenced company *should not transact business* that requires such license in this state." The Company failed to disclose this profoundly negative material development to its shareholders in any of its SEC filings during the Class Period.

18.     As alleged herein, Defendants willingly withdrew their key TPA Application with FLOIR due to their by-then legitimate concern that the Company's TPA Application would be denied.  Relatedly, Defendants also knew that the denial of their TPA Application would have, in the Company's publicly-undisclosed words, "grave attendant consequences" for the Company's operations both in and beyond Florida.  Rather than risk an outright denial by FLOIR – something Defendants knew they would have to disclose to insurance regulators in other states – Defendants instead voluntarily withdrew their TPA Application. Defendants, however, failed to make any contemporaneous public disclosure to its shareholders regarding this negative material development.

19.     Just a short time after Defendants privately withdrew the Company's TPA Application in December 2016, the Company filed a Final Prospectus on Form 424B3 with the SEC on March 8, 2017 to enable Defendant Kosloske and entities he controlled to sell shares of the Company's artificially-inflated stock to the public (the "Secondary

Offering"). According to the Company: "[a]ll such shares were offered and sold by … entities owned and controlled, directly and indirectly, by Michael Kosloske, the founder, Chief of Product Innovation, and a director of the Company. The selling stockholders will receive **all** of the net proceeds from the offering. The Company did not sell any shares in the offering."

20. Defendant Kosloske thereafter sold **three million** shares of his personally-held common stock – or **43.8%** of his total holdings – in the Secondary Offering, pocketing nearly $40 million from his suspiciously-timed insider transaction.[5] The Company's shares fell almost 10% on March 8, 2017 in response to the announcement that Defendant Kosloske – the Company's own founder – was selling nearly half of his HIIQ shares.[6]

21. A March 8, 2017 article published on the *Motley Fool* about the Secondary Offering partial fraud disclosure entitled, "Why Health Insurance Innovations Is Tumbling 10% Today," reported that "[o]n March 7, management updated investors on plans by the company's founder, Mike Kosloske, to sell 3 million shares of Class A stock in the company through a secondary offering. The offering was priced at $14 per share and **none of the proceeds of this offering will go to the company**. Kosloske moved from the CEO role to the executive chairman role at Health

---

[5]     As alleged in ¶¶ 112 – 121, *infra*, other Company insiders also sold shares of HIIQ common stock in unusual amounts and at suspicious time during the Class Period.

[6]     Courts hold that large, well-timed insider sales can constitute partial disclosures. *See Greater Pa. Carpenters Pension Fund v. Whitehall Jewellers, Inc*., 2005 U.S. Dist. LEXIS 376, *12 -*15 (N.D. Ill. 2005).

Insurance Innovations in 2015."  Market analysts covering the Company later justifiably identified Defendant Kosloske's massive sale as a key risk factor facing the Company.

22.     Just a short time after the Secondary Offering, the Company refiled its TPA Application with FLOIR on April 19, 2017.  The application appeared to be untimely because, in a December 16, 2016 email from FLOIR to the Company, FLOIR informed the Company that it could reapply without submitting new paperwork or fees "[s]o long as the application is submitted within 60 days from December 16, 2016 [*i.e.*, February 14, 2017]."

23.     Before FLOIR had made any decision regarding the renewed TPA Application, however, the Company filed a Registration Statement on Form S-3, effective May 19, 2017 ("2017 Registration Statement"), to offer and sell up to $150 million of any combination of debt securities, Class A Common Stock, Preferred Stock, Warrants, Units or Purchase Contracts to the unsuspecting public while the Company's share price remained artificially inflated.  All of the Insider Defendants signed the 2017 Registration Statement which incorporated by reference the Company's materially false and misleading: (i) Annual Report on Form 10-K for the year ended December 31, 2016 (as filed on March 2, 2017) (*see* ¶¶ 96 – 98, *infra*); and (ii) Quarterly Report on Form 10-Q for the period ended March 31, 2017 (*see* ¶ 102, *infra*).

24.     Just two weeks after filing the Registration Statement, the Company received devastating news.  In a private letter from FLOIR to Defendants sent June 1, 2017, the Company was informed that HIIQ's TPA Application had been "DENIED."

The bases for the denial included, *inter alia*, FLOIR's findings that HIIQ's application "contained numerous, material errors and omissions" and that HIIQ was "***not competent***."

25.     The denial also noted that HIIQ had misrepresented biographical information regarding Defendants Hershberger and Kosloske by failing to disclose "civil actions [against them] involving dishonesty, breach of trust, or financial dispute[s]…" The June 1, 2017 FLOIR denial also noted that the Company "has submitted a new application filing for review three times over eight months, has been provided two separate sets of clarification letters, and has been granted numerous extensions of time to submit supplemental responses."   The Company concealed these highly material developments from its shareholders ***for two months*** when the Company finally, but incompletely, acknowledged the FLOIR denial in their August 4, 2017 Quarterly Report on Form 10-Q.

26.     In a written letter to FLOIR dated June 16, 2017, the Company mischaracterized FLOIR's denial as merely a "notice proposing to deny" the Company's TPA application. In that same letter, HIIQ complained that the denial of its application would require HIIQ to report this event to other states where it operated.  In HIIQ's own words, this would then trigger a "domino effect" which could result in its losing licenses in the other states. According to HIIQ itself, therefore, the consequences of the Florida TPA license denial could be catastrophic.  HIIQ concealed this letter and its contents from its shareholders during the Class Period.

27.     More specifically, HIIQ's June 16, 2017 written appeal to FLOIR privately acknowledged the disastrous effects the denial would have on the Company's operations, writing:

> The application denial would trigger a *duty to report* (and thus raise the specter of additional denials) in many of those states as well, and every state in which [the Company] would seek to pursue any form of insurance-related licensure in the future (thus raising the specter of a *domino effect of denials* that would have to be reported); *to say that the interests of [the Company] as an entity would be substantially affected is a radical understatement*.

Defendants deliberately concealed these highly material negative facts from its own shareholders during the Class Period.

28.     On August 4, 2017, the Company filed its Quarterly Report on Form 10-Q with the SEC ("2Q17 Report") which Defendants Southwell and Hershberger signed. While the 2Q17 Report finally disclosed that FLOIR had denied the Company's key TPA Application, that disclosure was *itself* materially misleading because it failed to also reveal to investors the potentially devastating consequences Defendants contemporaneously knew the denial could have on the Company's operations.  The Company therefore deliberately understated the scope of those negative material developments to its shareholders, and did so in a manner Defendants knew would mislead the market.

29.     Then, on September 1, 2017, Defendants Southwell and Hershberger – who had signed the 2Q17 Report disclosing the denial by FLOIR just weeks earlier – both personally executed a "Declaration and Certification" under penalty of perjury with the Illinois Department of Insurance misrepresenting that the Company had never

been "refused" a TPA license, and that a "license to act as such" had never been denied "*in any state*." Given the TPA Application denial by FLOIR that Defendants Hershberger and Southwell disclosed in the 2Q17 Report just weeks earlier, this representation was false when made and Defendants Hershberger and Southwell knew it.

30. Finally, on September 11, 2017 (the last day of the Class Period), a whistleblower report about HIIQ called "Health Insurance Innovations: Penalties to Exceed $100 Million and Undisclosed Domino Effect" was published on *Seeking Alpha* publicly-disclosing for the first time that, *inter alia*, "HIIQ *privately* warns of disastrous 'domino effect' spreading to other states, causing additional loss of license. **HIIQ makes no disclosure to investors**."[7,8] (hereinafter, the "*Seeking Alpha* Report"). The negative information about the Company in the *Seeking Alpha* report proximately caused Plaintiff's losses as alleged in more detail in ¶¶ 122 – 135, *infra*.

31. Upon the release of this and related news, the Company's share price fell $6.55 per share, from a closing price of $29.90 per share on September 8, 2017 to a close at $23.35 per share on September 11, 2017 on massive volume of 9,454,100

---

[7] The article was written by financial analyst and whistleblower Richard Pearson. While Pearson has financial interests in companies he covers, he has also been credited by federal district courts for uncovering serious wrongdoing by publicly-traded companies. *See In re Galena Biopharma, Inc. Sec. Litig.*, 117 F. Supp. 3d 1145 (D. Oregon 2015); *In re CytRx Corp. Sec. Litig.*, 2015 U.S. Dist. LEXIS 91447, *10 (C.D. Cal. July 13, 2015) ("the Company's stock promotion scheme was revealed via two whistleblowers, Adam Feuerstein and Richard Pearson.").

[8] Further, given that the Company's assurance to investors on July 20, 2016 that Defendant Southwell would personally "***lead the Company's efforts in responding to and addressing any such regulatory matters***," (*see* ¶ 12, *supra*), his knowledge of the adverse developments alleged cannot be credibly disputed.

shares traded that day – a drop of approximately *21.91%*.  As the market continued to digest the negative news the following day, the Company's share price fell an additional 15.4% on September 12, 2017, again on massive trading volume as depicted in the chart below:



### III.   JURISDICTION AND VENUE

32.   The claims herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. § 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

33.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act, 15 U.S.C. § 78aa, because this is a civil action arising under the laws of the United States.

34.     Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391.   Many of the false and misleading statements were made in or issued from this District, and HIIQ's principal executive offices are located in this District.

35.     In connection with the acts, omissions, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## IV.   PARTIES

### A.     Lead Plaintiff

36.     Lead Plaintiff Robert Rector purchased HIIQ's securities during the Class Period as described in his Certification attached hereto, and as incorporated by reference herein, and suffered damages thereon.

### B.     Defendants

37.     Defendant HIIQ is a Delaware corporation incorporated on October 26, 2012. The Company became public *via* an initial public offering that closed on February 13, 2013. The terms "HII", "HPIH", and "ICE" refer to the stand-alone entities Health Insurance Innovations, Inc., Health Plan Intermediaries Holdings, LLC, and Insurance

Center for Excellence, LLC, respectively.  The Company's common shares trade on the NASDAQ under the ticker symbol "HIIQ."

38.     The Company claims to be a developer, distributor and cloud-based administrator of affordable individual health and family insurance plans ("IFP") which include short-term medical insurance plans, and guaranteed-issue and underwritten hospital indemnity plans. The Company also claims to develop, distribute and to administer supplemental products which include a variety of additional insurance and non-insurance products such as pharmacy benefit cards, dental plans, vision plans, cancer/critical illness plans, deductible and gap protection plans, and life insurance policies that are frequently purchased as supplements to IFP.

39.     Gavin D. Southwell has served as HIIQ's Chief Executive Officer since November 2016, and served as its President since July 2016. The Company's filings with the SEC represented at all relevant times that Defendant Southwell's detailed knowledge and extensive insurance background, including that having worked in senior executive positions for a broker, managing general underwriter, insurer and reinsurer, "makes him a valuable member of the Board."

40.     During the Class Period, Defendant Southwell signed HIIQ's materially false and misleading: (i) Annual Report on Form 10-K for the fiscal year ended December 31, 2016 that HIIQ filed with the SEC on March 2, 2017 ("2016 Annual Report"); (ii) Quarterly Report on Form 10-Q for the quarterly period ended March 31, 2017 that HIIQ filed with the SEC on May 4, 2017 (the "1Q17 Report"); (iii) Registration Statement on Form S-3 that HIIQ filed with the SEC on May 5, 2017

("2017 Registration Statement"); and (iv)  Quarterly Report on Form 10-Q for the quarterly period ended June 30, 2017 that HIIQ filed with the SEC on August 4, 2017 (the "2Q17 Report").

41.     During the Class Period, Defendant Southwell also certified the Company's periodic Class Period financial reports filed with the SEC under the Sarbanes-Oxley Act of 2002, and regularly spoke with investors and securities analysts about the Company during conference calls and investor presentations.

42.     Because of his senior position with the Company, Defendant Southwell possessed the power and authority to control the contents of press releases, investor and media presentations and all filings HIIQ made with the SEC during the Class Period.

43.     Michael D. Hershberger was appointed as the Company's Chief Financial Officer on September 16, 2015. Previously, he served as interim Chief Financial Officer and had been HIIQ's Senior Vice President of Finance and Business Development since November 2013.

44.     During the Class Period, Defendant Hershberger signed the Company's materially false and misleading: (i) Quarterly Report on Form 10-Q for the quarterly period ended September 30, 2016 that HIIQ filed with the SEC on November 3, 2016 (the "3Q16 Report"); (ii) press release on Form 8-K that HIIQ filed with the SEC on March 2, 2017; (iii) Final Prospectus Supplement on Form 424B3 that HIIQ filed on March 8, 2017; (iv) 2016 Annual Report; (v) 1Q17 Report; (vi) 2017 Registration Statement; (vii) 2Q17 Report; and (vii) press release on Form 8-K that the Company filed with the SEC on August 3, 2017.

45.     During the Class Period, Defendant Hershberger also certified the Company's periodic Class Period financial reports filed with the SEC under the Sarbanes-Oxley Act of 2002, and regularly spoke with investors and securities analysts about the Company during conference calls and investor presentations.

46.     Because of his senior position with the Company, Defendant Hershberger possessed the power and authority to control the contents of press releases, investor and media presentations and all filings HIIQ made with the SEC during the Class Period.

47.     Michael W. Kosloske, HIIQ's founder, currently serves as Chief of Product Innovation and as a member of the Board of Directors. Previously, Defendant Kosloske served as HIIQ's President and Chief Executive Officer since the Company began operations in 2008 until 2015, and as Chairman from 2012 to 2016. Defendant Kosloske is married to HIIQ's Chief Broker Compliance Officer, Lori Kosloske.

48.     During the Class Period, Defendant Kosloske signed the materially false and misleading 2016 Annual Report and 2017 Registration Statement.

49.     The defendants referenced in ¶¶ 39 – 48, *supra*, are collectively referred to herein as the "Insider Defendants."

50.     Because of their positions with the Company, the Insider Defendants possessed the power and authority to control the content and form of HIIQ's Registration Class Period SEC filings, press releases and presentations to the SEC, securities analysts, money and portfolio managers and investors (*i.e.*, the market).  They were provided with copies of the SEC filings alleged herein to be misleading prior to

their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected.

51.     Because of their positions with the Company and their access to material non-public information available to them but not to the public, the Insider Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were materially false and misleading.

52.     The Insider Defendants each made materially false and misleading statements during the Class Period by speaking on earnings conference calls, signing the Company's SEC filings and/or making presentations to investors.  At all relevant times, the Insider Defendants possessed the power and authority to control the contents of HIIQ's press releases, investor and media presentations and SEC filings.  The Insider Defendants were also intimately involved with and aware of, or deliberately disregarded, all aspects of the Company's operations.

53.     At all relevant times, each of the Insider Defendants had access to the adverse undisclosed information about HIIQ's business, operations and practices through access to internal corporate documents, conversations and contact with other corporate officers and employees, attendance at meetings and through reports and other information provided to them.  The Insider Defendants were directly involved in the day-to-day operations of HIIQ at its highest levels.  They each bear responsibility for the accuracy of the public reports and press releases detailed herein, and are therefore primarily liable for the misrepresentations and omissions contained therein.

18

54.     The Insider Defendants also each substantially participated in and had exclusive authority and control over the content of HIIQ's false and misleading statements and how they were communicated to investors.  They also engaged in conduct in furtherance of a fraudulent scheme and course of business and were involved in the preparation and dissemination of HIIQ's materially false and misleading statements, all of which made it necessary or inevitable that material misrepresentations and omissions would be communicated to, and mislead, investors.  Defendants' scheme deceived the investing public regarding HIIQ's operations and the intrinsic value of HIIQ's securities, and caused Plaintiff and other members of the Class to be damaged as a result of their purchases of the Company's securities at artificially inflated prices.

55.     The federal securities laws required the Insider Defendants not to falsify HIIQ's SEC filings and prohibited them from using the instrumentalities of interstate commerce or the mails to: (i) employ any device, scheme, or artifice to defraud; (ii) make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (iii) engage in any act, practice, or course of business which operates or would operate as a fraud upon any person.  Their conduct violated the Exchange Act and SEC regulations promulgated thereunder in connection with the purchase or sale of HIIQ's securities.

56.     The Company's press releases and SEC filings were group-published documents, representing the collective actions of the Company management.  The Insider Defendants were involved in drafting, producing, reviewing and/or

disseminating the false and misleading statements and information alleged herein, were aware, or recklessly disregarded, that the false and misleading statements were being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

57.     The Insider Defendants were well-aware of their disclosure obligations under the Company's own Code of Business Conduct and Ethics ("Code") which provides that the Insider Defendants have "a responsibility to provide full and accurate information in our public disclosures, in all material respects, about the Company's financial condition and results of operations. Our reports and documents filed with or submitted to the Securities and Exchange Commission and our other public communications shall include full, fair, accurate, timely and understandable disclosure." Moreover, the Insider Defendants knew that they were required to "comply with all of the provisions of this Code." As alleged throughout herein, they failed to comply with either the Code or their federal securities law obligations.

## V.     VIOLATIONS OF THE EXCHANGE ACT

### A.     Company and Regulatory Background

#### 1.     HIIQ's Business Model

58.     HIIQ is a Delaware company whose operations are centered in Florida. It is a holding company whose sole asset is a 35% stake in the "aggregate membership interests" of Health Plan Intermediaries, Holdings LLC ("HPIH"). "Health Insurance Innovations, Inc." is also registered as a fictitious name of HPIH. At the time of the February 2013 IPO, HIIQ's "only business" was to act as the "sole managing member of Health Plan Intermediaries Holdings, LLC."

59.     HIIQ's SEC filings describe the Company as a "developer and administrator" of individual health plans and ancillary products, who "design[s] and structure[s] insurance products on behalf of insurance carrier companies" and "market[s] them to individuals." HIIQ targets "the large and under-penetrated segment of the U.S. population who are uninsured or underinsured," which includes "new graduates, divorcees, early retirees, military discharges, the unemployed, part-time and seasonal employees and temporary workers."

60.     A distribution network of HIIQ-owned websites and about 100 third-party call centers sell insurance products underwritten by insurance companies. HIIQ collects payments from customers on behalf of insurance companies and remits commissions to the third-party call center that sold the customer the policy. HIIQ also acts as a third-party administrator (TPA) that functions as a middleman between health insurers and customers looking for affordable health insurance plans. The short-term medical policies, ancillary insurance, and health benefit plans HIIQ administers are sold outside of the Affordable Care Act ("ACA") marketplace, and therefore are not considered qualifying health coverage under the ACA.

61.     The Company markets "affordable alternatives" to health plans available on the government exchanges. Because these products are sold outside the ACA marketplaces, they do not have to comply with many key ACA regulations. For example, they are not required to comply with the ACA's requirement to cover pre-existing conditions. To the extent that some states may require some coverage of pre-

existing conditions, HIIQ has promised investors that their customer base "substantially [] has no covered pre-existing conditions."

62.    A customer can purchase an HIIQ-administered policy *via* one of two channels: (i) through a call center; or (ii) on a website owned by the Company. The customer then pays premiums and an enrollment fee to HIIQ, which transfers the premium payment to the underwriting insurer and keeps the enrollment fee. HIIQ also pays the commission to the agent who sold the policy, which originates from the underwriting insurer. HIIQ advances the commission to the third-party call center in the form of a secured loan (below is a diagram of the relationship):



63.    At all relevant times, the Company acknowledged that "state regulators require us to maintain a valid license in each state in which we transact health insurance business and further require that we adhere to sales, documentation and administration practices specific to each state."

64. HIIQ sought and obtained licenses to operate as a third party administrator from a number of states long before it did so in Florida. For example, it applied for a TPA license in the state of Illinois in 2012, wherein it disclosed that it was not licensed it in its home state of Florida. HIIQ did not seek a TPA license from the state of Florida, where the business is headquartered, until July of 2016.

65. HIIQ went public pursuant to an IPO on February 7, 2013. Prior to the IPO, on December 6, 2012, the SEC informed Defendants that "[i]t is *not appropriate* to imply that you are not liable for statements included in your registration statement. Please delete these statements or specifically state that you are responsible for the referenced information." The SEC was concerned that the Company's draft prospectus inappropriately represented that the Company was not responsible for some of the information it presented as follows:

> This prospectus includes industry and market data that we obtained from periodic industry publications, third-party studies and surveys, filings of public companies in our industry and internal company surveys. These sources include government and industry sources. Industry publications and surveys generally state that the information contained therein has been obtained from sources believed to be reliable. Although we believe the industry and market data to be reliable as of the date of this prospectus, *this information could prove to be inaccurate*. Industry and market data *could be wrong* because of the method by which sources obtained their data and because information cannot always be verified with complete certainty due to the limits on the availability and reliability of raw data, the voluntary nature of the data gathering process and other limitations and uncertainties. In addition, *we do not know* all of the assumptions regarding general economic conditions or growth that were used in preparing the forecasts from the sources relied upon or cited herein.

66.     On December 12, 2012, the Company acknowledged its attempted sleight of hand and informed the SEC that the "Company acknowledges the Staff's comment and has ***deleted these statements***."

### 2.     HIIQ Has Been Repeatedly Accused of Making False and Misleading Statements to State Regulators

#### a.     Beyond Florida

67.     At all relevant times, HIIQ has misleadingly represented to the market that it had market-leading compliance.  In truth, and as set forth throughout herein, the Company's compliance failures with state regulators has harmed the Company, its prospects and damaged HIIQ's shareholders.

68.     On March 28, 2016, for instance, the Arkansas Insurance Department ("Arkansas") issued a press release titled: "[f]raudulent practices alleged against Florida company" that announced a Cease and Desist Order again HIIQ.  More specifically, Arkansas accused the Company of "intentionally misrepresenting the terms of an insurance contract or application for insurance" and using "fraudulent and dishonest practices in attempting to sell short-term health care plans" – namely, the Company's core business operations.[9]  The press release announcing the Cease and Desist Order is represented below:

---

[9]     During a business update call with investors on September 11, 2017, Defendant Southwell represented that the Arkansas action against HIIQ "is a closed item."

**PUBLISHED:** March 28, 2016

## Kerr Issues Cease & Desist Order

### *Fraudulent practices alleged against Florida company selling health plans to Arkansans*

**LITTLE ROCK** – Arkansas Insurance Commissioner Allen Kerr today released the following statement regarding a Cease and Desist Order issued against Health Plan Intermediaries Holdings, LLC., dba Health Insurance Innovations (HII), a Tampa, Florida-based company, over allegations the company has used fraudulent and dishonest practices in attempting to sell short-term health care plans to Arkansans, claiming the plans were compliant with the Affordable Care Act:

"The Arkansas Insurance Department takes very seriously its charge to protect Arkansas consumers from fraud.  We will not allow unlicensed individuals to prey upon our neighbors with non-compliant health insurance plans under the promise of avoiding a tax penalty."

The Cease and Desist Order requires HII and its affiliates to immediately stop the sale, solicitation, or advertising of any health plans or medical insurance using unlicensed agents, and stop intentionally misrepresenting the terms of an insurance contract or application for insurance.  The order can be read here.

AID investigators engaged in a phone call with an HII employee who offered insurance plans, and provided price quotes for HII products, despite admitting he was not a licensed insurance agent.  Additionally, several company representatives made misleading statements to investigators about two HII short-term health plans, "HealtheFlex" and "Principal Advantage Plan," that they were ACA-compliant plans that would allow a consumer to avoid receiving a tax penalty.

69.     On May 9, 2016, HIIQ was issued a temporary Cease and Desist Order by the State of Montana which directed the Company to "***cease and desist*** from selling negotiating, transacting, administering, or otherwise take part in or benefit from any insurance transaction in, to, or from Montana, or attempt to do any of the same." The Company's health insurance producer license has been suspended in Montana since the time of Montana's action against it, and the Company is currently not permitted to operate there.

70.     In a Notice of Proposed Hearing issued the same day as the Cease and Desist Order, the Office of the Montana State Auditor alleged that the HIIQ entities "enrolled thousands of Montanans in short term medical plans, and HII[Q] received at least $449,000 in administrative fees and another $54,000 in premium [between January 1, 2012 and April 20, 2015]" and that "[n]one of the HII[Q] entities have ever been

25

certified as administrators in Montana, or have requested or received waiver of the certification requirement."

71.    Throughout the Montana action, the Montana State Auditor refers to the Defendants' fraud as "the HII scheme." The Montana fraud complaint also specifically highlighted HIIQ's role in the scheme, without any mention of the "two dozen" other entities misleadingly emphasized by HIIQ in its Class Period SEC filings to downplay the significance of these regulatory sanctions against it:



72.    The following month, on June 8, 2016, the Commissioner of the Indiana Department of Insurance issued an Examination Warrant to HIIQ indicating that the Market Actions Working Group of the National Association of Insurance Commissioners had accepted a request for a review of "HII sales, marketing and

administration of short term medical plans and ACA plans" between March 23, 2010 through April 30, 2016. That review was to be conducted in conjunction with a multistate examination of HCC Life Insurance Company, one of HIIQ's previously affiliated insurers.

73. Then, in September 2016, the Company filed an application to renew its third party administrator license in Illinois. The application specifically asked whether HIIQ had ever been "refused a license to act as a Third Party Administrator, agent, producer, or solicitor, or has a license to act as such ever been denied, suspended, revoked, or surrendered for regulatory reasons in any state either as an individual or as a member of entity?" Despite the fact that Montana had suspended HIIQ's license just six months prior – Defendant Hershberger signed his name to an application under penalty of perjury indicating that the answer was "no."

74. On October 31, 2016 the Company filed an application for a third party administrator license with the Montana CSI. There, Defendants Southwell and Hershberger signed notarized affidavits stating that, to their knowledge, they had never been an officer of a company that "[h]ad its permit, license, or certificate of authority suspended, revoked, canceled, non-renewed, or subjected to any judicial, administrative, regulatory, or disciplinary action . . ." Notably, Defendant Kosloske answered the question affirmatively, saying that he had been in such a position, but did not provide any details in the follow-up question asking for explanation.

75.     The attestations by Defendants Southwell and Hershberger were materially misleading because they were officers of HPIH which had been the subject of at least three regulatory actions that year alone – including in the state of Montana.[10]

76.     On March 6, 2017, the commissioner of the Indiana Department of Insurance issued a Modified Examination Warrant to HIIQ that expanded the forty-two state examination against the Company. The Modified Examination Warrant notified HIIQ that "the Examination is hereby modified to include a review of Health Insurance Innovation Inc., and its affiliates, parents, subsidiaries and assigns (collectively "HII")'s marketing, sales, administration and claims payment of insurance products for all insurance carriers, agencies, sub-agencies, agents, sub-agents, producers, contractors and other parties with whom HII conducted business."

77.     Then, on September 1, 2017, the Company filed an application to renew its third party administrator license in the state of Illinois.  The application asked: "[h]ave you been refused a license to act as a Third Party Administrator, agent, broker, producer, or solicitor, or has a license to act as such ever been denied, suspended, revoked, or surrendered for regulatory reasons in any state either as an individual or as a member of entity?"  Despite the fact that their license was still suspended in Montana and that they had recently been denied a license in their home state of Florida, Defendants Gavin Southwell and Michael Hershberger signed their names to an application indicating that the answer to this question was "no."

---

[10]     While Defendant Hershberger signed his Affidavit on June 2, 2016 - *i.e.* before the Indiana warrant was filed, he still would have been aware of the Montana and Arkansas actions.

78.     As herein alleged, the Company's failure to provide the information requested was a deliberate attempt to delay the agency's scrutiny as well as mislead investors and state insurance regulators.

### b.     In Florida

79.     The Company initially filed its Florida TPA Application on July 18, 2016.   On July 20, 2016, the Company revealed that it was under investigation in Florida for its "sales practices" and "unlicensed sale of insurance by third-party distributor call centers utilized by the Company."   Subsequently, after FLOIR issued clarification letters seeking additional or missing information from Defendants, on December 1, 2016 the Company requested an extension to respond until December 12, 2016.  FLOIR granted this request.

80.     Defendants failed to timely respond.  Instead, on December 16, 2016 the Company acknowledged in a private letter to FLOIR that it had not yet responded to all the requests for clarification and requested another extension. Later that day, the Company withdrew its application.  In response to the Company's withdrawal, FLOIR advised the Company in a letter dated December 16, 2016 that "until your application has been approved by the office and the appropriate licensure issued, the referenced *company should not transact business that requires such license in this state*." The Company did not contemporaneously disclose the existence of this highly material order.

81.     FLOIR also advised Defendants that the Company's TPA Application could be effectively reinstated without incurring additional fees if the Company resubmitted its application within sixty days of December 16, 2016 (February 14, 2017).

82.     After the Company ultimately refiled its TPA Application on April 19, 2017, FLOIR denied it on June 1, 2017 deeming HIIQ "not competent," and finding that the Company "failed to correct errors or omissions in the application and did not supply additional information when requested by [FLOIR]."[11]   FLOIR's June 1, 2017 denial added that the Company's TPA Application errors and omissions were "material." FLOIR also determined that the Company had attempted to mislead it by concealing lawsuits against Defendants Kosloske and Hershberger "involving dishonesty, breach of trust or a financial dispute."

83.     FLOIR also noted that over the "extended period" during which the Company submitted a new application filing three times over an eight month period, during which the agency provided two separate sets of clarification letters, the Company still failed to provide information the agency had repeatedly requested.  The Company failed to provide details on the premiums collected and paid out by the insurance companies it worked with, and failed to provide information explaining its affirmative answer to the question asking if HIIQ had ever had a permit, license, or certificate of authority suspended, revoked or cancelled.

---

[11]     Defendants were informed of the denial and the reasons for it by their outside counsel at Greenspoon Marder no later than June 4, 2017.

84.     Further, the Company answered "no" in response to a question asking whether Defendant Kosloske had been a party to "any civil action involving dishonesty, breach of trust, or a financial dispute." When an independent audit by FLOIR revealed that he in fact had been named in two Florida state actions, the Company still failed to provide information requested about their nature and final disposition.

85.     The Company similarly answered "no" in response to a question asking whether Defendant Hershberger had been a party in the last ten years to "any civil action involving dishonesty, breach of trust, or a financial dispute." When a background report revealed that he had been named in two Wisconsin state actions, the Company again failed to provide information requested about their nature and final disposition.

86.     In a June 16, 2017 letter to FLOIR purporting to appeal the denial of its TPA Application, the Company represented that it had TPA licenses in "over twenty states where such licensure is required" and complained that many states require license applicants to disclose if a license has been suspended, revoked or denied in another jurisdiction.  The Company added that: "*to say that the interests of [the Company] as an entity would be substantially affected is a radical understatement*."

B.     **Defendants' Materially False and Misleading Class Period Statements and Omissions**

1.     **Defendants' November 3, 2016 Materially Misleading Statements and Omissions are Actionable**

87.    The Class Period commences on November 3, 2016.  That day, the Company filed its 3Q16 Report with the SEC which Defendant Hershberger signed.[12]  The 3Q16 Report represented that, as of the date it was filed: "[t]here were ***no material changes*** to the risk factors disclosed in our Annual Report on Form 10-K for the year ended December 31, 2015, other than the following new risk factor…"[13]  The Company's 2015 Annual Report on Form 10-K was filed with the SEC on March 8, 2016.

88.    The 3Q16 Report also represented that "[w]e are aware that several other states, including Arkansas, Florida, Kansas, ***Montana***, Ohio, South Dakota, Texas and Massachusetts, are ***reviewing*** the sales practices and potential unlicensed sale of insurance by third-party distributor call centers utilized by the Company…"

89.    The statements alleged in ¶¶ 87 – 88, *supra*, were materially misleading when made because: (i) Defendants knew or deliberately disregarded that, between the filing of the 2015 Annual Report on March 8, 2016 and the filing on the 3Q16 Report on November 3, 2016, material developments had occurred regarding the Company's operations that did

---

[12]    Patrick R. McNamee, who was appointed President of the Company in June 2015, and was named Chief Executive Officer of the Company and elected to the Board of Directors of the Company in November 2015, also signed the 3Q16 Report.  While not presently named as a Defendant, Mr. McNamee was suddenly removed as the Company's CEO in November 17, 2016, a short time after the 3Q16 Report was filed and as the Company's TPA Application with FLOIR began facing significant obstacles.

[13]    The only newly disclosed risk factor involved a new short-term medical insurance rule by the Internal Revenue Service, the Employee Benefits Security Administration, and the U.S Department of Health and Human Services that could impact the Company's revenues.

pose a risk to investors, including the fact that the state of Montana had moved far beyond merely "reviewing" the Company's sales practices.

90.     In fact, in May 2016, the State of the Montana action accused the Company of engaging in "misinformation and deception" and entered a Cease and Desist Order against it requiring it to "immediately cease and desist from selling, negotiating, transacting, administering, or otherwise take part in or benefit from any insurance transaction in, to or from Montana…"  Moreover, the Cease and Desist Order summarily suspended all the Company's Montana insurance license pending a hearing.  Specifically, on May 9, 2016, the Office of the Montana State Auditor, Commissioner of Securities & Insurance filed an action against the Company for "routinely" selling insurance policies "through misinformation and deception," and characterized the Company's misconduct as a "scheme" to defraud Montana's residents.

91.     The 3Q16 Report was also materially misleading because it contained a signed certification pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendant Hershberger stating that the information contained in the 3Q16 Report was accurate. Defendant Southwell was also aware of these negative material facts, because, on July 20, 2016, the Company represented that "[Defendant] Southwell … *will lead the Company's efforts in responding to and addressing any such regulatory matters*."[14]

---

[14]     In an August 9, 2016 earnings call, Defendant Hershberger announced that Mr. Southwell had been promoted to President saying that Mr. Southwell had a "significant amount of expertise" in state regulatory matters and would be "responsible for sales, marketing distribution and operations."

92.     Defendant Hershberger participated in an earnings call on November 3, 2016, to discuss the 3Q16 quarterly results.  At no time during that call did Defendant Hershberger (or Mr. McNamee) disclose the existence of the negative developments in Montana.

**2.      The Company's March 2, 2017 SEC Filings Contained Materially Misleading Statements and Omissions**

93.     On March 2, 2017, the Company filed a press release with the SEC on Form 8-K reporting the Company's Fourth Quarter and Fiscal 2016 Financial and Operating Results ("March 2017 8-K").  The March 2017 8-K was signed by Defendant Hershberger. Defendants either knew or deliberately disregarded that the March 2017 8-K's "Regulatory Update" section was materially misleading because it failed to disclose that, in December 2016, the Company had withdrawn its Florida TPA application due to numerous failures on the Company's part to accurately complete it.

94.     Defendants either knowingly or with deliberate recklessness also failed to disclose in the March 2017 8-K the material fact that, in response to the Company's withdrawal on December 16, 2016, FLOIR advised the Company that "until your application has been approved by the [FLOIR] and the appropriate licensure issued, the referenced ***company should not transact business that requires such license in this state***."  Defendant Southwell was clearly aware of this negative material fact because, on July 20, 2016, the Company represented that "[Defendant] Southwell … ***will lead the Company's efforts in responding to and addressing any such regulatory matters***."

95.     The March 2017 8-K also represented that: "[i]n addition to the multistate examination led by Indiana, we are aware that several other states, including Arkansas,

Florida, Kansas, Massachusetts, **Montana**, Ohio, South Dakota, and Texas are **reviewing** alleged non-compliance with sales practices, non-compliance with insurance laws, and/or unlicensed sale of insurance by third-party distributor call centers utilized by the Company." This statement was materially misleading when made for the same reasons set forth in ¶¶ 89 – 92, *supra*.

96.     On March 2, 2017, the Company also filed its Annual Report on Form 10-K for fiscal year 2016 with the SEC ("2016 Annual Report").  The 2016 Annual Report was signed by Defendants Southwell, Hershberger and Kosloske.

97.     There, Defendants represented that: "[i]n addition to the multistate examination, the Office of the Montana State Auditor, Commissioner of Securities and Insurance ("CSI") has initiated an administrative action against us." While Defendants finally acknowledged the material fact that their license had been suspended in Montana (**nine months after the fact**), the 2016 Annual Report was materially misleading when made because Defendants either knowingly or with deliberate recklessness failed to disclose that the Montana CSI had accused the Company of engaging in a fraudulent "scheme" against Montana's residents.

98.     Again, Defendant Southwell cannot credibly deny his knowledge of these negative, undisclosed material facts, because, on July 20, 2016, the Company represented that "[Defendant] Southwell … **will lead the Company's efforts in responding to and addressing any such regulatory matters**."

35

3.    **The Company's March 8, 2017 Prospectus Contained Materially Misleading Statements and Omissions**

99.    On March 8, 2017, Defendants filed a Final Prospectus Supplement on Form 424B3 with the SEC announcing that the "selling stockholders identified in this prospectus supplement are offering 3,000,000 shares of our Class A common stock, which are to be issued upon the exchange of an equivalent number of Series B Membership Interests (together with an equal number of shares of our Class B common stock) of Health Plan Intermediaries Holdings, LLC."  The Company announced the pricing of the underwritten Secondary Offering at a price to the public of $14.00 per share which was expected to close on March 13, 2017.

100.    All shares in the Secondary Offering were offered and sold by entities owned and controlled, directly and indirectly, by Defendant Kosloske who received all of the net proceeds from the Secondary Offering.  The Company did not sell any shares in the Secondary Offering. As the selling stockholder, Defendant Kosloske received *all* of the net proceeds from the offering.  The Company's share price fell on March 8, 2017 to close at $15.65 from the prior day's closing price of $17.35 – a drop of 9.8% -- in response to the announcement of the Secondary Offering.

101.    The Prospectus was materially misleading because it incorporated by reference the materially misleading: (i) 2016 Annual report; and (ii) March 2017 8-K as alleged in ¶¶ 93 – 95, *supra*.  Defendant Southwell was also aware of these negative material facts, because, on July 20, 2016, the Company represented that "[Defendant] Southwell … *will lead the Company's efforts in responding to and addressing any such regulatory matters*."

36

### 4. The Company's May 4-5 2017 SEC Filings Contained Materially Misleading Statements and Omissions

102. On May 4, 2017 HIIQ filed its Quarterly Report on Form 10-Q with the SEC for the quarterly period ended March 31, 2017 ("1Q17 Report") which Defendants Southwell and Hershberger signed. The 1Q17 Report was materially misleading for the same reasons alleged in ¶¶ 87 – 101, *supra*.

103. On May 5, 2017 the Company filed a Registration Statement on Form S-3, effective May 19, 2017 ("2017 Registration Statement"), to offer and sell up to $150 million of any combination of debt securities, Class A Common Stock, Preferred Stock, Warrants, Units or Purchase Contracts to the unsuspecting public. All of the Insider Defendants signed the 2017 Registration Statement which incorporated by reference the Company's materially false and misleading: (i) Annual Report on Form 10-K for the year ended December 31, 2016 (as filed on March 2, 2017) (*see* ¶¶ 96 – 97, *supra*); and (ii) Quarterly Report on Form 10-Q for the period ended March 31, 2017 (*see* ¶ 102, *supra*).

104. Approximately one month after filing the Registration Statement, Defendants were informed on June 4, 2017 that HIIQ's TPA Application had been denied by FLOIR on June 1, 2017 and the reasons for the denial. The bases for the denial included, *inter alia*, the FLOIR's conclusions that HIIQ's application "contained numerous, material errors and omissions" and that HIIQ was "not competent." The Company failed to immediately report this material negative development in a Form 8-K under Item 8.01 (or otherwise) for "events that … the registrant considers to be of importance to security holders." Instead, the Company waited to do so – and only partially – several months later in August 2017. *See* ¶¶ 105 - 111, *infra*.

37

5.   **The Company's August 3-4, 2017 SEC Filings Contained Materially Misleading Statements and Omissions**

105.   On August 3, 2017, the Company filed a press release on Form 8-K with the SEC that Defendant Hershberger signed.  *See* n. 15, *infra*.  On August 4, 2017, HIIQ filed its Quarterly Report with the SEC on Form 10-Q for the quarterly period ended June 30, 2017 ("2Q17 Report") which Defendants Southwell and Hershberger signed.   In addition, Defendants Southwell and Hershberger executed certifications pursuant to the Sarbanes Oxley Act of 2002 attesting to the accuracy of the 2Q17 Report.

106.   The 2Q17 Report represented in relevant part that:

Many states have statutes that require the licensure of third-party insurance administrators ("TPA"). The statutes and applicable regulations vary from state-to-state with respect to the nature of the business activities that may require licensure. Where the Company believes that statutes are unclear or open to interpretation, it takes the prudent approach of applying for a TPA license. Therefore, the Company applied for a TPA license with the Florida Office of Insurance Regulation ("OIR"). In June 2017, the OIR denied the Company's application based on its determination that the Company ***had not yet provided all information required to process the application***. In June 2017, the Company appealed the denial with the Florida Division of Administrative Hearings. A final hearing on the matters has been scheduled for October 17-20, 2017, but the Company is working with the OIR to reach a mutually agreeable resolution of the matter prior to the hearing, ***including discussing whether the OIR will require the Company to hold such a license at all***.

107.   Defendants either knew or deliberately disregarded that the statements in ¶106, *supra*, were materially misleading when made because they: (i) misrepresented the necessity of obtaining a TPA license by the Company in Florida, including the fact that in December 2016 FLOIR warned the Company that it "***should not transact business that requires such license in this state***"; (ii) failed to disclose that the Company had already received TPA licenses in a number of jurisdictions – including in Indiana which required

licensing in an applicant's home state – in HIIQ's case, Florida; and (iii) that FLOIR had denied HIIQ's TPA Application because FLOIR determined that the Company had made material misstatements in its application and found it "not competent."

108.   In addition, the 2Q17 Report was materially misleading because Defendants either intentionally or with deliberate recklessness concealed the severe consequences of FLOIR's denial of the Company's TPA Application on the Company's operations and future prospects.  Similarly, the Company's August 3, 2017 8-K was materially misleading because it failed to make *any* mention of the FLOIR denial which enabled the Company to conceal the denial during its subsequent August 3, 2017 conference call with analysts and investors. The Company's share price accordingly rose that day from an open of $28.90 per share to a close of $29.60 per share as a result of Defendants' concealment.[15]

109.   Further, while the Company stated in the 2Q17 Report that it had "appealed the denial" and that "the OIR denied the Company's application based on its determination that the Company *had not yet provided all information* required to process the application,"

---

[15]   Further, and notably, while the Company's other Class Period press releases on Form 8-K announcing quarterly results contained a "Regulatory Update" section, the August 3, 2017 8-K did not include a "Regulatory "Update" section.  Worse, the Company's prior two Class Period conference calls discussing quarterly results occurred *the same day, not before* the Company had filed its Quarterly Reports on Forms 10-Q.  Accordingly, analysts covering the Company – including Northland Capital Markets, Craig-Hallum Capital Group LLC and Lake Street Capital Markets – issued research reports about HIIQ on August 3, 2017 that bullishly increased their price targets for the Company due in part to the fact that they were unaware of the FLOIR denial.  Lake Street Capital Markets rated the Company a buy and increased the Company's price target to $37.00 per share to $28.00 per share.  Craig-Hallum Capital Group also rated the Company a buy and increased the Company's price target from $27.00 per share to $38.00 per share.  Northland Capital Markets similarly increased the Company's price target from $27.00 per share to $37.00 per share.

they deliberately failed to disclose that HIIQ's written appeal dated June 16, 2017 privately acknowledged that:

> The application denial would trigger a duty to report (and thus raise the specter of additional denials) in many of those states as well, and every state in which [the Company] would seek to pursue any form of insurance-related licensure in the future (thus raising the specter of a domino effect of denials that would have to be reported); to say that the interests of [the Company] as an entity would be substantially affected is a radical understatement.

110. Even when questioned **specifically** about the Company's regulatory compliance status during the Company's August 3, 2017 earnings conference call with investors and analysts, Defendant Southwell failed to disclose the truth. There, analyst Richard Collamer Close asked Defendant Southwell to "go into more details" about the Company's "efforts on improved compliance," noting that "obviously, there you have outstanding litigation and I guess regulatory oversight here . . ." In response, Defendant Southwell misleadingly downplayed the regulatory issues the Company then faced as "a lot of noise . . . that comes from kind of historic items." But there was nothing historic about the FLOIR rejection. As evidenced by the desperate language contained in the Company's June 16, 2017 appeal to FLOIR and their misleading statements in the Illinois and Montana applications, the Florida rejection was a serious and imminent threat to the Company's operations and Defendant Southwell knew it as the person charged with leading the Company's efforts to address HIIQ's Class Period regulatory scrutiny.

111. In sum, the 2Q17 Report was materially misleading because it misrepresented that: (i) the Company's critically important TPA license with FLOIR had been denied due to, *inter alia*, Florida's discovery of undisclosed legal actions against HIIQ insiders and finding that HIIQ was "not competent"; (ii) the Company privately warned FLOIR of the

40

anticipated "domino effect" that the rejection was likely to cause, by which the Company would subsequently lose licenses in other states; (iii) the Company had intentionally omitted material information and disregarded the FLOIR's instructions to complete the TPA Application; (iv) the TPA license denial adversely affected the Company's other licenses and future license applications; (v) the denial was substantially harming the Company's ability to conduct its core business operations; and (vi) as a result, the Company's public statements in the 2Q17 Report were materially false and misleading.

### C.   Defendants' Class Period Sales of HIIQ Stock Were Suspicious in Timing and Amount

112.   As a result of Defendants' intentional or deliberately reckless materially misleading statements and omissions alleged in ¶¶ 87 – 111, *supra*, HIIQ's stock price soared during the Class Period – from a low of $5.98 on November 8, 2016 to a high of $36.35 on August 31, 2017 – just two weeks before the truth about Defendants' Class Period misconduct was revealed in the September 11, 2017 *Seeking Alpha* Report.

113.   The Company's highest ranking executive officers and directors sold aggressively throughout the Class Period demonstrating their additional motive to commit fraud. While some of these insiders – including Defendant Hershberger – established 10b5-1 trading plans during the Class Period, they also sold extensively outside of the scope of the suspiciously timed adoption of these trading plans. At the time of the IPO, Defendant Hershberger was awarded 400,000 shares pursuant to the Company' long term incentive plan. These shares were scheduled to vest: 20% on August 13, 2013, 20% on October 1, 2013, 20% on October 1, 2014, 20% October 1, 2015 and 20% October 1, 2016.

114.    A shell corporation in the IPO named "Health Plan Intermediaries Sub, LLC" was awarded 86,667 Class B Shares. Defendant Kosloske is the sole member and primary manager of Health Plan Intermediaries, LLC ("HPI"), which is sole managing member of HPIS and has sole voting and dispositive power over the shares held by HPIS. Further, according to the Company's filings with the SEC, these "shares of Class B common stock, together with the Series B Membership Interests of HPI, are exchangeable, at Michael W. Kosloske's election, for equal number of shares of Class A common stock. This exchange right has no expiration date." In total, Defendant Kosloske acquired 8,666,667 shares of the Class B Common stock through HPI, LLC. If he executed such an exchange, Defendant Kosloske would control 65% of the Class A common stock.

115.    In July 2014, HIIQ acquired HealthPocket in exchange for $21.9 million and 900,900 shares of the Class A stock.  Shortly after the merger, on August 15, 2014, HIIQ filed a prospectus for the sale of 1,725,000 shares the HPIH and HPIS subsidies Defendant Kosloske owned at a price of $12.15 per share.  After HIIQ's IPO, no individual identified by the company[16] as a corporate insider sold any stock outside of a 105b-1 trading plan until March 8, 2016.[17]

116.    On July 20, 2016, the Company filed with the SEC a press release on Form 8-K announcing that HIIQ was the subject of a multistate examination and that several states had announced that they were investigating their sales practices and regulatory compliance.

---

[16]     While the company provided trading information for Lori Kosloske on its website, her trades are not identified as "insider" trades on NASDAQ's website.

[17]     On that date, Defendant Kosloske disclosed that HIIQ had withheld 533 of his shares "to satisfy tax liability incident to vesting of restricted stock."

Prior to this disclosure, the Company filed its application for a TPA license with FLOIR on July 18, 2016.   A few days later on July 25, 2016 FLOIR rejected HIIQ's TPA license as incomplete.

117.   On November 18, 2016 Defendant Hershberger established his 10b5-1 trading plan.   Between November 17 and 21, 2016 Defendant Hershberger sold 39,500 shares of HIIQ stock – over one-fifth of his original holdings – for more than ***$400,000*** in proceeds.

118.   On March 8, 2017, HIIQ filed the 2017 Registration Statement enabling Defendant Kosloske to sell three million shares of his HIIQ common stock – almost half of his holdings – at an average price of $13.16 per share for a total of ***$39.48 million***.

119.   On April 19, 2017, one hundred and twenty-four days after it withdrew its TPA Application in December 2016, HIIQ refiled it. As part of its application, Defendants Southwell and Hershberger signed a notarized affidavit attesting that they understood Florida's statutory regulatory requirements regarding a company's responsibility to submit annual reports, financial statements, administrative agreements with health insurance companies, and notification of class action lawsuits.[18]

120.   A short time later on May 9, 2017, Defendant Hershberger sold 15,000 shares of his HIIQ common stock (about 10% of his holdings) outside the scope of his 10b5-1 trading plan at an average price of $20.37 per share, pocketing more than ***$300,000*** in proceeds.

---

[18]   Curiously, the title of that document identified a company called "Matrix Absence Management, Inc." as the insurance administrator in question – though neither Hershberger nor Southwell are executives (as they are identified in the documents) of that company.

121.     On June 1, 2017 FLOIR denied the TPA Application.  On August 31, 2017 and September 1, 2017, Defendant Hershberger sold a total of 17,769 shares of his HIIQ common stock at an average price of $31.42 per share for proceeds of *$558,384*. On September 11, 2017, the *Seeking Alpha* Report was published disclosing the truth about the Company's regulatory problems. Over the course of the day the Company's share price lost more than a fifth of its value, falling dramatically from an opening price of $29.90 per share to a closing price of $23.35 per share. The next day, the Company's share price fell even further, opening at $20.55 per share and closing at $19.75per share – a loss of more than 40% of the value that Defendant Hershberger sold his stock for two weeks earlier.

## VI.    LOSS CAUSATION

122.     When Defendants' prior material misrepresentations, omissions and misconduct were revealed and became apparent to investors, the price of HIIQ securities declined precipitously − as the prior artificial inflation in the price of the Company's securities was eliminated as a result of the September 11, 2017 disclosures in the *Seeking Alpha* Report.  As a result of their purchases of HIIQ securities during the Class Period, Plaintiff and other members of the Class suffered economic losses, *i.e.*, damages under the federal securities laws.

123.     The economic loss suffered by Plaintiff and other members of the Class was a direct result of Defendants' fraudulent scheme to artificially inflate the price of HIIQ's securities and the subsequent significant decline in the value of the Company's securities when Defendants' prior misstatements and other fraudulent conduct were revealed.  The timing and magnitude of HIIQ's securities price declines negate any inference that the losses

suffered by Plaintiff and the other members of the Class were caused by changed market conditions, macroeconomic or industry factors, or even Company-specific facts unrelated to Defendants' fraudulent conduct.

124.    At all relevant times, the material misrepresentations and omissions alleged in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false or misleading statements about HIIQ's business, prospects and operations.

125.    The material misstatements and omissions alleged in ¶¶ 87 – 111, *supra*, had the cause and effect of creating in the market an unrealistically positive assessment of HIIQ and its business, prospects, and operations, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times. Defendants' materially false and misleading statements during the Class Period caused Plaintiff and other members of the Class to purchase the Company's securities at artificially inflated prices, thus causing the damages complained of herein.

### A.    March 8, 2017

126.    On March 8, 2017, the Company filed a Final Prospectus on Form 424B3 with the SEC to enable Defendant Kosloske and entities he controlled to sell shares of the Company's stock to the public at artificially inflated prices.  Defendant Kosloske sold three million shares of his personally-held common stock – or 43.8% of his total holdings – in the Secondary Offering and pocketed nearly $40 million from that single well-timed insider transaction. The Company's shares fell 9.8% on March 8, 2017 in response to the

announcement that Defendant Kosloske – the Company's own founder – was selling nearly half of his personally-held HIIQ shares.

127.    A March 8, 2017 article published on the *Motley Fool* about this partial fraud disclosure entitled, "Why Health Insurance Innovations Is Tumbling 10% Today," reported that "[o]n March 7, management updated investors on plans by the company's founder, Mike Kosloske, to sell 3 million shares of Class A stock in the company through a secondary offering. The offering was priced at $14 per share and none of the proceeds of this offering will go to the company. Kosloske moved from the CEO role to the executive chairman role at Health Insurance Innovations in 2015."  Market analysts covering the Company later identified his massive sale as a "key risk factor" facing the Company.

128.    While not revealing the nature of Defendants' Class Period wrongdoing, the March 8, 2017 disclosure about Defendant Kosloske's large insider transaction was a partial disclosure that proximately caused the Company's nearly 10% share price decline, damaging the Company's shareholders.

**B.**    **September 11-12, 2017**

129.    On September 11, 2017, the *Seeking Alpha* Report widely disseminated information in the market about the Company, including access to: (i) the letter from Florida's Office of Insurance Regulation denying the Company's TPA Application dated June 1, 2017; (ii) the Company's appeal to challenge the TPA Application denial dated June 16, 2017; and (iii) regulatory documents from the states of Montana and Arkansas disclosing the Company's regulatory and compliance failures and penalties.  The *Seeking Alpha* Report also demonstrated to the market that Defendants had fraudulently concealed the risks

flowing from the TPA Application process and ultimate denial.  Once the risk of the denial materialized in the disclosures contained in the *Seeking Alpha* Report, the value of HIIQ's securities declined precipitously on September 11-12, 2017, losing some 22% of their value on September 11, 2017 alone.[19]

130.    The *Seeking Alpha* Report was critical in that it revealed to the market the pertinent truth about new information that was previously concealed and/or obscured by Defendants' fraud, including the previously undisclosed June 2017 letter from HIIQ to FLOIR appealing the denial of its TPA Application as represented below:

> Additionally, HPIH holds a substantial number of other insurance-related licenses at the entity level; for example, HPIH is a licensed insurance producer entity (or the state equivalent) in every state in the nation. The application denial would trigger a duty to report (and thus raise the specter of additional renewal denials) in many of those states as well, and every state in which HPIH would seek to pursue any form of insurance-related licensure in the future (thus raising the specter of a domino effect of denials that would have to be reported); to say that the interests of HPIH as an entity would be substantially affected is a radical understatement.

131.    Further, the Company's dramatic share price decline on September 11, 2017 occurred the same day that the *Seeking Alpha* Report was published, and there were no other factors or explanations for the Company's dramatic share price decline that day.  In fact, the NASDAQ Composite Index declined by a mere 0.6% on September 11, 2017.

132.    Further, HIIQ's main competitors showed an overall simple average increase of 0.23% on September 11, 2017, with the single largest gain of 3.36% belonging to Argo

---

[19]    The percentage point drop is based on a decline to a closing price of $23.35, down $6.55 from the preceding day's closing price of $29.90.

Group International Holdings, Ltd. (NASDAQ: AGII), and the single biggest loss of 2.62%

belonging to specialty insurance company Brown & Brown, Inc.  (NYSE: BRO). These

facts, combined with the indisputable fact that HIIQ's share price declined nearly 22% drop

on massive volume on September 11, 2017, negates any suggestion that the *Seeking Alpha*

Report did not disclose new information that proximately caused Plaintiff's losses.

133.   Specifically, the new, previously-undisclosed information in the *Seeking*

*Alpha* Report disclosing the Company's "private" statements to FLOIR about: (i) the

potentially devastating "domino effect" of a TPA License denial; and (ii) that "the interests

of [HIIQ] as an entity would be substantially affected is a radical understatement," along

Montana's findings that the Company had engaged in a "scheme" to defraud consumers

were a substantial and/or significant contributing cause for the Company's nearly 22% share

price decline on September 11, 2017.

134.   The previously-undisclosed and non-public June 1, 2017 FLOIR denial letter

also listed material information about HIIQ that the Company repeatedly failed to provide to

FLOIR in its three application filings over a period of eight months, along with the basis for

denial.  In the Company's appeal to challenge the TPA Application denial, dated June 16,

2017, the Company, admittedly, described the negative impact of the denial on its core

business.

135.   On release of this information, the Company's share price fell $6.55 per

share, from a closing price of $29.90 per share on September 8, 2017 to a close of $23.35

per share on September 11, 2017, a drop of approximately 21.91%.  The following day, as

the market continued to digest this negative information about Defendants, the Company's

shares price fell an additional 15% on massive trading volume causing investors significant losses.

## VII.   POST CLASS PERIOD EVENTS

136.    Following the *Seeking Alpha* Report, the Company continued to attempt to downplay the significance of FLOIR's denial of its TPA Application in Florida.  In a press release on Form 8-K that was filed with the SEC on September 12, 2017 ("HIIQ Release"), Defendants asserted that their TPA Application had been denied because of FLOIR's "determination that the Company had not provided all information required to process the application" – ignoring FLOIR's findings that their submissions "contained numerous, material errors and omissions" which the Company, repeatedly, failed to correct. Defendant Hershberger was identified as the investor contact in connection with the HIIQ Release.

137.    The HIIQ Release also acknowledged that it made the "domino effect" comment but that it "was making a reference to the fact that an application denial would likely be a disclosure item on all future licensing in other states, which would add significant work to future licensing efforts in those states." The Company also admitted, contrary to its statements in ¶106, *supra*, that: "based on discussions with the OIR, the Company determined that its business activities ***likely require licensure as a TPA*** even though the Company is not a traditional TPA."  But, the Company failed to provide any basis for its conjecture that Florida – unlike the vast majority of other states where the Company operates – would not require it to be licensed as a third party administrator.

138.    The Company also stated that "[t]he OIR has not to date informed the Company that it intends to request that the Company modify its business activities in

49

Florida." This, however, is contradicted by FLOIR's response to the Company's decision to withdraw its application in December of 2016 wherein the agency advised HIIQ that: "until your application has been approved by the [FLOIR] and the appropriate licensure issued, the referenced company *should not transact business that requires such license in this state*."

139.   On December 15, 2017, HIIQ published another press release announcing that the Company had formed a Risk and Compliance Committee.  The Company attached this press release to a Current Report on Form 8-K and filed it with the SEC on the same date.  In the release, the Company represented, in pertinent part:

> HIIQ also announced today the formation of a Risk and Compliance Committee of the Board, which will assist the Board and the Company in navigating today's complex regulatory environment. The Committee will initially include all of the Company's independent directors, Paul E. Avery, Anthony J. Barkett, Robert S. Murley, Paul G. Gabos and John A. Fichthorn, as well as the Company's Chief Executive Officer and President, Gavin D. Southwell.
>
> The formation of the Risk and Compliance Committee demonstrates HIIQ's continued focus on upholding and enhancing the highest standards in legal and regulatory compliance and customer service. The Board will benefit from the Committee's counsel as the Company continues its investments in these key areas," Mr. Gabos added.

140.   Despite announcing the purported establishment of the Risk and Compliance Committee, as of March 19, 2018, the Company's public access website section addressing "Corporate Governance" neither acknowledges the existence of the so-called Risk and Compliance Committee, nor does it present a charter for same.[20]

---

[20]   The Company's Public Access Website's Corporate Governance Page is accessible at http://investor.hiiquote.com/corporate-governance (last accessed March 19, 2018).

141.    On October 2, 2017, FLOIR entered a Consent Order against the Company demanding, *inter alia*, that HIIQ provide full biographical information for Defendant Kosloske and forcing the Company to waive its rights to a hearing regarding its renewed application and all rights to challenge or to contest the Consent Order.  Defendant Southwell executed the Consent Order.  Then, on February 14, 2018, the Company disclosed another Consent Order wherein FLOIR granted the Company's TPA license but assessed a fine of $140,000 as a result of a finding by the agency (which the Company did not contest) that HIIQ conducted business as an insurance administrator in the State of Florida prior to HIIQ's submission of the application.

## VIII.    CLASS ACTION ALLEGATIONS

142.    Plaintiff brings this matter as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of a Class of all persons and entities who purchased or otherwise acquired HIIQ securities between November 3, 2016, and September 11, 2017, inclusive. Excluded from the Class are Defendants, directors, and officers of HIIQ, as well as their families and affiliates.

143.    The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  As of March 2018, HIIQ had over 12.5 million shares of its common stock outstanding, with a float of 6.96 million shares, owned by hundreds if not thousands of persons.

144.    There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

(a)    Whether the Exchange Act was violated by Defendants;

(b)    Whether Defendants omitted and/or misrepresented material facts;

(c)    Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)    Whether Defendants knew or recklessly disregarded that their statements were false and misleading;

(e)    Whether the price of HIIQ securities was artificially inflated during the Class Period; and

(f)    The extent of damage sustained by Class members and the appropriate measure of damages.

145.    Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from Defendants' wrongful conduct alleged herein.

146.    Plaintiff will adequately protect the interests of the Class and have retained counsel who are experienced in class action securities litigation and possess the necessary financial resources to pursue this matter on behalf of the Class.  Plaintiff has no interests that conflict with those of the Class.

147.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## IX.    APPLICABILITY OF PRESUMPTION OF RELIANCE

148.    As a result of the foregoing, the market for HIIQ's securities promptly digested current information regarding HIIQ from all publicly available sources and reflected such information in the prices of the stock.   Under these circumstances, all purchasers of HIIQ's securities during the Class Period suffered similar injury through their purchase of HIIQ's securities at artificially inflated prices, and the *Basic* presumption of reliance applies.

149.    Plaintiff is also entitled to a presumption of reliance under *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), because claims asserted herein against defendants are predicated upon omissions of material fact which there was a duty to disclose.

150.    Had Plaintiff and other members of the Class known of the material adverse information not disclosed by defendants or been aware of the truth behind defendants' material misstatements, they would not have purchased HIIQ common stock at artificially inflated prices.

151.    At all relevant times, there existed a substantial likelihood that the disclosure of the omitted facts would have been viewed by a reasonable investor as having significantly altered the total mix of information made available to HIIQ's shareholders.

152.    Plaintiff will rely upon the presumption of reliance established by the fraud-on- the-market doctrine in that, among other things:

(a)    Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)     The omissions and misrepresentations were material;

(c)     The Company's securities traded in efficient markets;

(d)     The misrepresentations alleged herein would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

(e)     Plaintiff and other members of the Class purchased HIIQ's securities between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

(f)     At all relevant times, the markets for HIIQ's securities were efficient for the following reasons, among others: (i) HIIQ filed periodic public reports with the SEC; (ii) its shares traded on the NASDAQ – a presumptively efficient national secondary exchange; and (iii) HIIQ regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts and other similar reporting services. Plaintiff and the Class relied on the price of HIIQ's securities, which reflected all the information in the market, including the misstatements and material omissions by Defendants.

## X.     NO SAFE HARBOR

153.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the false statements pleaded in this Complaint.  Many of the specific statements pleaded herein were not identified as and were not "forward-looking statements" when made.  To the extent there were any forward-looking

statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

154.    Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, the Insider Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of HIIQ who knew that those statements were false when made.

## FIRST CLAIM

### Violation of Section 10(b) of the Exchange Act
### and Rule 10b-5 Promulgated Thereunder
### (Against All the Defendants)

155.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

156.    During the Class Period, Defendants disseminated or approved the false statements and omissions specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

157.    Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the

statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon those who purchased or otherwise acquired HIIQ securities during the Class Period.

158.    Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for HIIQ's securities. Plaintiff and the Class would not have purchased HIIQ's securities at the price paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements and material omissions.

159.    The Insider Defendants had actual knowledge of the misrepresentations and omissions of material fact set forth herein, or recklessly disregarded the true facts that were available to them.   Defendants' misconduct was engaged in knowingly or with reckless disregard for the truth, and for the purpose and effect of concealing HIIQ's true financial condition from the investing public and supporting the artificially inflated price of HIIQ's securities.

160.    In addition, Item 7 of Form 10-K and Item 2 of Form 10-Q, Management Discussion and Analysis of Financial Condition and Results of Operations  ("MD&A"), requires issuers like HIIQ to furnish information required by Item 303 of Regulation S-K, 17.C.F.R. § 229.303.  In discussing results of operations, Item 303 of Regulation S-K requires the registrant to "[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a materially favorable or unfavorable impact on net sales or revenues or income from continuing operations."

161.    In addition, the SEC, in its May 1989 Interpretive Release No. 34-26831, indicated that registrants should employ a two-step analysis in determining when a known trend or uncertainty is required to be included in the MD&A disclosure pursuant to Item 303 of Regulation S-K: "A disclosure duty exists where a trend, demand, event or uncertainty is both presently known to management and is reasonably likely to have a material effect on the registrant's financial condition or results of operations."

162.    In violation of the foregoing SEC Regulations, HIIQ failed to disclose the material developments and uncertainties regarding its TPA Application in Florida, including, *inter alia*, that: (i) FLOIR had returned its application to the Company as incomplete; and (ii) HIIQ had withdrawn its TPA Application as alleged in ¶¶ 16–19, 79–81, *supra*.

## SECOND CLAIM

### Violation of Section 20(a) of the Exchange Act
### (Against the Insider Defendants)

163.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

164.    The Insider Defendants acted as controlling persons of HIIQ within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions at the Company, the Insider Defendants had the power and authority to cause or prevent HIIQ from engaging in the wrongful conduct complained of herein. The Insider Defendants were provided with or had unlimited access to the fraudulent SEC filings and other reports alleged by Plaintiff to be misleading both prior to and

immediately after their publication, and had the ability to prevent the issuance of these materials or cause them to be corrected so as not to be misleading.

165.    By reason of such conduct, Insider Defendants are liable pursuant to Section 20(a) of the Exchange Act.

## XI.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

1.    Determining that this action is a proper class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Class Classes as defined herein, and a certification of Plaintiff as class representative pursuant to Rule 23 of the Federal Rules of Civil Procedure and appointment of Plaintiff's counsel as Class Counsel;

2.    Awarding compensatory and punitive damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount proven at trial, including pre-judgment and post-judgment interest thereon;

3.    Awarding Plaintiff and other members of the Class their costs and expenses in this litigation, including reasonable attorneys' fees and experts' fees and other costs and disbursements; and

4.    Awarding Plaintiff and the other Class members such other relief as this Court may deem just and proper.

## XII.    JURY DEMAND

Plaintiff hereby demands a trial by jury in this action of all issues so triable.

Dated: March 23, 2018                        Respectfully submitted,


                                             By:  /s/ *Ramzi Abadou*
                                             RAMZI ABADOU
                                             (California Bar #222567)
                                             (admitted *pro hac vice*)
                                             ramzi.abadou@ksfcounsel.com
                                             KAHN SWICK & FOTI, LLP
                                             912 Cole Street, # 251
                                             San Francisco, CA 94117
                                             Telephone:  504-455-1400
                                             Facsimile:  504-455-1498

                                             *Counsel for Robert Rector and*
                                             *Lead Counsel for the Class*

                                             DAVID J. GEORGE
                                             Florida Bar No.: 898570
                                             dgeorge@gunster.com
                                             GUNSTER, YOAKLEY & STEWART,
                                             P.A.
                                             777 South Flagler Drive
                                             Suite 500 East
                                             West Palm Beach, FL 33401
                                             Telephone:  561-655-1980
                                             Facsimile:  561-655-5677

                                             *Liaison Counsel*

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and correct copy of the foregoing was served on this

23rd day of March 2018 on all counsel of record by using the CM/ECF system.


*/s/ Ramzi Abadou*
Ramzi Abadou

# EXHIBIT A

## CERTIFICATION PURSUANT TO SECURITIES LAWS

_____Robert Rector_____ (name) ("Movant") declares, as to the claims asserted under the federal securities law, that:

1.  Movant has fully reviewed the facts of the complaint(s) filed in this action alleging violations of the securities laws, Movant adopts the allegations of the complaint(s), and Movant retains the firm of Kahn Swick and Foti, LLC, to pursue such action on a contingent fee basis.

2.  Movant did not purchase securities of **Health Insurance Innovations, Inc.** at the direction of counsel or in order to participate in a private action under the federal securities laws.

3.  Movant is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.

4.  During the Class Period, Movant has executed transactions in the securities of **Health Insurance Innovations, Inc.** as follows.  See attached Schedule.

5.  In the last three years, Movant has not sought to serve as a representative party on behalf of a class in an action filed under the federal securities laws, except as indicated herein.

6.  Movant will not accept payment for serving as a lead plaintiff beyond his/her/its pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class as ordered or approved by the Court.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: _**/6 - 27**_____, 2017

_____
Movant Signature

_____
Printed Name

Name of Movant: __Robert Rector_____

Schedule of Movant's Transaction(s) in: **Health Insurance Innovations, Inc.**

Purchase(s):

| **Date** | **Units** | **Price** |
|----------|-----------|-----------|

See attached.

**Health Insurance Innovations, Inc.**
**Trade Data for Robert Rector**

| DATE: | BUY/SELL: | QTY: | PRICE: |
|---|---|---|---|
| 12/2/2016 | buy | 1000 | $11.2000 |
| 12/6/2016 | SELL | 1000 | $13.7050 |
| 12/9/2016 | buy | 3000 | $14.1500 |
| 12/21/2016 | SELL | 3000 | $14.7000 |
| 12/27/2016 | buy | 1000 | $18.0000 |
| 12/27/2016 | buy | 1000 | $17.2000 |
| 12/27/2016 | SELL | 2000 | $18.0000 |
| 12/27/2016 | buy | 2000 | $18.0500 |
| 12/27/2016 | SELL | 2000 | $18.1000 |
| 12/27/2016 | buy | 1000 | $18.5000 |
| 12/28/2016 | SELL | 1000 | $19.2500 |
| 12/28/2016 | buy | 1000 | $18.3500 |
| 12/29/2016 | buy | 1000 | $17.3950 |
| 1/10/2017 | SELL | 2000 | $18.1500 |
| 1/11/2017 | buy | 1000 | $18.5500 |
| 1/12/2017 | SELL | 1000 | $19.3000 |
| 1/17/2017 | buy | 1000 | $19.2000 |
| 1/18/2017 | SELL | 1000 | $19.7000 |
| 1/20/2017 | buy | 1000 | $20.3000 |
| 1/20/2017 | SELL | 1000 | $20.5500 |
| 1/23/2017 | buy | 1000 | $19.7500 |
| 1/23/2017 | buy | 1000 | $19.0400 |
| 1/25/2017 | SELL | 2000 | $19.5000 |
| 2/14/2017 | buy | 1000 | $17.7400 |
| 2/14/2017 | buy | 1000 | $17.7500 |
| 2/14/2017 | SELL | 2000 | $17.8500 |
| 2/22/2017 | buy | 1000 | $17.9000 |
| 3/2/2017 | buy | 1000 | $18.5000 |
| 3/2/2017 | buy | 1000 | $16.2000 |
| 3/3/2017 | SELL | 22 | $17.7000 |
| 3/2/2017 | SELL | 2978 | $17.6000 |
| 3/7/2017 | buy | 700 | $15.0000 |
| 3/8/2017 | SELL | 700 | $15.7000 |
| 5/11/2017 | buy | 1000 | $20.4000 |
| 5/12/2017 | SELL | 1000 | $21.6500 |
| 5/12/2017 | buy | 1000 | $22.2700 |
| 6/23/2017 | SELL | 1000 | $25.3000 |
| 6/26/2017 | buy | 1000 | $24.5000 |
| 6/26/2017 | buy | 1000 | $24.5000 |
| 7/14/2017 | buy | 1000 | $26.0500 |
| 7/18/2017 | SELL | 3000 | $26.0500 |
| 7/21/2017 | buy | 1000 | $28.0400 |

| | | | |
|---|---|---|---|
| 7/24/2017 | SELL | 1000 | $28.3500 |
| 8/10/2017 | buy | 1000 | $30.2500 |
| 8/10/2017 | buy | 1000 | $31.0500 |
| 8/14/2017 | SELL | 2000 | $32.7500 |
| 8/17/2017 | buy | 1000 | $33.1000 |
| 8/17/2017 | buy | 1000 | $33.1000 |
| 8/17/2017 | buy | 1000 | $33.1000 |
| 8/25/2017 | buy | 2000 | $34.8000 |
| 8/28/2017 | SELL | 2000 | $34.8100 |
| 8/28/2017 | buy | 1300 | $34.7500 |
| 8/28/2017 | buy | 700 | $34.7450 |
| 8/29/2017 | buy | 2000 | $36.1000 |
| 8/31/2017 | SELL | 830 | $35.9500 |
| 8/31/2017 | buy | 1000 | $34.9500 |
| 8/31/2017 | SELL | 1000 | $34.9500 |
| 8/31/2017 | buy | 1000 | $34.6000 |
| 8/31/2017 | buy | 1000 | $33.7500 |
| 8/31/2017 | buy | 1000 | $33.7500 |
| 9/1/2017 | buy | 2000 | $31.7500 |
| 9/1/2017 | buy | 2000 | $28.3200 |
| 9/11/2017 | buy | 2000 | $26.7000 |

**TOTAL SHARES BOUGHT:** 48,700
**TOTAL SHARES SOLD:** 33,530
**DIFFERENCE:** 15,170