## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

IN RE HEALTH INSURANCE
INNOVATIONS SECURITIES
LITIGATION

Case No.: 8:17–cv–2186–T–17SPF

---

## ORDER

**THIS CAUSE** is before the Court on Defendants' Motion to Dismiss the Consolidated Complaint (the "**Motion**"), which seeks to dismiss a putative class action for violation of federal securities laws. (Doc. 53). After careful review and upon consideration, the Court will grant-in-part and deny-in-part the Motion.

## I.   Factual Background

### A.   The Parties

Health Insurance Innovations, Inc. ("**HIIQ**") is a publicly traded company listed on the NASDAQ Stock Market and headquartered in Tampa, Florida. (Doc. 43 ¶5). HIIQ, which was founded by Michael W. Kosloske ("**Kosloske**") in 2008, "develops, distributes[,] and administers short-term medical plans, hospital indemnity plans" and certain supplementary products, such as dental plans, life insurance policies, and pharmacy benefit cards. *Id.* According to the Consolidated Class Action Complaint for Violation of Federal Securities Laws (the "**Complaint**"), HIIQ markets its products "through an internal distribution network[,] as well as an external distribution network of independently owned and operated call centers." *Id.* (internal

quotations omitted). HIIQ's target market consists of uninsured or underinsured Americans. *Id.*

HIIQ is one of four defendants to this action (collectively, "**Defendants**"). In addition to HIIQ, Lead Plaintiff Robert Rector ("**Lead Plaintiff**") sues three individuals, who held the following positions when this lawsuit was initiated: HIIQ's founder and Chief of Product Innovation, Kosloske; HIIQ's chief executive officer, Gavin T. Southwell ("**Southwell**"); and HIIQ's chief financial officer, Michael D. Hershberger ("**Hershberger**" and, together with Kosloske and Southwell, the "**Insider Defendants**"). *Id.* at ¶¶2, 47.

Lead Plaintiff purchased HIIQ's securities during the class period, which runs from November 3, 2016, through September 11, 2017 (the "**Class Period**"). *Id.* at ¶¶1, 36. Attached to the Complaint is Lead Plaintiff's certification that he (i) did not purchase securities of HIIQ at the direction of counsel or to participate in this action; (ii) is willing to serve as a representative party on behalf of a putative class; (iii) executed transactions in HIIQ's securities, as shown in an accompanying schedule; and (iv) has not previously sought to serve as a representative party in a securities class action within the last three years. *Id.* at Ex. A.

### B.   *Factual Allegations*

#### 1.   *Regulatory Scrutiny Outside Florida*

HIIQ initially went public through its initial public offering in February 2013. *Id.* at ¶5. As part of HIIQ's business model, a network of HIIQ-owned websites and approximately one hundred third-party call centers sell insurance products that are

underwritten by insurance companies. *Id.* at ¶60. Throughout 2016, HIIQ's core business faced regulatory scrutiny outside of Florida. *Id.* at ¶7. HIIQ faced acute public scrutiny regarding its relationships with the third-party call centers, as both consumers and state regulators alleged that the call center agents made false or deceptive representations in order to sell HIIQ's short-term insurance policies. *Id.*

Several state regulatory agencies had acted against HIIQ for allegedly misrepresentative or deceptive practices. *Id.* at ¶9. For example, the Arkansas Insurance Department announced a cease and desist order against HIIQ on March 28, 2016, accusing HIIQ of "intentionally misrepresenting the terms of an insurance contract or application for insurance and using fraudulent and dishonest practices in attempting to sell short-term health care plans." *Id.* (internal quotations omitted). Similarly, on May 9, 2016, the office of the Montana State Auditor, Commissioner of Securities and Insurance (the "**Montana CSI**") filed an action against HIIQ for routinely utilizing misinformation and deception in selling insurance policies. *Id.* at ¶10. The Montana CSI issued a cease and desist order to HIIQ and suspended HIIQ's health insurance producer license in Montana. *Id.* at ¶69.

### 2.    *HIIQ's Florida TPA Licensure Application and the Commencement of the Class Period*

HIIQ also acts as a third-party administrator ("**TPA**"), functioning as a middleman between insurers and customers seeking affordable health insurance plans. *Id.* at ¶60. A TPA is "an organization that processes insurance claims or certain aspects of employee benefit plans for a separate entity." *Id.* Consequently, HIIQ sought and

obtained TPA licenses in numerous states. *Id.* at ¶64. In 2016, HIIQ set its sights on obtaining a TPA license in Florida. *See id.* at ¶79. Securing the TPA license from the Florida Office of Insurance Regulation ("**FOIR**") was "critically important" to HIIQ. *Id.* at ¶111. Indeed, Lead Plaintiff asserts that HIIQ's TPA application, together with allegedly undisclosed compliance failures in other states, "lies at the heart of this action." *Id.* at ¶6.

HIIQ initially filed its Florida TPA application on June 18, 2016. *Id.* at ¶79. Two days later, HIIQ filed a Form 8-K with the United States Securities and Exchange Commission (the "**SEC**"). *Id.* at ¶11. This Form 8-K disclosed HIIQ's awareness of a multistate examination and that several states, including Florida, were "reviewing the sales practices and potential unlicensed sale of insurance by third-party distributor call centers utilized by [HIIQ]." *Id.* (original emphasis removed). FOIR deemed HIIQ's TPA application incomplete on July 25, 2016, and returned the application to HIIQ. *Id.* at ¶13. HIIQ reapplied for a TPA license with FOIR on October 28, 2016. *Id.*

On November 3, 2016, the first day of the Class Period, HIIQ filed with the SEC a Form 10-Q quarterly report for the quarterly period ending on September 30, 2016 (the "**3Q16 Report**"). *Id.* at ¶87. As set forth in greater detail below, Lead Plaintiff asserts that statements within the 3Q16 Report, which Hershberger signed, were materially misleading. *Id.* at ¶¶87–91. On the same day, Hershberger participated in an earnings teleconference to discuss the third quarter results, but, according to Lead Plaintiff, Hershberger never disclosed the existence of allegedly negative developments

for HIIQ in Montana's investigation. *Id.* at ¶92. At this point, HIIQ's Florida TPA license application remained pending. *Id.* at ¶13.

Beginning two weeks later, from November 17, 2016, to November 21, 2016, Hershberger sold 39,500 shares of his personally-held common stock in HIIQ, which represented approximately one-fifth of his holdings and resulted in more than $400,000 in proceeds. *Id.* at ¶¶14, 117. During this time, Southwell began serving as HIIQ's chief executive officer (in addition to serving as its president) and Hershberger adopted a 10b5-1 trading plan.[1] *Id.* at ¶¶ 87 n.12, 117

FOIR sent a clarification letter to HIIQ on November 28, 2016, seeking "additional material information that Defendants had omitted from" HIIQ's application for its Florida TPA license. *Id.* at ¶15. Upon HIIQ's request, FOIR granted an extension of time through December 12, 2016, for HIIQ to respond to the letter. *Id.* HIIQ failed to respond by this deadline, however; instead, HIIQ "admitted in a private letter to [FOIR] that it had failed to timely reapply" and requested an additional, unspecified extension of time to gather the requisite information. *Id.* at ¶16. HIIQ concurrently withdrew its application. *Id.* In response to HIIQ's withdrawal of the application, FOIR advised HIIQ that "until [HIIQ's] application has been approved by [FOIR] and the appropriate licensure issued, [HIIQ] should not transact business

---

[1] Rule 10b5-1 provides that a "purchase or sale is not 'on the basis of' material nonpublic information if the person making the purchase or sale demonstrates" that he or she had adopted a written plan for trading securities prior to becoming aware of the information. 17 C.F.R. § 240.10b5-1(c). The SEC adopted Rule 10b5–1 to permit company executives to use a pre-determined method to trade in company stock. *In re Miva, Inc. Sec. Litig.*, 544 F. Supp. 2d 1310, 1316 n.1 (M.D. Fla. 2008), *aff'd sub nom. FindWhatInvestor Grp. v. FindWhat.com*, 658 F.3d 1282 (11th Cir. 2011).

that requires such licensure in [Florida]." *Id.* at ¶80 (internal quotations omitted and original emphasis removed).

### 3.   HIIQ's March 2017 SEC Filings

Shortly after HIIQ withdrew its Florida TPA licensure application, on March 2, 2017, HIIQ filed its Form 10-K for the year ending on December 31, 2016 (the "**2016 Annual Report**"), which the Insider Defendants signed. *Id.* at ¶96. HIIQ also filed a Form 8-K with the SEC, which allegedly reported HIIQ's financial and operating results for the fourth quarter of 2016 and the 2016 fiscal year (the "**March 2017 8-K**"). *Id.* at ¶93. Hershberger signed the March 2017 8-K. *Id.*

On March 8, 2017, HIIQ filed Form 424B3 with the SEC (the "**Final Prospectus Supplement**"), which stated that the "selling stockholders identified in this prospectus are offering 3,000,000 shares of our Class A common stock, which are to be issued upon the exchange of an equivalent number of Series B Membership Interests (together with an equal number of shares of our Class B common stock) of Health Plan Intermediaries Holdings, LLC."[2] *Id.* at ¶99. HIIQ listed the public offering price as $14.00 per share. *Id.* HIIQ did not sell any shares in the offering, however; instead, entities owned and controlled by Kosloske sold the shares. *Id.* at ¶100. According to the Complaint, Kosloske sold three million shares of his personally-held common stock in this second public offering, representing approximately 43.8% of his total

---

[2] Health Plan Intermediaries Holdings, LLC ("**HPIH**") is a subsidiary of HIIQ. (Doc. 43 at ¶3 n.2). HIIQ is the sole managing member of HPIH. *See id.* at ¶58. As used in the Complaint, "HIIQ" and "the Company" includes HPIH. *Id.* at ¶3 n.2. Accordingly, as used herein, "HIIQ" includes HPIH.

holdings and resulting in nearly $40 million in proceeds. *Id.* at ¶20. HIIQ's share price immediately dropped by nearly 10%, from a closing price of $17.35 per share on the prior day to a closing price of $15.65 per share on March 8, 2017. *Id.* at ¶100. An article published on the *Motley Fool* on the same day, entitled "Why Health Insurance Innovations Is Tumbling 10% Today," reported that HIIQ's management advised investors regarding Kosloske's plans to sell the three million shares of Class A stock through the second offering on March 7, 2017. *Id.* at ¶127. Lead Plaintiff contends that the March 8, 2017 disclosure regarding Kosloske's transaction was a partial disclosure that proximately caused HIIQ's nearly 10% share price decline. *Id.* at ¶128. Furthermore, as discussed in more detail below, Lead Plaintiff alleges that the 2016 Annual Report, the March 2017 8-K, and the Final Prospectus Supplement contained materially misleading statements or omissions.

### 4.    *HIIQ's May 2017 SEC Filings and FOIR's Denial of HIIQ's Florida TPA Licensure Application*

HIIQ refiled its Florida TPA licensure application with FOIR on April 19, 2017. *Id.* at ¶22. HIIQ filed two documents with the SEC prior to FOIR's ultimate denial of the TPA application on June 1, 2017. *Id.* at ¶24. First, on May 4, 2017, HIIQ filed its a Form 10-Q quarterly report for the quarterly period ending on March 31, 2017 (the "**1Q17 Report**"). *Id.* at ¶40. Southwell and Hershberger signed the 1Q17 Report. *Id.* at ¶102. Second, on May 5, 2017, HIIQ filed a Form S-3 registration statement (the "**2017 Registration Statement**"), effective May 19, 2017, the purpose of which allegedly was "to offer and sell up to $150 million of any combination of debt securities, Class A

Common Stock, Preferred stock, Warrants, Units or Purchase Contracts" to the public. *Id.* at ¶23. The Insider Defendants signed the 2017 Registration Statement. *Id.* The 2017 Registration Statement allegedly incorporated the 2016 Annual Report and the 1Q17 Report. *Id.* Shortly thereafter, on May 9, 2017, Hershberger sold 15,000 shares of his HIIQ common stock, representing approximately 10% of his holdings and purportedly outside the scope of his previously adopted 10b5-1 trading plan, thereby resulting in more than $300,000 in proceeds. *Id.* at ¶120. Lead Plaintiff contends the 1Q17 Report and the 2017 Registration Statement contained materially misleading statements and omissions. *Id.* at ¶¶ 102–04.

In a letter sent to HIIQ on June 1, 2017, FOIR informed HIIQ that it had denied HIIQ's TPA licensure application. *Id.* at ¶24. FOIR explained in the letter that its bases for denying the application included: (i) "numerous, material errors and omissions" in the application and (ii) FOIR's determination that HIIQ was "not competent." *Id.* (internal quotations omitted). Additionally, FOIR noted that HIIQ had misrepresented biographical information for Hershberger and Kosloske that involved dishonesty, breach of trust, or financial disputes. *Id.* at ¶25. HIIQ responded in a letter to FOIR, dated June 16, 2017, which provided:

> The application denial would trigger a duty to report (and thus raise the specter of additional denials) in many of those states as well, and every state in which [HIIQ] would seek to pursue any form of insurance-related licensure in the future (thus raising the specter of a domino effect of denials that would have to be reported; to say that the interests of [HIIQ] as an entity would be substantially affected is a radical understatement.

*Id.* at ¶109. According to Lead Plaintiff, HIIQ concealed this letter and its contents from shareholders during the Class Period, and the letter was publicly disclosed for the first time only on September 11, 2017, the last day of the Class Period. *Id.* at ¶¶26, 30.

### 5.    *HIIQ's August 2017 SEC Filings and the Close of the Class Period*

Lead Plaintiff contends HIIQ's materially misleading statements and omissions did not stop there. On August 3, 2017, HIIQ filed a Form 8-K with the SEC (the "**August 2017 8-K**"), which Hershberger signed. *Id.* at ¶105. When asked about HIIQ's regulatory compliance on an earnings conference call on the same day, Southwell allegedly downplayed the regulatory issues that HIIQ faced as "a lot of noise . . . that comes from kind of historic items." *Id.* at ¶110 (internal quotations omitted). The next day, HIIQ filed a Form 10-Q quarterly report with the SEC (the "**2Q17 Report**"), which Hershberger and Southwell signed. *Id.* at ¶28. Although the 2Q17 Report acknowledged FOIR's denial of HIIQ's TPA license application, which had occurred almost two months earlier, Lead Plaintiff contends the 2Q17 Report was incomplete and materially misleading. *Id.* at ¶¶25, 28. Lead Plaintiff asserts that 2Q17 Report and August 2017 8-K contained material misrepresentations. *Id.* at ¶¶105–111.

Following HIIQ's submission of the 2Q17 Report and August 2017 8-K to the SEC, HIIQ's stock prices reached a high of $35.36 per share on August 31, 2017. *Id.* at ¶112. On August 31, 2017 and September 1, 2017, Hershberger sold 17,769 shares of his HIIQ common stock at an average price of $31.42 per share, resulting in proceeds of approximately $558,384. *Id.* at ¶121. On September 1, 2017, Southwell and Hershberger both personally executed a declaration and certification under

9

penalty of perjury with the Illinois Department of Insurance, which indicated that HIIQ had never been refused a TPA license and that a "license to act as such" had never been denied "in any state." *Id.* at ¶29 (internal quotations omitted).

On the last day of the Class Period, September 11, 2017, a whistleblower report was published on *Seeking Alpha*, which was entitled "Health Insurance Innovations: Penalties to Exceed $100 Million and Undisclosed Domino Effect" (the "*Seeking Alpha* Report"). *Id.* at ¶30. Financial analyst and whistleblower Richard Pearson wrote the article. *Id.* at ¶30 n.7. The *Seeking Alpha* Report allegedly included previously undisclosed information, such as (i) HIIQ's private letter to FOIR, dated June 16, 2018, which included HIIQ's warning of the "domino effect" of FOIR's TPA licensure denial; (ii) HIIQ's appeal of FOIR's denial of the TPA license application; and (iii) regulatory documents from state agencies in Montana and Arkansas, which supposedly disclosed HIIQ's regulatory and compliance failures and penalties. *Id.* at ¶129. Lead Plaintiff also alleges that the *Seeking Alpha* Report "demonstrated to the market that Defendants had fraudulently concealed the risks flowing from the TPA Application process and ultimate denial." *Id.*

As a result of this news and other news, HIIQ's share price fell $6.55 per share, from a closing price of $29.90 per share on September 8, 2017, to a closing price of $23.35 per share on September 11, 2017, on a volume of 9,454,100 shares traded that day, thereby representing a drop of approximately 21.91%. *Id.* at ¶31. According to Lead Plaintiff, the *Seeking Alpha* Report proximately caused his losses. *Id.* at ¶30. The

next day, HIIQ's share price dropped an additional 15.4%. *Id.* HIIQ filed a Form 8-K
with the SEC, which addressed FOIR's denial of HIIQ's TPA license application. *Id.*
at ¶136.

## II.   Issues

Lead Plaintiff alleges that Defendants violated the Securities Exchange Act of
1934 (the **"Exchange Act"**). *Id.* at ¶¶ 155–65. Specifically, the Complaint includes two
claims: (i) one claim against Defendants for violation of Section 10(b) of the Exchange
Act, as well as Rule 10b-5 promulgated thereunder and Item 303 of Regulation S-K;
and (ii) one claim against the Insider Defendants for violation of Section 20(a) of the
Exchange Act. *Id.* As Lead Plaintiff's Section 20(a) claim is a derivative claim, the
Court looks to the Section 10(b) claim first. *See Thompson v. RelationServe Media, Inc.*,
610 F.3d 628, 635–36 (11th Cir. 2010). Defendants focus on the first claim, asserting
that the Complaint fails to conform with the strict pleading requirements for securities
fraud class actions. (Doc. 53 at 7). Primarily, Defendants take umbrage with the
Complaint's alleged failure to establish loss causation, an actionable false statement or
omission, and a strong inference of scienter. *Id.* at 8–25. Accordingly, Defendants
argue that the Court should dismiss the Complaint with prejudice. *Id.* at 25.

## III.   Legal Analysis

### A.   Section 10(b) and Rule 10b-5 Claim

The Court divides its analysis into four parts. First, the Court will identify the
applicable pleading standards, as modified by Rule 9 of the Federal Rules of Civil
Procedure and the Private Securities Litigation Reform Act (the **"PSLRA"**), and the

cause of action's elements. The Court will subsequently address the merits of the issues presented in the Motion, including the alleged material misrepresentations and omissions, scienter, and loss causation.

### 1.   Legal Standards

A pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P 8(a)(2). Although Rule 8's pleading standard does not demand detailed factual allegations, it requires "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). For a complaint to survive a motion to dismiss, it must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "A pleading that offers 'labels and conclusions' or a 'formulaic recitation of the elements of a cause of action will not do.'" *Id.* (quoting *Twombly*, 550 U.S. at 555). District courts must use their own judicial experience and common sense to engage in a context-specific task to determine if a complaint's allegations give rise to an entitlement to relief. *Id.* at 679. In evaluating the sufficiency of a complaint, district courts must accept as true all of the complaint's allegations and view the facts in the light most favorable to the plaintiff. *Rowe v. Mentor Worldwide, LLC*, 297 F. Supp. 3d 1288, 1292 (M.D. Fla. 2018) (citing *Erickson v. Pardus*, 551 U.S. 89, 93–94 (2007)).

Like other fraud claims, security fraud claims must also meet the heightened pleading requirements under Rule 9(b), *Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1237 (11th Cir. 2008), which requires a complaint to "state with particularity the circumstances constituting fraud or mistake," Fed. R. Civ. P. 9(b). Rule 9(b) is satisfied when the complaint sets forth:

> (1) precisely what statements were made in what documents or oral representations or what omissions were made, and (2) the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) same, and (3) the content of such statements and the manner in which they misled the plaintiff, and (4) what the defendants obtained as a consequence of the fraud.

*Mizzaro*, 544 F.3d at 1237 (quoting *Tello v. Dean Witter Reynolds, Inc.*, 494 F.3d 956, 972 (11th Cir. 2007)).

The PSLRA altered the particularity requirement of Rule 9(b), requiring a securities fraud complaint's Rule 10b-5(b) claims predicated on allegedly false or misleading statements or omissions to

> specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.

*In re Galectin Therapeutics, Inc. Sec. Litig.*, 843 F.3d 1257, 1259 (11th Cir. 2016) (*citing* 15 U.S.C. § 78u–4(b)(1)(B)). The PSLRA also altered the scienter pleading requirement: "with respect to each act or omission" alleged to violate the Exchange Act, the plaintiff must "state with particularity facts giving rising to a *strong inference* that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2)

(emphasis added). Consequently, in a securities fraud class action lawsuit, a plaintiff may not plead the requisite scienter element generally, as previously permitted by Rule 9(b), and the complaint "must allege facts supporting a strong inference of scienter for each defendant for each violation." *Mizzaro*, 544 F.3d at 1238 (citing *Phillips v. Sci.-Atlanta, Inc.*, 374 F.3d 1015, 1016 (11th Cir. 2004)) (internal quotations omitted). Significantly, "the court shall, on the motion of any defendant, dismiss the complaint" if these PSLRA pleading requirements are not met. 15 U.S.C. § 78u–4(b)(3)(A).

The elements for securities fraud under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder are: (1) a material misrepresentation or omission; (2) made with scienter; (3) in connection with the purchase or sale of a security; (4) reliance, often referred to in fraud-on-the-market cases as "transaction causation"; (5) economic loss; and (6) loss causation, which is "a causal connection between the material misrepresentation and the loss."[3] *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 341–42 (2005); *Meyer v. Greene*, 710 F.3d 1189, 1194 (11th Cir. 2013).

---

[3] Under Section 10(b), it is "unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange . . . [t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, or any securities-based swap agreement, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b). In turn, Rule 10b–5 provides:

> It is unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or the mails of any facility of any national securities exchange,
>> (a) To employ any device, scheme, or artifice to defraud,
>> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
>> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud upon any person,

### 2.   *Material Misrepresentations or Omissions*

To prevail on a Rule 10b-5 claim, "a plaintiff must show that the [defendant's] statements were *misleading* as to a *material* fact." *Basic Inc. v. Levinson*, 485 U.S. 224, 238 (1988) (emphasis in original). A false or incomplete statement is insufficient if the misrepresented fact is otherwise insignificant. *Id.* A statement is misleading when, in light of the facts existing at the time of the statement, a reasonable investor exercising due care would have been misled by such statement. *FindWhat Investor Grp. v. FindWhat.com*, 658 F.3d 1282, 1305 (11th Cir. 2011). A statement is misleading only if it "convey[s] to the public a false impression." *Id.* at 1306 (internal quotations omitted). Consequently, the "appropriate primary inquiry is into the meaning of the statement to the reasonable investor and its relationship to truth." *Id.* at 1305 (internal quotations omitted).

Determining materiality in the securities fraud context "depends on the significance the reasonable investor would place on the withheld or misrepresented information." *Basic*, 480 U.S. at 240. In other words, the test for materiality is "whether a reasonable man would attach importance to the fact misrepresented or omitted in determining his course of action." *S.E.C. v. Merch. Capital, LLC*, 483 F.3d 747, 766 (11th Cir. 2007) (internal quotations omitted). Within the Eleventh Circuit, materiality is deemed "at least a mixed question of law and fact involving 'assessments of

---

in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5.

peculiarity within the province of the trier of fact.'" *S.E.C. v. Bankatlantic Bancorp, Inc.*, No. 12-60082-Civ, 2012 WL 1936112, at *10 (S.D. Fla. May 29, 2012) (quoting *Merch. Capital*, 483 F.3d at 766). On the other hand, "[a] statement that is vague, generalized, non-verifiable, or mere corporate puffery is immaterial because a reasonable investor would not make a decision based on such a statement," and thus these types of statements are inactionable as a matter of law. *Thorpe v. Walter Inv. Mgmt., Corp.*, No. 14-cv-20880, 2014 WL 11961964, at *11 (S.D. Fla. Dec. 23, 2014).

Furthermore, the PSLRA establishes a "safe harbor" for certain "forward-looking statements." 15 U.S.C. § 78u–5(c)(1). Forward-looking statements that fall under the PSLRA's safe harbor provisions cannot support a claim. *Fernandez v. River Valley Bancorp, Inc.*, No. 14-cv-23755-WILLIAMS, 2017 WL 2800389 (S.D. Fla. Apr. 11, 2017). "In that safe harbor, corporations and individuals may avoid liability for forward-looking statements that prove false if the statement is 'accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement," *City Pension Fund for Firefighters and Police Officers in City of Miami Beach v. Aracruz Cellulose S.A.*, 41 F. Supp. 3d 1369, 1399 (S.D. Fla. 2011) (quoting *Harris v. Ivax Corp.*, 182 F.3d 799, 803 (11th Cir. 1999)), or if the forward-looking statement is immaterial, 15 U.S.C. § 78u–5(c)(1).

Pursuant to PSLRA, a forward-looking statement includes:

> (A) a statement containing a projection of revenues, income (including income loss), earnings (including earnings loss) per share, capital expenditures, dividends, capital structure,

> or other financial items; (B) a statement of the plans and
> objectives of management for future operations, including
> plans or objectives relating to the products or services of the
> issuer; (C) a statement of future economic performance,
> including any such statement contained in a discussion and
> analysis of financial condition by the management or in the
> results of operations included pursuant to the rules and
> regulations of the Commission; or (D) any statement of the
> assumptions underlying or relating to any statement
> described in subparagraph (A), (B), or (C).

15 U.S.C. §78u-5(i).

As for omissions, "[s]ilence, absent a duty to disclose, is not misleading under Rule 10b-5." *Basic*, 485 U.S. at 239 n.17. Neither Section 10(b) nor Rule 10b-5(b) establish an affirmative duty to disclose any and all material information. *Galectin*, 843 F.3d at 1274. However, Rule 10b-5(b) prohibits not only false statements of material fact, "but also any omissions of material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading." *Id.* (internal quotations omitted). Thus, "[b]y voluntarily revealing one fact about its operations, a duty arises for the corporation to disclose such other facts, if any, as are necessary to ensure that what was revealed is not so incomplete as to mislead." *FindWhat*, 658 F.3d at 1305 (internal quotations omitted). In other words, omission of facts is actionable only when the absence of those facts would, under the circumstances, render another reported statement misleading to a reasonable investor who exercises due care. *Galectin*, 843 F.3d at 1275. For an omission to be material here, Lead Plaintiff must show that there is a substantial likelihood that a reasonable investor would have viewed the disclosure of the omitted fact as one that would

significantly alter the total mix of information made available. *Finnerty v. Stiefel Labs., Inc.*, 756 F.3d 1310, 1321 (11th Cir. 2014).

> a.    *Alleged November 3, 2016 Misleading Statements and Omissions*
> i.    *3Q16 Report*

Lead Plaintiff argues that two statements in the 3Q16 Report were materially misleading: (i) HIIQ's assertion of no material changes to the risk factors disclosed in its 2015 annual report (the "**2015 Annual Report**"), which HIIQ filed with the SEC on March 8, 2016; and (ii) HIIQ's "mischaracterization of Montana's enforcement activities as simply 'reviewing' HIIQ's sale practices." (Doc. 43 ¶¶ 87–88). According to the Complaint, Hershberger signed the 3Q16 Report, which stated that "there were no material changes to the risk factors disclosed in our Annual Report on Form 10-K for the year ended December 31, 2015," other than a risk factor regarding a new-short-term medical insurance rule. *Id.* at ¶87. Furthermore, the 3Q16 Report indicated that "several states, including Arkansas, Florida, Kansas, Montana, Ohio, South Dakota, Texas, and Massachusetts are *reviewing* the sales practices and potential unlicensed sale of insurance by third-party distributor call centers" used by HIIQ. *Id.* at ¶88 (emphasis in original).

Lead Plaintiff primarily alleges "Defendants knew or deliberately disregarded" that material developments regarding HIIQ's operations posing a risk to investors occurred between the HIIQ's filing of the 2015 Annual Report and the 3Q16 Report, "including the fact that the state of Montana had moved far beyond merely 'reviewing'

[HIIQ's] sales practices."[4] *Id.* at ¶89. In support, the Complaint alleges that, in May of 2016, Montana accused HIIQ of engaging in deception and misinformation and entered a cease and desist order against HIIQ, thereby preventing HIIQ from selling, transacting, administering, negotiating, or otherwise taking part in or benefit from any insurance transaction within Montana. *Id.* at ¶90. As previously mentioned, the Montana CSI filed an action against HIIQ for alleged deception and misinformation on May 9, 2016, and Montana summarily suspended HIIQ's insurance license pending a hearing. *Id.*

Defendants argue that HIIQ "repeatedly warned investors of the regulatory risks inherent in its business operations," such as the substantial effect that a state's suspension or denial of a license would cause on the status of HIIQ's licenses in other states. (Doc. 53 at 4). The Court judicially notices the excerpts of the 2015 Annual Report and the 3Q16 Report provided by Defendants in support of the Motion for the purpose of determining which statements the documents contain and not to prove the truth of the documents' contents. *See Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1278 (11th Cir. 1999) (stating that a district court considering a motion to dismiss in securities fraud case may take judicial notice of relevant public documents required to be filed, and actually filed, with the SEC for the purpose of determining which statements the documents contained). The 2015 Annual Report provided:

---

[4] The Complaint also alleges the 3Q16 Report was materially misleading because it contained a signed certification per the Sarbanes-Oxley Act of 2002 ("**Sarbanes-Oxley**") by Hershberger that information in the 3Q16 Report was accurate. (Doc. 43 ¶91).

> Compliance with the strict regulatory environment applicable to the health insurance industry and the specific products we sell is difficult and costly. If we fail to comply with the numerous laws and regulations that are applicable to our business, our business and results of operations could be harmed . . . Although we believe we currently are in compliance with applicable insurance laws and regulations, due to the complexity, periodic modification and differing interpretations of insurance laws and the number of third parties with which we have relationships, we may not have always been, and we may not always be, in compliance with such laws and regulations. Failure to comply could result in significant liability, additional state insurance licensing requirements or the revocation of licenses in a particular jurisdiction, which could significantly reduce our revenue, increase our operating expenses, prevent us from transacting health insurance business in a particular jurisdiction and otherwise harm our business, results of operations and financial condition. Moreover, an adverse regulatory action in one jurisdiction could result in penalties and adversely affect our license status or reputation in other jurisdictions due to the requirement that adverse regulatory actions in one jurisdiction be reported to other jurisdictions.

(Doc. 54–1 at 5–6). The 2015 Annual Report also stated that each jurisdiction's insurance department often maintains the power to grant and revoke licenses, inquire into insurance-related conduct and activities of agents and agencies, and impose fines and other penalties. *Id.* Defendants assert that these risk factors were incorporated into all of HIIQ's Form 10-Qs and 10-Ks for 2016 and were accompanied by cautionary language as to forward-looking statements. (Doc. 53 at 4).

Furthermore, the 3Q16 Report included an entire section devoted to the Montana regulatory action, which provided:

> The Company has also received notification from the Office of the Montana State Auditor, Commissioner of Securities and Insurance ("CSI") that an administrative action has

been initiated against it. The Company was among more than two dozen separate parties named by the CSI in a Notice of Proposed Agency Action on May 12, 2016, that alleges potential violations of the Montana Insurance Code. The Notice, directed to the Company as well as a large pool of third-party respondents ranging from very large companies to individual insurance agents, indicated that the CSI was concerned with the possibility of unfair trade practices, potentially unlicensed insurance practices, or agents that were not properly appointed to the insurance carriers for whom products were being offered. Seventeen of the named parties, including the Company, have requested a hearing before the CSI to contest the state's allegations and the Company is in the process of retrieving data and information to do so. The state has formally granted the Company's request to be heard on the issues, and a neutral Hearing Officer experienced in the insurance industry, has been appointed to hear the matter. This matter is at a very early stage of the investigative process and the Company has been cooperative with the CSI while seeking to properly measure and gauge the potential of the allegations.

While it is still too early to assess whether the CSI's Notice and the investigation of these organizations and individuals will have a material impact on the Company, the Company believes that based on nature of the allegations and evidence provided by the state of Montana during the third quarter, a loss arising from the future assessment of a civil penalty against the Company is probable. Notwithstanding, the Company is currently unable to either estimate the amount of any potential civil penalty, or determine a range of potential loss, as the Company lacks insight into the events or factors that could assist the Company in estimating the amount of any potential civil penalty or a range of potential loss related to such penalties. It is very possible that there may be no financial loss, or a reasonable resolution reached with the CSI. The Company continues to regularly communicate and work closely with the CSI in furtherance of bringing the matter towards a mutually satisfactory resolution.

(Doc. 54–2 at 4–5).

Based on the allegations, Lead Plaintiff's theory of liability is premised on the statements constituting alleged omissions of material facts. Indeed, the Complaint contends that Defendants knew or were aware of the Montana CSI's adverse regulatory action, which supposedly posed a risk to investors, and without this information, the statements in the 3Q16 Report were materially misleading. In other words, Lead Plaintiff alleges that the statements within the 3Q16 Report were made under circumstances in which the omission of certain information—the failure to disclose that Montana had issued the cease and desist order and suspended HIIQ's insurance producer license in Montana for "routinely selling insurance policies 'through misinformation and deception,'" also characterizing HIIQ's alleged misconduct as a "scheme" to defraud Montana residents—made the statements misleading. (Doc. 43 ¶90).

Accepting as true the Complaint's allegations and viewing the facts in the light most favorable to Lead Plaintiff, Lead Plaintiff sufficiently alleges the 3Q16 Report's statement regarding the absence of any material changes to the risk factors disclosed in the 2015 Annual Report and statement that Montana was among several states "reviewing" HIIQ's sales practices and the potential unlicensed sale of insurance by HIIQ's TPA call centers are actionable omissions. Preliminarily, the Complaint describes the 3Q16 Report's allegedly misleading statements with the requisite specificity under Federal Rule of Civil Procedure 9(b) and the PSLRA. The Complaint quotes the allegedly misleading statements, identifies when HIIQ filed the 3Q16 Report, alleges that Hershberger signed the 3Q16 Report, provides reasons for why the

statements were materially misleading, contends that "HIIQ's stock prices soared during the Class Period" as a result of such materially misleading statements," (Doc. 43 ¶112), and describes the allegedly suspicious sales of HIIQ stock during the Class Period. In this respect, the Complaint provides Defendants with sufficient notice regarding the 3Q16 Report's allegedly misleading statements.

As previously mentioned, "[s]ilence, absent a duty to disclose, is not misleading under Rule 109b-5." *Basic*, 485 U.S. at 239 n.17. Neither Section 10(b) nor Rule 10b-5(b) establish an affirmative duty to disclose any and all material information. *Galectin*, 843 F.3d at 1274. "[T]he omission of a fact, even a material fact, is actionable only if Defendants had a duty to disclose the information." *Mich. Carpenters' Pension Fund v. Rayonier Advanced Materials, Inc.*, No. 3:18-cv-771-J-34JRK, 2019 WL 1429667, at *19 (M.D. Fla. Mar. 29, 2019). "The omission of facts is actionable only to the extent that the absence of those facts would, under the circumstances, render another reported statement misleading to the 'reasonable investor, in the exercise of due care.'" *Galectin*, 843 F.3d at 1275 (quoting *FindWhat*, 843 F.3d at 1305).

As alleged in the Complaint, the Montana CSI's action against HIIQ had actually extended beyond merely "reviewing" HIIQ's sales practices and potential unlicensed sale of insurance by HIIQ's call centers, as HIIQ's insurance producer license to operate in Montana had been suspended, and the Montana CSI had issued a cease and desist order against HIIQ, which prohibited HIIQ from "selling, negotiating, transacting, administering, or otherwise taking part in or benefit from any insurance transaction in, to or from Montana," and characterized HIIQ's alleged

misconduct as a "scheme" to defraud Montana residents. *Id.* at ¶¶89, 90. Thus, based on Lead Plaintiff's allegations and viewing the alleged facts in the light most favorable to Lead Plaintiff, material changes to the risk factors disclosed in the 2015 Annual Report did exist and there were further negative developments regarding the Montana CSI's action, despite the 3Q16 Report's omission of this information. Defendants' argument that HIIQ adequately disclosed this information or that investors otherwise had access to this information because the Montana CSI's Notice of Proposed Agency Action and Cease and Desist Order and Summary Suspension were available online is unpersuasive. (Doc. 53 at 5). Lead Plaintiff sufficiently alleges how the absence of this information would render the statements within the 3Q16 Report misleading to a reasonable investor exercising due care. Drawing all reasonable inferences in favor of Lead Plaintiff, as the Court must at the motion to dismiss stage, the Complaint's allegations adequately establish the substantial likelihood that a reasonable investor would have viewed these omitted developments as significantly altering the total mix of information available.

*ii.    November 3, 2016 Earnings Call*

Finally, the Complaint alleges that Hershberger participated in an earnings call regarding the 3Q16 on November 3, 2016, yet he never disclosed the existence of the purportedly negative developments in Montana. (Doc. 43 ¶92). Lead Plaintiff fails to allege sufficiently that Hershberger made an omission of a material fact during the earnings telephone call on November 3, 2016, however. As discussed above, Rule 10b-5(b) prohibits not only false statements of material fact, "but also any omissions of

material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading." *Galectin*, 843 F.3d at 1274 (internal quotations omitted). The Complaint merely alleges that Hershberger participated in a telephone call to discuss the 3Q16 quarterly results and never disclosed the existence of the negative developments in Montana. This allegation fails to identify the corresponding affirmative statements of Hershberger that were allegedly misleading without the revelation of the negative developments in Montana. Securities fraud law in the Eleventh Circuit demands more than this two-sentence allegation.

### b.    *Alleged March 2017 Misleading Statements and Omissions*

Next, Lead Plaintiff alleges that the March 2017 8-K, the 2016 Annual Report, and the Final Prospectus Supplement were materially misleading. As discussed in more detail below, Lead Plaintiff has pleaded only one actionable materially misleading statement in the March 2017 8-K.

### i.    *March 2017 8-K*

The Court begins with the March 2017 8-K. Lead Plaintiff contends the document, which Hershberger signed, was materially misleading because the "Regulatory Update" section failed to disclose that HIIQ had withdrawn its Florida TPA licensure application in December of 2016. (Doc. 43 ¶93). Additionally, Lead Plaintiff alleges the March 2017 8-K was materially misleading because it neglected to mention FOIR's response to HIIQ's withdrawal of its TPA licensure application, in which FOIR advised HIIQ that, until FOIR had approved HIIQ's application "and the appropriate licensure [was] issued, [HIIQ] should not transact business that

requires such licensure in [Florida]." *Id.* at ¶94. (original emphasis removed). Lead Plaintiff also alleges that the March 2017 8-K was materially misleading because, like the 3Q16 Report, it stated that several states, including Montana, were "reviewing" the sales practices and potentially unlicensed sale of insurance by HIIQ's third-party distributor call centers. *Id.* at ¶95.

Turning first to the allegations regarding HIIQ's Florida TPA license application, FOIR had sent a clarification letter to HIIQ on November 28, 2016, which sought "additional material information that Defendants had omitted" from HIIQ's application for its Florida TPA license. *Id.* at ¶15. As discussed above, HIIQ withdrew its application after failing to meet the revised deadline in December of 2016. Significantly, FOIR allegedly advised HIIQ that "until [HIIQ's] application has been approved by [FOIR] and the appropriate licensure issued, [HIIQ] should not transact business that requires such licensure in [Florida]." *Id.* at ¶80 (internal quotations omitted and original emphasis removed).

Although Lead Plaintiff contends that the March 2017 8-K was materially misleading because it failed to disclose HIIQ's withdrawal of its Florida TPA license application and FOIR's explanation that HIIQ should not transact business in Florida, Lead Plaintiff fails to identify which statements within the March 2017 8-K were misleading as a result of such omissions. Indeed, even assuming *arguendo* that a reasonable investor would have viewed HIIQ's withdrawal of its Florida TPA application and FOIR's response thereto as significantly altering the total mix of information made available, the Complaint bypasses any identification of other

statements that were rendered misleading to the reasonable investor. The Complaint fails to evince whether the March 2017 8-K's "Regulatory Update" section included language that may have been rendered misleading by such omission, and judicial notice of the 2017 March 8-K's provided excerpts therein is unavailing for this purpose. *Bryant*, 187 F.3d at 1278. Thus, Lead Plaintiff's allegations are insufficient.

Lead Plaintiff also contends that, like the 3Q16 Report, the following statement from the March 2017 8-K was materially misleading: "In addition to the multistate examination led by Indiana, we are aware that several other states, including Arkansas, Florida, Kansas, Massachusetts, *Montana*, Ohio, South Dakota, and Texas are *reviewing* alleged non-compliance with sales practices, non-compliance with insurance laws, and/or unlicensed sale of insurance by third-party distributor call centers utilized by [HIIQ]." (Doc. 43 ¶95) (emphasis in original). This statement noticeably differs from the statement in the 3Q16 Report, in that this statement informs investors that the listed states were reviewing alleged non-compliance with sales practices, insurance laws, and/or the unlicensed sale of insurance by the TPA call centers, whereas the 3Q16 Report simply advised that the listed states were "reviewing the sales practices and potential unlicensed sale of insurance by third-party distributor call centers utilized by [HIIQ]." *Id.* at ¶87 (emphasis removed). Nonetheless, Lead Plaintiff maintains that March 2017 8-K's statement was materially misleading for the same reasons that the 3Q16 Report's statement was materially misleading.

The Complaint's allegations regarding this particular purportedly misleading statement meets the requisite pleading standards, including specifying the misleading

statement and Lead Plaintiff's reasons for why the statement was misleading. According to the Complaint, HIIQ filed its 2016 Annual Report with the SEC on the same day as the March 2017 8-K. As discussed in more detail below, Lead Plaintiff alleges that the 2016 Annual Report "finally acknowledged the material fact that [HIIQ's] license had been suspended in Montana," even though such suspension had occurred nine months earlier. *Id.* at ¶97. Whether HIIQ filed its 2016 Annual Report prior to the March 2017 8-K is unclear from the Complaint. The March 2017 8-K's "Regulatory Update" section provides that additional information "*will* be included in [the 2016 Annual Report]," however. (Doc. 54–9 at 3) (emphasis added). The Court must accept Lead Plaintiff's allegations as true and view the facts in the light most favorable to Lead Plaintiff, which demonstrates that Lead Plaintiff sufficiently alleges that this statement in the March 2017 8-K was misleading as to a material fact. The Montana CSI's action against HIIQ had extended beyond merely reviewing alleged non-compliance with sales practices, insurance laws, and/or the unlicensed sale of insurance by the TPA call centers, as the agency had suspended Montana's insurance producer license and entered a cease and desist order against HIIQ, which allegedly required HIIQ to "immediately cease and desist from selling, negotiating, transacting, administering, or otherwise taking part in or benefit from any insurance transaction in, to or from Montana[.]" (Doc. 43 ¶90). The Complaint sufficiently identifies the statement in the March 2017 8-K that was rendered misleading as a result of the omission of these developments. Furthermore, Lead Plaintiff sufficiently alleges that a reasonable investor exercising due care would have been misled by this statement

and that there is a substantial likelihood that a reasonable investor would have viewed the disclosure of the omitted negative developments in Montana as one that would significantly alter the total mix of information made available. Thus, this particular alleged misrepresentation in the March 2017 8-K survives.

### *ii.   2016 Annual Report*

Next, Lead Plaintiff asserts that the 2016 Annual Report was materially misleading because Defendants failed to disclose that the Montana CSI had accused HIIQ of engaging in a fraudulent "scheme" against residents of Montana, despite acknowledging that Montana had suspended its license. *Id.* at ¶97. As previously mentioned, the Insider Defendants signed the 2016 Annual Report. *Id.* at ¶96.

Lead Plaintiff fails to sufficiently allege a material misleading statement or omission as to the 2016 Annual Report. The PSLRA requires a securities fraud complaint predicated on allegedly false or misleading statements or omissions to "specify each statement alleged to have been misleading." 15 U.S.C. § 78u-4(b)(1)(B). Thus, the focus in determining whether a statement is misleading is on the content of the statement. The "appropriate primary inquiry" is "into the meaning of the statement to the reasonable investor and its relationship to the truth." *FindWhat*, 658 F.3d at 1305. As previously emphasized, a statement is misleading only if it "convey[s] to the public a false impression." *Id.* at 1306.

The Complaint briefly cites language from the 2016 Annual Report to explain that the 2016 Annual Report "represented" that that the Montana CSI had initiated an administrative action against HIIQ. (Doc. 43 ¶97). In the next sentence, the

Complaint alleges that, although "Defendants finally acknowledged the material fact that their license had been suspended in Montana," the 2016 Annual Report was misleading because "Defendants either knowingly or with deliberate recklessness failed to disclose that the Montana CSI had accused [HIIQ] of engaging in a fraudulent 'scheme' against Montana's residents." *Id.* As alleged, Lead Plaintiff fails to specify which statement supposedly was misleading: the cited language regarding the Montana CSI's initiation of an administrative action, the acknowledgment that HIIQ's insurance producer license had been suspended (the language of which is missing from the Complaint), or other language in the 2016 Annual Report. The PSLRA demands more than this unclear language.

### iii.    *Final Prospectus Supplement*

Lastly, Lead Plaintiff alleges the Final Prospectus Supplement was materially misleading by incorporating the 2016 Annual Report and March 2017 8-K. *Id.* at ¶101. Lead Plaintiff fails to sufficiently allege that the Final Prospectus Supplement was materially misleading through its incorporation of the March 2017 8-K and the 2016 Annual Report.

Preliminarily, the Court judicially notices the provided excerpts from the Final Prospectus Supplement, *see Bryant*, 187 F.3d at 1278, which Lead Plaintiff filed in support of his opposition to the Motion, (Doc. 60-2). In addition to asserting the 2016 Annual Report "provides additional information about [HIIQ's] business, operations and financial condition," the Final Prospectus Supplement stated that it incorporated by reference several documents filed with the SEC, including the 2016 Annual Report

and several Form 8-Ks. *Id.* at 4. Among these Form 8-Ks is an 8-K filed on March 8, 2017, *id.*, which presumably refers to the March 2017 8-K, which was actually filed on March 2, 2017, (Doc. 43 ¶93). Although the Final Prospectus Supplement incorporated both the 2016 Annual Report and the March 2017 8-K, the Court considers only those actionable materially misleading statements or omissions from the March 2017 8-K, as Lead Plaintiff fails to allege adequately the 2016 Annual Report contained misleading statements as to a material fact.

Lead Plaintiff pleads only one actionable materially misleading statement from that filing: the statement indicating that Montana was merely "reviewing" alleged non-compliance with sales practices, insurance laws, and/or the unlicensed sale of insurance by HIIQ's third-party distributor call centers. As previously mentioned, however, the Montana CSI had allegedly accused HIIQ of engaging in "misinformation and deception," characterized HIIQ's misconduct as a purported scheme to defraud Montana residents, entered a cease and desist order against HIIQ, which allegedly required HIIQ to "immediately cease and desist from selling, negotiating, transacting, administering, or otherwise taking part in or benefit from any insurance transaction in, to or from" the State of Montana, and suspended Montana's insurance producer license. *Id.* at ¶90.

Despite the presence of this actionable materially misleading statement from the March 2017 8-K and the Final Prospectus Supplement's incorporation of the March 2017 8-K, Lead Plaintiff has failed to sufficiently demonstrate that the Final Prospectus Supplement's incorporation of the March 2017 8-K necessarily rendered the Final

Prospectus Supplement materially misleading. Indeed, in order to plead securities fraud based on misstatements or omissions, Lead Plaintiff must identify the alleged false or misleading statements. *See* 15 U.S.C. § 78u–4(b)(1)(B). Although Lead Plaintiff has sufficiently alleged a misleading statement in the March 2017 8-K, he has failed to identify a materially misleading statement in the Final Prospectus Supplement or demonstrate why the March 2017 8-K statement may serve as the basis for deeming the Final Prospectus Supplement materially misleading. Neither the Complaint nor Lead Plaintiff's response in opposition to the Motion offer any rationale; instead, Lead Plaintiff devotes his response to addressing Defendants' contention that the accompanying prospectus statement did not incorporate by reference the misleading statements. (Doc. 58 at 14). Accordingly, because of this failure, the Complaint does not sufficiently allege that the Final Prospectus Supplement was materially misleading.

     *c.*     *Alleged May 2017 Misleading Statements and Omissions*

Lead Plaintiff further claims that the 1Q17 Report, which HIIQ filed on May 4, 2017, contained actionable misleading statements or omissions. Lead Plaintiff also asserts the 2017 Registration Statement was materially misleading. Lead Plaintiff's allegations regarding the purported materially misleading statements or omissions within these documents are insufficient.

     *i.*     *1Q17 Report*

The Complaint's allegations regarding the 1Q17 Report leave much to be desired. Aside from reciting the filing date and who signed the document, Lead Plaintiff asserts that the 1Q17 Report "was materially misleading for the same reasons

alleged in" all previous paragraphs describing the purportedly actionable misleading statements or omissions for the Class Period and their supporting factual bases. *Id.* at ¶102. This approach is inconsistent with the dictates of the PSLRA, which demands that the Complaint "specify each statement alleged to have been misleading," as well as "the reason or reasons why the statement is misleading[.]" 15 U.S.C. § 78u–4(b)(1)(B). Congress enacted this pleading requirement "[a]s a check against abusive litigation by private parties." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007).

By describing the 1Q17 Report in cursory fashion and relying on the previous paragraphs to establish the document's alleged inclusion of materially misleading statements or omissions, Lead Plaintiff fails to sufficiently specify each statement in the 1Q17 Report alleged to be misleading and the reasons why such statements were misleading. Lead Plaintiff's allegations in the cited paragraphs set forth varying reasons for the allegedly misleading nature of the aforementioned SEC filings, thereby inviting Defendants to speculate which allegations are applicable. And, unsurprisingly, some allegations seem inapplicable. For example, one of these paragraphs contends that Hershberger did not discuss the negative developments in Montana during the earnings telephone call in November of 2016. (Doc. 43 ¶92). Another paragraph alleges only that HIIQ filed the 2016 Annual Report on March 2, 2017, which the Insider Defendants signed. *Id.* at ¶96. These allegations are insufficient under the PSLRA.

*ii.      2017 Registration Statement*

The Complaint also alleges the 2017 Registration Statement incorporated by reference HIIQ's "materially false and misleading" 2016 Annual Report and 1Q17 Report. *Id.* at ¶103. The Complaint thus appears to allege that the 2017 Registration Statement was materially misleading because it incorporated these filings by reference. As with the Final Prospectus Supplement, Lead Plaintiff has failed to sufficiently demonstrate that the 2017 Registration Statement's incorporation of the 2016 Annual Report and the 1Q17 Report necessarily rendered the 2017 Registration Statement materially misleading. Even assuming Lead Plaintiff demonstrated this, however, Lead Plaintiff fails to sufficiently allege a material misleading statement or omission as to the 2016 Annual Report or the 1Q17 Report. Therefore, without more, the Complaint, as currently pleaded, fails to sufficiently allege the presence of any material misleading statements or omissions in the 2017 Registration Statement.

*d.      Alleged August 2017 Misleading Statements and Omissions*

Lead Plaintiff asserts the August 2017 8-K and 2Q17 Report were materially misleading. Lead Plaintiff also contends Southwell "failed to disclose the truth" when questioned regarding HIIQ's regulatory compliance during an earnings conferences call with analysts and investors on August 3, 2017. For the reasons set forth below, Lead Plaintiff has pleaded actionable misrepresentations or omissions as to only the 2Q17 Report.

        *i.*     *August 2017 8-K*

Examining the August 2017 8-K first, Lead Plaintiff alleges the August 2017 8-K was materially misleading because it omitted any mention of FOIR's June 1, 2017 denial of HIIQ's TPA licensure application. *Id.* at ¶108. Lead Plaintiff also highlights in passing that, unlike HIIQ's other Form 8-K press releases during the Class Period, the August 2017 8-K lacked a "Regulatory Update" section. *Id.* at ¶108 n.15. Thus, Lead Plaintiff's theory of liability for the August 2017 8-K is based on an alleged omission because Lead Plaintiff asserts that the filing's failure to include information regarding FOIR's denial of HIIQ's TPA licensure made the statements therein materially misleading.

Rule 10b-5(b) makes it unlawful for a person, whether directly or indirectly, by using any means or instrumentality of interstate commerce, or the mails of any facility of any national securities exchange, "to make any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5. In turn, as repeatedly emphasized herein, regardless of whether a plaintiff alleges that a defendant made an "untrue statement or material fact" or that a defendant "omit[ted] to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading," the plaintiff must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement

or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u–4(b)(1)(B).

Here, Lead Plaintiff fails to satisfy this requirement for its August 2017 8-K allegations. Rather than specifying which statements were allegedly misleading as a result of HIIQ's omission of the information pertaining to FOIR's denial of HIIQ's TPA license application, the Complaint merely alleges that the August 2017 8-K was materially misleading because "it failed to make any mention of the [FOIR] denial[.]" (Doc. 43 ¶108). This reference to the entire August 2017 8-K is unavailing, as it fails to highlight the statements rendered misleading. Lead Plaintiff's failure to identify the statements rendered misleading necessarily results in a failure to specify why such statements were misleading, too. Lead Plaintiff's cursory allegation that the August 2017 8-K did not include a "Regulate Update" section does not change this outcome. Therefore, the Complaint lacks sufficient allegations to demonstrate that the August 2017 8-K contained materially misleading statements.

### ii.   2Q17 Report

Lead Plaintiff next attacks the 2Q17 Report, which HIIQ filed with the SEC on August 4, 2017, as materially misleading on several grounds. The Complaint includes the following excerpt from the 2Q17 Report:

> In June 2017, [FOIR] denied [HIIQ's] application based on its determination that [HIIQ] *had not yet provided all information required to process the application.* In June 2017, [HIIQ] appealed the denial with the Florida Division of Administrative Hearings. A final hearing on the matters has been scheduled for October 17-20, 2017, but [HIIQ] is working with [FOIR] to reach a mutually agreeable

Case No.: 8:17–cv–2186–T–17SPF

> resolution of the matter prior to the hearing, *including discussing whether [FOIR] will require [HIIQ] to hold such license at all.*

*Id.* at ¶106 (emphasis in original).

Lead Plaintiff first attacks statements within the 2Q17 Report regarding FOIR's denial of HIIQ's TPA licensure application. As the excerpt demonstrates, the 2Q17 Report acknowledged FOIR's denial of HIIQ's TPA licensure application. Nonetheless, Lead Plaintiff characterizes these statements as materially misleading because Defendants "misrepresented the necessity of obtaining a TPA license" in Florida, including FOIR's December 2016 warning to HIIQ that HIIQ should not transact business in Florida requiring the appropriate licensure until FOIR approved HIIQ's application and such licensure was issued. *Id.* at ¶107. Lead Plaintiff further contends these statements are materially misleading because Defendants "failed to disclose that [HIIQ] had already received TPA licenses in a number of jurisdictions," including Indiana, which required an applicant to secure licensing in its home state, thereby requiring HIIQ to secure licensing in Florida. *Id.* Similarly, Lead Plaintiff claims the 2Q17 Report was materially misleading because it "misrepresented" that HIIQ's "critically important TPA license with [FOIR] had been denied due to, *inter alia*, Florida's discovery of undisclosed legal actions against HIIQ insiders and finding that HIIQ was 'not competent[.]'" *Id.* at ¶111.

Lead Plaintiff also attacks the 2Q17 Report regarding the effect of FOIR's denial on HIIQ's operations. For example, Lead Plaintiff alleges that the 2Q17 Report was materially misleading because Defendants "concealed the severe consequences" of

FOIR's denial of HIIQ's TPA licensure application on HIIQ's "operations and future prospects." *Id.* at ¶108. According to Lead Plaintiff, the 2Q17 Report was materially misleading because it "misrepresented" that FOIR's TPA license application denial (i) "adversely affected [HIIQ's] other licenses and future applications"; and (ii) "was substantially harming [HIIQ's] ability to conduct its core business operations." *Id.* at ¶111. Relatedly, Lead Plaintiff attacks the 2Q17 Report for Defendants' alleged failure to disclose therein certain aspects of HIIQ's private letter to FOIR. Specifically, Lead Plaintiff alleges that Defendants failed to disclose in the 2Q17 Report that HIIQ's private letter to FOIR acknowledged that FOIR's denial would trigger a duty to report in many states, which could result in a domino effect of denials from varying state agencies, despite HIIQ's assertion in the 2Q17 Report that it had "appealed the denial" and that FOIR denied HIIQ's TPA license application "based on its determination that [HIIQ] had not yet provided all information required to process the application[.]" *Id.* at ¶109 (internal quotations and emphasis removed).

Looking first at the 2Q17's representation that HIIQ was discussing whether FOIR would require HIIQ to hold a TPA license, Lead Plaintiff has sufficiently alleged at this stage of the litigation that such statement was misleading as to a material fact. At the outset, Lead Plaintiff's allegations regarding this statement clearly satisfy the applicable pleading standards. Defendants argue, however, that this statement is not actionable because it constitutes a forward-looking statement accompanied by meaningful cautionary statements, thereby insulating Defendants from liability under the PSLRA's safe harbor. The Court disagrees. The statement does not fall under any

of the statutory categories of forward-looking statements. Defendants cite *Carvelli v. Ocwen Financial Corporation*, No. 9:17-cv-80500-RLR, 2018 WL 4941110, at *5 (S.D. Fla. Apr. 30, 2018), in support of their contention. In *Carvelli*, the court held that many of the statements alleged in the complaint were forward-looking statements that were accompanied by sufficient cautionary language. *Id.* A review of these statements reveals, as the *Carvelli* court recognized, that they "either reflect[ed] management's future plans and objectives or offer[ed] predictions concerning [the defendant's] future economic performance." *Id.* The statement regarding whether FOIR will require HIIQ to hold a TPA license is distinguishable. Unlike the forward-looking statements in *Carvelli*, the statement here does not reflect HIIQ's future plans and objectives or offer predictions regarding HIIQ's future economic performance, but instead presents an option for resolving FOIR's denial, in which FOIR decides to not require HIIQ to hold a TPA license. For this reason, the statement is also distinguishable from the "[w]e will continue to work in cooperation with our regulators on this issue" statement in *In re Australia & New Zealand Banking Group Limited Securities Litigation*, No. 08 Civ 11278 (DLC), 2009 WL 4823923, at *11 (S.D.N.Y. Dec. 14, 2009). Furthermore, Defendants' assertion that companies do not maintain an obligation under Rule 10b-5 to accurately predict future regulatory action misses the mark, as Lead Plaintiff is not alleging that HIIQ failed to accurately predict regulatory action in making this statement.

As alleged, this statement was misleading as to a material fact. Lead Plaintiff's allegations sufficiently demonstrate that, in light of the facts existing at the time of this

statement, a reasonable investor exercising due care would have been misled by this statement. Indeed, accepting as true the Complaint's allegations and viewing the facts in the light most favorable to Lead Plaintiff, the Complaint sufficiently demonstrates that this statement conveyed a false impression to the public by suggesting that FOIR may not require HIIQ to hold a TPA license. FOIR had admonished HIIQ months earlier, however, that HIIQ should refrain from transacting business that required the appropriate licensure in Florida until HIIQ's TPA application was approved. The allegations also establish, for pleading purposes, that there is a substantial likelihood that a reasonable investor would have placed substantial significance on this misrepresentation, as it conveyed that FOIR may allow HIIQ to conduct business in Florida without the requisite licensure, when instead the denial allegedly negatively impacted HIIQ's ability to conduct business in its home state.[5]

Next, Lead Plaintiff contends the excerpted sentences from the 2Q17 Report were materially misleading because Defendants failed to disclose that HIIQ had received TPA licenses in other jurisdictions, which in turn required HIIQ to be licensed

---

[5] To the extent that Lead Plaintiff seeks to allege that FOIR's prior admonishment is an omitted material fact necessary to make the statement, in the light of the circumstances in which it was made, not misleading, the Complaint fails to adequately set forth this allegation; instead, the Complaint merely alleges that "Defendants knew or deliberately disregarded" that the excerpted statements from the 2Q17 Report were materially misleading because they "*misrepresented* the necessity of obtaining a TPA license by [HIIQ] in Florida, *including* the fact that in December 2016 [FOIR] warned [HIIQ] that it 'should not transact business that requires such license in this state[.]'" (Doc. 43 ¶107) (original emphasis removed and emphasis added). The Court is not convinced that the inclusion of FOIR's admonishment with the misrepresentation of the necessity of obtaining a TPA license sets forth an omission allegation, especially where Lead Plaintiff has pleaded alleged omissions more clearly in other areas of the Complaint. Although Lead Plaintiff contends in his response in opposition to the Motion that HIIQ's August 3 and 4, 2017 statements regarding the Florida TPA license were materially misleading because they "omitted [FOIR's prior] admonishment," Lead Plaintiff may not amend the Complaint through his response. *Grandrimo v. Parkcrest Harbour Island Condo. Ass'n, Inc.*, No. 8:10-cv-964-T-27MAP, 2011 WL 550579, at *5 (M.D. Fla. Feb. 9, 2011).

in its home state of Florida. The excerpt from the 2Q17 Report revealed that FOIR had denied HIIQ's TPA license application, advised that HIIQ had appealed the denial and was awaiting a final hearing, and explained that HIIQ was "working with" FOIR to reach a "mutually agreeable resolution" of the denial prior to the hearing, including whether FOIR would require HIIQ to even hold a license. (Doc. 43 ¶106). As discussed above, the 2Q17 Report thus suggested that FOIR may not require HIIQ to hold a TPA license. Based on Lead Plaintiff's allegations, however, HIIQ had already received TPA licenses in other jurisdictions that required HIIQ to secure a license in Florida. Accepting Lead Plaintiff's allegations as true and viewing the alleged facts in the light most favorable to Lead Plaintiff, the allegations adequately establish the substantial likelihood that a reasonable investor would have viewed this omitted fact as significantly altering the total mix of information available, as its disclosure would have revealed the purported falsity of the 2Q17 Report's suggestion that FOIR may not require HIIQ to hold a TPA license. The allegations thus adequately demonstrate that the omission of this fact renders this statement misleading to the reasonable investor exercising due care.

Lead Plaintiff also characterizes the 2Q17 Report as materially misleading because it misrepresented the reasons for FOIR's denial of HIIQ's TPA license application. Although the 2Q17 Report states that FOIR denied the application "based on its determination that [HIIQ] had not yet provided all information required to process the application" to FOIR, Lead Plaintiff alleges that FOIR denied the application because (i) the application "contained numerous, material errors and

omissions"; (ii) HIIQ had made material misstatements in its application; (iii) FOIR discovered undisclosed legal actions against HIIQ personnel; and (iv) FOIR's "not competent" finding for HIIQ.[6] *Id.* at ¶¶ 24, 107. As pleaded, the Complaint sufficiently alleges the 2Q17's statement regarding the reasons for FOIR's denial of HIIQ's TPA license application is misleading as to a material fact. Based on the allegations, the statement would have misled a reasonable investor exercising due care because it conveyed that FOIR denied the TPA application only because HIIQ had yet to provide all required information to process the application. The allegations also establish that a reasonable investor would afford considerable significance to this misrepresentation because it dealt with HIIQ's ability to secure a TPA license, and thus conduct significant business, in Florida.

Defendants request the Court to judicially notice FOIR's June 1, 2017 letter advising HIIQ of FOIR's denial of the TPA license application. *See* (Doc. 54-8). The Court declines to take judicial notice of the denial letter at this stage of the litigation, however. First, the denial letter is not a document required by law to be filed, and actually filed, with the SEC. *Bryant*, 187 F.3d at 1278. The Court is cognizant that, upon a motion to dismiss, a district court may also consider documents referenced in the complaint, even if such documents are not attached to the complaint, "if the documents are (1) central to the complaint and (2) no party questions their

---

[6] The Complaint alleges that the denial letter noted the number of HIIQ's application submissions, FOIR's subsequent clarification letters, and extensions of time, but fails to explain whether this recognition served as a basis for the denial. (Doc 43 ¶25).

authenticity." *Basson v. Mortg. Elec. Registration Sys., Inc.*, 741 F. App'x 770, 771 (11th Cir. 2018) (quoting *Day v. Taylor*, 400 F.3d 1272, 1276 (11th Cir. 2005)). Such consideration does not convert the motion to dismiss into a motion for summary judgment. *Day*, 400 F.3d at 1276. A document is central to a complaint when "it is a necessary part of the plaintiff's effort to make out a claim." *Basson*, 741 F. App'x at 771 (internal quotations and alternations omitted). Here, however, the denial letter is not necessary part of Lead Plaintiff's effort to make out a claim, as the 2Q17 Report is the document alleged to contain the misrepresentations. While the denial letter may be *helpful* to state Lead Plaintiff's claim, it is far from "positively needed" or "indispensable" as part of Lead Plaintiff's effort to set forth the claim. *The Merriam-Webster Dictionary*, 468 (11th Ed. 1975). Therefore, the Court declines to judicially notice the denial letter at this stage of the litigation.

As for Lead Plaintiff's assertion that the 2Q17 Report was also materially misleading because Defendants failed to disclose certain aspects of HIIQ's private letter to FOIR, the Court finds this allegation is insufficient. Despite the 2Q17 Report's statement that HIIQ had appealed FOIR's denial and FOIR's denial was based on its determination that HIIQ had yet to provide the necessary information to process the application, Lead Plaintiff alleges Defendants failed to disclose the following private acknowledgment by HIIQ to FOIR:

> The application denial would trigger a duty to report (and thus raise the specter of additional denials) in many of those states as well, and every state in which [HIIQ] would seek to pursue any form of insurance-related licensure in the future (thus raising the specter of a domino effect of denials

that would have to be reported); to say that the interests of [HIIQ] as an entity would be substantially affected is a radical understatement.

(Doc. 43 ¶109).[7]

Lead Plaintiff's assertion that the 2Q17 Report was materially misleading as a result of this purported failure to disclose, as currently pleaded, does not survive. By asserting that Defendants failed to disclose HIIQ's private acknowledgment to FOIR, Lead Plaintiff impliedly contends a duty to disclose this information existed in the first place. However, "Section 10(b) of the Exchange Act and Rule 10b-5(b) do not create an affirmative duty to disclose any and all material information." *Galectin*, 843 F.3d at 1274. Rule 10b-5(b) prohibits those false statements of material fact and "any omissions of material fact necessary in order to make the statements made, in light of the circumstances in which they were made, not misleading." *Id.* (internal quotations omitted). Here, Lead Plaintiff's allegations fail to demonstrate why HIIQ had a duty to disclose its private acknowledgment to FOIR and how HIIQ's private acknowledgment rendered the operative, excerpted portion of the 2Q17 Report misleading. Thus, this particular attack against the 2Q17 Report is insufficient.[8]

---

[7] Lead Plaintiffs requests the Court to judicially notice HIIQ's June 16, 2017 letter to FOIR. *See* (Docs. 59–60). The Court declines to do so, as the letter is not a document required to be filed, and actually filed, with the SEC, *Bryant*, 187 F.3d at 1278, nor is the letter "a necessary part" of Lead Plaintiff's effort to make out his claim, *Basson*, 741 F. App'x at 771.

[8] Furthermore, to the extent that Lead Plaintiff contends the 2Q17 Report was materially misleading because Defendants "*concealed* the severe consequences" of FOIR's denial on "HIIQ's operations and future prospects," (Doc. 43 ¶108) (emphasis added), such assertion is duplicative of Lead Plaintiff's failed attack against the 2Q17 Report for the purported failure to disclose HIIQ's private warning to FOIR. Likewise, Lead Plaintiff's assertion that the 2Q17 Report was materially misleading because it "misrepresented" that FOIR's denial "adversely affected [HIIQ's] other licenses and future applications" and "was substantially harming [HIIQ's] ability to conduct its core business operations" is also duplicative of such failed attack. Indeed, this assertion appears to be grounded in an alleged omission—namely, that the 2Q17 Report was rendered misleading by the omission

Defendants argue the 2Q17 Report did disclose this potential risk because it stated that "an adverse regulatory action in one jurisdiction could result in penalties and adversely affect our license status or reputation in other jurisdictions due to the requirements that adverse regulatory actions in one jurisdiction be reported in other jurisdictions." (Doc. 53 at 16) (internal quotations omitted). The Court now examines this argument and finds it to be unavailing.

The Court takes judicial notice of the 2Q17 Report excerpts for the sole purpose of determining the statements contained therein and not to prove the truth of the contents. *Bryant*, 187 F.3d at 1278. A review of the supplied excerpts reveals that the 2Q17 Report contained the quoted cautionary language at the end of a section discussing regulatory actions in Indiana, Montana, Massachusetts, and Texas. (Doc. 54-5 at 3–4). The 2Q17 Report provided:

> We are proactively communicating and cooperating with all regulatory agencies involved in the above-described examinations and actions and we have recently developed and enhanced our compliance and control mechanisms. However, it is too early to determine whether any of these regulatory matters will have a material impact on our business. Any adverse finding could result in significant penalties or other liabilities and/or a requirement to modify our marketing or business practices and the practices of our third-party distributors, which could harm our business, results of operations or financial conditions. *Moreover, an adverse regulatory action in one jurisdiction could result in penalties and adversely affect our license status or reputation in another jurisdiction due to the requirement that adverse regulatory actions in one jurisdiction be reported to other jurisdictions.*

---

of this information. For the reasons explained above, this assertion is insufficient. To the extent that Lead Plaintiff seeks to allege otherwise, the allegation lacks the requisite specificity to put Defendants on notice.

*Id.* at 4. (emphasis added). Lead Plaintiff maintains that this language "stops far short of accurately describing [HIIQ's] tenuous condition" because a reasonable investor would not believe that the consequences of an adverse regulatory action resulting from these other states' regulatory actions applied to the denial of the Florida TPA license. (Doc. 58 at 15). The Court agrees. The statement is contained in a concluding paragraph discussing enforcement actions in Indiana, Montana, Massachusetts, and Texas. As the paragraph references "the above-described examinations and actions" and "these regulatory matters," the context and placement of the statement within the paragraph suggest that the warning pertains to the regulatory actions in those states. *Id.* At the very least, whether the statement pertains to all adverse regulatory actions is unclear. Consequently, the statement does not defeat Lead Plaintiff's allegations with respect to the 2Q17 Report and HIIQ's private letter to FOIR.[9]

Finally, Lead Plaintiff alleges the 2Q17 Report is materially misleading because it "misrepresented that . . . [HIIQ] had intentionally omitted material information and disregarded FOIR's instructions to complete the TPA [a]pplication." (Doc. 43 ¶111). This allegation is insufficient. First, "[s]ilence, absent a duty to disclose, is not misleading under Rule 10b-5." *Basic*, 485 U.S. at 239 n.17. Instead, Rule 10b-5(b)

---

[9] Defendants also argue the 2Q17 Report "incorporated the risk factors set forth in" the 2016 Annual Report. (Doc. 53 at 16). The provided excerpt from the 2Q17 Report merely states, "There were no material changes to the risk factors disclosed in [the 2016 Annual Report]." (Doc. 54–5 at 9). The Court takes judicial notice of the 2016 Annual Report simply for the purpose of determining which statements the filing contains. *Bryant*, 187 F.3d at 1278. The 2016 Annual Report contains the same cautionary language regarding an adverse regulatory action in one jurisdiction possibly resulting in penalties and adversely affecting HIIQ's licenses or reputations in another jurisdiction, but whether this statement is included under the 2016 Annual Report's "Risk Factors" section is unclear, as Defendants provided only excerpts from the 2016 Annual Report. (Doc. 54–3). Accordingly, this argument is unpersuasive.

prohibits those "omissions of material fact necessary to make the statements made, in the light under which they were made, not misleading." *Galectin*, 848 F.3d at 1274 (internal quotations omitted). This allegation is based on an alleged omission, yet Lead Plaintiff fails to identify the omissions of material fact that rendered the 2Q17 Report misleading, describing the omissions merely as "omitted material information." (Doc. 43 ¶111). This lack of specificity impedes any determination of whether a duty to disclose existed. Next, the allegations do not sufficiently establish which "instructions to complete the TPA [a]pplication" Lead Plaintiff references. For example, this language might refer to specific instructions from FOIR's denial letter that Lead Plaintiff elected not to include in the Complaint, FOIR's prior advisement that HIIQ could resubmit its application within sixty days from December 16, 2016, to avoid submitting new paperwork or incurring new fees, or a general instruction that HIIQ must complete the TPA application. The Complaint does not supply the answer to this inquiry. Accordingly, Lead Plaintiff fails to adequately plead that the 2Q17 Report is materially misleading for this reason.

### iii.    *August 3, 2017 Earnings Call*

Lastly, according to the Complaint, Southwell "failed to disclose the truth" when questioned regarding HIIQ's regulatory compliance during an earnings conference call with investors and analysts on August 3, 2017. *Id.* at ¶110. Specifically, analyst Richard Collamer Close allegedly asked Southwell "to 'go into more details' about [HIIQ's] 'efforts on improved compliance,' noting that 'obviously, there you have outstanding litigation and I guess oversight here . . . [.]'" *Id.* Southwell responded

that the regulatory issues encountered by HIIQ were "a lot of noise . . . that comes from kind of historic items." *Id.* (internal quotations omitted). Lead Plaintiff asserts that, to the contrary, FOIR's then-recent rejection of HIIQ's was not "kind of historic." *Id.* at ¶110. Lead Plaintiff further contends that HIIQ's private letter to FOIR, along with HIIQ's allegedly misleading statements on the Illinois and Montana applications, demonstrated that FOIR's rejection was a "serious and imminent threat to HIIQ's operations." *Id.* at ¶110. The August 2017 8-K's omission of the FOIR denial supposedly enabled Southwell to "conceal" such denial during the teleconference with investors and analysts. *Id.* at ¶108. Lead Plaintiff's allegations appear to contend that Southwell's statement during the earnings call was materially misleading based on an omission of a purportedly material fact—specifically, FOIR's denial of HIIQ's TPA license application—which thereby rendered his representation that HIIQ's regulatory issues stemmed from "kind of historic items" misleading.

Unfortunately, the Complaint provides only partial quotations in an attempt to summarize the conversation between analyst Richard Collamer Close and Southwell. Consequently, the context of the conversation, as pleaded in the Complaint, is ambiguous. For example, whether Richard Collamer Close was referencing regulatory oversight by a particular state agency, such as the Montana CSI, by state agencies across the nation, or merely internally within HIIQ is unclear. Because the context of this quotation is absent from the Complaint, the context of Southwell's response is unclear and, thus, the reason why Southwell's response was allegedly misleading is unclear. The Complaint also only partially quotes Southwell's response, as

demonstrated by the ellipsis included therein, thereby adding to the ambiguity of Southwell's response. Therefore, as the context and nature of Southwell's response on the earnings call is unclear from the Complaint as currently pleaded, the allegations regarding Southwell's statement on the earnings call are insufficient to establish that the statement was materially misleading.

### 3.   Scienter

Lead Plaintiff must also sufficiently allege facts evincing scienter—a defendant's intention to deceive, to manipulate, or to defraud. *Tellabs*, 551 U.S. at 313. It is well-settled in the Eleventh Circuit that Section 10(b) and Rule 10b-5 require Lead Plaintiff to show either "an intent to deceive, manipulate, or defraud, or severe recklessness." *Mizzaro*, 544 F.3d at 1238 (internal quotations omitted). The severe recklessness standard is narrowed "to those highly unreasonable omissions or misrepresentations that involve not merely simple or even excusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it." *Id.* (citing *Bryant*, 187 F.3d at 1282 n.18).

The above analysis demonstrates that Lead Plaintiff has pleaded six actionable material misrepresentations or omissions in connection with the following:

1) The statement in the 3Q16 Report that there were no material changes to the risk factors disclosed in the 2015 Annual Report;

2) The statement in the 3Q16 Report that Montana was among the states reviewing sales practices and potential unlicensed sale of insurance by HIIQ's third-party distributor call centers;

3) The statement in the March 2017 8-K that Montana was among several states reviewing purported non-compliance with insurance laws, non-compliance with sales practices, and/or unlicensed sale of insurance by HIIQ's thirty-party distributor call centers;

4) The 2Q17 Report's statement that FOIR had denied HIIQ's TPA license application based on FOIR's determination that HIIQ had not yet provided the requisite information to process the application; and

5) The 2Q17 Report's statement that HIIQ was cooperating with FOIR to reach a resolution of FOIR's denial of HIIQ's TPA license application, including exploring whether FOIR would even require HIIQ to hold a TPA license at all.

The PSLRA requires Lead Plaintiff, with respect to *each* act or omission alleged to violate the Exchange Act, to "state with particularity facts giving rise to a *strong inference* that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2) (emphasis added). To qualify as strong, "an inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 314. In making this determination, the Court must, of course, accept all factual allegations in the Complaint as true and consider the entirety of the Complaint, documents incorporated

by reference into the Complaint, and those matters of which the Court may take judicial notice. *Id.* at 322. In this analysis, ambiguities and omissions count against inferring scienter. *Mizzaro*, 544 F.3d at 1239.

When determining whether the pleaded facts give rise to a strong inference of scienter, the Court "must take into account plausible opposing inferences." *Tellabs*, 551 U.S. at 310. The Court cannot decide the strength of such inference in a vacuum. *Id.* at 323. Instead, "[t]he inquiry is inherently comparative: How likely is it that one conclusion, as compared to others, follows from the underlying facts?" *Id.* The Court "must consider plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff." *Id.* at 324. The Court must not "scrutinize each allegation in isolation," but instead "assess all the allegations holistically." *Id.* at 326.

The inference of scienter "must be more than merely plausible or reasonable— it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Id.* at 314. Thus, the Complaint will survive only if "a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* at 310. While factual allegations may be aggregated to infer scienter, a plaintiff must nonetheless "allege facts sufficiently demonstrating each defendant's state of mind regarding his or her alleged violations." *Phillips*, 314 F.3d at 1018. Because a corporation does not maintain its own state of mind, the scienter of the corporation's agents must be imputed to the

corporation. *Mizzaro*, 544 F.3d at 1254. "Even then, 'it is not enough to establish fraud on the part of a corporation that one corporate officer makes a false statement that another knows to be false. A defendant corporation is deemed to have the requisite scienter for fraud only if the individual corporate officer making the statement has the requisite level of scienter . . . .'" *Maverick Fund, L.D.C. v. Lender Processing Servs., Inc.*, No. 3:13-cv-1585-J-32JRK, 2015 WL 5559761, at *5 (M.D. Fla. Sept. 21, 2015) (quoting *Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*, 365 F.3d 353, 366 (5th Cir. 2004)).

The Court will analyze scienter as to only those actionable material misrepresentations or omissions identified thus far and as to each Insider Defendant. At the outset, the Complaint is littered with conclusory scienter allegations. For example, the Complaint alleges "Insider Defendants either knowingly or with deliberate recklessness failed to disclose that the Montana CSI had accused [HIIQ] of engaging in a fraudulent scheme against Montana's residents," (Doc. 43 ¶52) (internal quotations omitted), and asserts that "Defendants knew or deliberately disregarded" that material developments had occurred between the filing of the 2015 Annual Report and the 3Q16 Report's filing, *Id.* at ¶89. Such legal conclusions are often unsupported by any factual allegations. More troubling, though, is the frequency with which the Complaint fails to distinguish among the Insider Defendants, opting instead to refer to them collectively as "Insider Defendants" or just "Defendants" (the latter of which

includes HIIQ, despite the inability of corporation to act on its own).[10] *See, e.g., id.* at

¶¶54, 108. Other areas of the Complaint evince more creative versions of these

collective references. *See, e.g., id.* at ¶¶14, 28. Courts in this District have dismissed

securities fraud class action complaints that fail to differentiate among individual

defendants. *See, e.g., City of St. Clair Shores Gen. Emps.' Ret. System v. Lender Processing

Servs., Inc.*, No. 3:10-cv-1073-J-32JBT, 2012 WL 1080953, at *4 (M.D. Fla. Mar. 30,

2012).

Nonetheless, while these failures are harmful to Lead Plaintiff's attempts to

plead scienter, the Complaint does include some factual allegations in an attempt to

sufficiently plead scienter as to each of the Insider Defendants.[11] Consequently, the

appropriate inquiry is into whether, through such factual allegations, Lead Plaintiff

sufficiently pleads scienter. The analysis below demonstrates that Lead Plaintiff

successfully pleads scienter as to Hershberger, but fails to sufficiently plead scienter as

to Southwell and Kosloske.

      *a.*    *Southwell*

The Complaint contains several allegations regarding Southwell's purported

scienter. First, Lead Plaintiff points to a notarized affidavit that Southwell signed,

together with Hershberger, on October 31, 2016, for HIIQ's application for a TPA

---

[10] To the extent that Lead Plaintiff seeks to utilize the group pleading doctrine, in which "allegations of securities fraud based upon statements in group published information are presumed to be the collective action of corporate officers involved in the day-to-day management of the corporation," the doctrine does not apply to the PSLRA's scienter pleading requirements. *In re Sunbeam Sec. Litig.*, 89 F. Supp. 2d 1326, 1340–41 (S.D. Fla. 1999).

[11] Although Lead Plaintiff argues he is entitled to an inference of scienter under the core operations doctrine in his response in opposition to the Motion, his argument is unpersuasive, given the manner in which Lead Plaintiff frames his argument and distinctions in the cited cases. (Doc. 58 at 18).

license with the Montana CSI. (Doc. 43 ¶74). The affidavit stated that, to Southwell's

knowledge, he had never been an officer of a company that had its license suspended,

canceled, revoked, non-renewed, or subjected to any administrative action. *Id.*

However, Montana had issued its cease and desist order against HIIQ and suspended

HIIQ's license just a few months prior. *Id.* at ¶73. The Complaint also heavily relies

on an alleged July 20, 2016 representation to investors regarding Southwell's role in

addressing regulatory matters. *See, e.g., id.* at ¶¶91, 94, 98. Specifically, Lead Plaintiff

alleges that in response to the several state regulatory examinations into the sales

practices and potential unlicensed sale of insurance by HIIQ's call centers, HIIQ stated

in a July 20, 2016 8-K that "Southwell, with his strong skills and experience with

insurance regulatory matters, will lead [HIIQ's] efforts in responding to and addressing

any such regulatory matters." [12] *Id.* at ¶12. Relatedly, Lead Plaintiff alleges that

Southwell "possessed the power and authority to control the contents of press releases,

investor and media presentations[,] and all filings HIIQ made with the SEC during the

Class Period." *Id.* at ¶42.

Lead Plaintiff also points out that Southwell "certified [HIIQ's] periodic Class

Period financial reports filed with the SEC" under Sarbanes-Oxley and "regularly

spoke with investors and securities analysts" regarding HIIQ during conference calls

and presentations. *Id.* at ¶41. Aside from the purported August 3, 2017 earnings call,

---

[12] Hershberger repeated this proclamation during an August 9, 2016 earnings call, in which he stated that Southwell held "a significant amount of expertise in state regulatory matters and would be responsible for sales, marketing distribution[,] and operations." (Doc. 43 ¶91 n.14) (internal quotations omitted).

however, for which Lead Plaintiff failed to sufficiently allege a material misrepresentation or omission, the Complaint lacks any allegations regarding Southwell's regular conference calls and presentations with investors and analysts. Furthermore, Southwell signed a Sarbanes-Oxley certification for only the 2Q17 Report. *Id.* at ¶105.

Lead Plaintiff also attempts to establish scienter for Southwell by relying on Southwell's signature on certain SEC filings. Southwell signed the 2016 Annual Report, the 1Q17 Report, the 2017 Registration Statement, and the 2Q17 Report. *Id.* at ¶40. Lead Plaintiff has pleaded actionable misrepresentations or omissions as to only the 2Q17 Report. The Complaint also alleges that Southwell, together with Hershberger, executed a "Declaration and Certification" under penalty of perjury with the Illinois Department of Insurance on September 1, 2017, in connection with HIIQ's application to renew its TPA license in Illinois. *Id.* at ¶¶29, 77. This "Declaration and Certification" supposedly asked: "[H]ave you ever been refused a license to act as a [TPA], agent, broker, producer, or solicitor, or has a license to act as such ever been denied, suspended, revoked, or surrendered for regulatory reasons in any state either as an individual or as a member of entity?" *Id.* at ¶77. Even though FOIR had denied HIIQ's TPA application weeks earlier and HIIQ's health insurance producer license was still suspended, Southwell answered "no" to this inquiry. *Id.*

As previously mentioned, the Complaint heavily relies on Southwell's role in leading HIIQ's efforts in addressing and responding to insurance regulatory matters. By way of example, Lead Plaintiff relies chiefly on this allegation to demonstrate

Southwell's scienter for the purported misrepresentations or omissions in the 3Q16 Report, the March 2017 8-K, and the 2Q17 Report. *Id.* at ¶¶91, 94, 110. Simply alleging that certain defendants must have known the falsity of certain statements based on their senior management positions and access to inside information is insufficient to plead scienter. *In re Smith Gardner Sec. Litig.*, 214 F. Supp. 2d 1291, 1303 (S.D. Fla. 2002). Relatedly, allegations that a company's officer or director was involved in the daily operations of the company, standing alone, fails to satisfy the pleading requirements of Rule 9(b) and the PSLRA. *Cheney v. Cyberguard Corp.*, No. 98-6879-CIV-GOLD, 2000 WL 1140306, at *9 (S.D. Fla. July 31, 2000) (quoting *In re Cendant Corp. Sec. Litig.*, 76 F. Supp. 2d 539, 547 (D.N.J. 1999)) (internal quotations omitted).

Thus, despite Lead Plaintiff's strong reliance on Southwell's purported role, such allegation in isolation would be insufficient to plead scienter. The Complaint does not leave this allegation in solitude, however, but provides additional allegations in an effort to adequately plead Southwell's severe recklessness or intent to deceive, manipulate, or defraud. As previously mentioned, Southwell answered "no" to two questions regarding prior regulatory action on separate applications for TPA licenses, signed the 2Q17 Report, and also signed a Sarbanes-Oxley certification for the 2Q17 Report. A Sarbanes-Oxley certification is probative of scienter only when "the person signing the certification had reason to know, or should have suspected, due to the presence of glaring accounting irregularities or other 'red flags' that the financial statements contained material misstatements or omissions." *Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1266 (11th Cir. 2006). "Red flags" are defined as "those facts

which come to the attention of an auditor which would place a reasonable auditor on notice that the audited company was engaged in wrongdoing to the detriment of its investors." *Id.* at 1268. Otherwise, "[t]he mere fact that certain defendants signed SEC filings is not indicative of scienter and certainly does not create a more compelling inference than the inference that defendants' signatures were routine." *Durham v. Whitney Information Network, Inc.*, No. 06-cv-00687, 2009 WL 3783375, at *18 (M.D. Fla. Nov. 10, 2009).

The law tasks the Court with determining whether these pleaded facts give rise to a strong inference that Southwell acted with the required state of mind as to *each* act or omission alleged to violate the Exchange Act. The Court "must take into account plausible opposing inferences." *Tellabs*, 551 U.S. at 310. These pleaded facts, even when viewed in the light most favorable to Lead Plaintiff and analyzed collectively, demonstrate that the resulting inference of scienter for Southwell is "merely plausible or reasonable," rather than "cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Id.* at 314. Thus, any resulting inference of scienter fails to qualify as "strong."

Lead Plaintiff's conclusive allegations and failure to set forth more specific allegations as to each of the Insider Defendants weakens Lead Plaintiff's attempt to establish a strong inference of scienter for Southwell. Furthermore, to argue that the one Sarbanes-Oxley certification executed by Southwell is probative of his scienter, Lead Plaintiff asserts that "red flags" existed "throughout the Class Period." (Doc. 58 at 21). Lead Plaintiff merely recites the Complaint's factual allegations regarding

Southwell's purported scienter in support of this assertion, however, such as Southwell's role in leading HIIQ's efforts in responding to and addressing insurance regulatory matters. *Id.* As this argument fails to properly link the allegations to "those facts which come to the attention of an auditor which would place a reasonable auditor on notice that the audited company was engaged in wrongdoing to the detriment of its investors," the signature receives less weight in the scienter analysis. *Garfield*, 466 F.3d at 1266. Finally, unlike the allegations pertaining to Hershberger and Kosloske, Lead Plaintiff also does not allege that Southwell sold stock during the Class Period to maximize returns on nonpublic information, which weighs against inferring scienter. *Mizzaro*, 544 F.3d at 1253.

A competing, nonculpcable explanation is that Southwell was unaware of the statements in the 3Q16 Report and March 2017 8-K, as he did not sign either filing or participate in the accompanying earnings call for the 3Q16 Report. He may have viewed the statement that Montana was "reviewing" the sales practices and potential unlicensed sale of insurance by HIIQ's third-party call centers as sufficient because Montana merely suspended HIIQ's health producer license, rather than terminating it, which signified a temporary halt of HIIQ's activity pending further examination. HIIQ's representation in July of 2016 that Southwell would respond and address regulatory matters evinces that he would be responsible for addressing future regulatory matters, not that he was necessarily familiar with the Montana CSI's earlier suspension of the license, nor does it demonstrate that he remained tasked with this duty when FOIR denied HIIQ's TPA license application in June of 2017. All opposing

inferences point to simple neglect, rather than an intent to defraud, manipulate, or deceive, or an "*extreme* departure from the standards of ordinary care." *Mizzaro*, 544 F.3d at 1238 (emphasis added). The inference that Southwell acted with the requisite state of mind is not as compelling as any cognizable opposing inferences.

Accordingly, Lead Plaintiff's claim against Southwell for violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder fails.

> b.    *Hershberger*

Many of the scienter allegations for Hershberger mirror the scienter allegations for Southwell. In September 2016, Hershberger allegedly signed HIIQ's application to renew its TPA license in Illinois under penalty of perjury, which asked whether HIIQ had ever been "refused a license to act as a [TPA], agent, broker, producer, or solicitor, or has a license to act as such ever been denied, suspended, revoked, or surrendered for regulatory reasons in any state either as an individual or as a member of entity?" *Id.* at ¶73. Hershberger answered "no" to this question. *Id.* Additionally, like Southwell, Hershberger signed a notarized affidavit in October of 2016 for HIIQ's TPA license with the Montana CSI, stating that, to his knowledge, he had never been an officer of a company that had its license suspended, canceled, revoked, non-renewed, or subjected to any judicial, regulatory, administrative, or disciplinary action. *Id.* The Montana CSI had previously suspended HIIQ's health insurance producer license in May of 2016. *See id.* at ¶75.

Additionally, Lead Plaintiff points to Hershberger's signature on certain SEC filings in alleging scienter. Because the Court will analyze only those SEC filings

containing actionable misrepresentations or omissions, the Court will consider only the 3Q16 Report, March 2017 8-K, and 2Q17 Report. *See id.* ¶44. Further, like Southwell, Hershberger "certified [HIIQ's] periodic Class Period financial reports filed with the SEC under [Sarbanes-Oxley], and regularly spoke with investors and securities analysts about [HIIQ] during conference calls and investor presentations." *Id.* at ¶45. Just like the allegations for Southwell, the Complaint lacks any allegations to substantiate Hershberger's purported conference calls and investor presentations, rather than Hershberger's November 3, 2016 earnings call, for which Lead Plaintiff failed to plead an actionable misrepresentation or omission. Hershberger signed Sarbanes-Oxley certifications for the 3Q16 Report and the 2Q17 Report. *Id.* at ¶¶91, 105.

Lead Plaintiff offers even less support through his response in opposition for his argument that the Sarbanes-Oxley certifications executed by Hershberger are probative of scienter than he offers for Southwell, however. In support of his claim that "red flags" existed "throughout the Class Period," Lead Plaintiff references only the instances in which Hershberger provided allegedly inaccurate information to state regulatory agencies on TPA applications. (Doc. 58 at 21). Lead Plaintiff again fails to properly link the allegations to "those facts which come to the attention of an auditor which would place a reasonable auditor on notice that the audited company was engaged in wrongdoing to the detriment of its investors." *Garfield*, 466 F.3d at 1266. Thus, the Sarbanes-Oxley certifications executed by Hershberger receive less weight in the scienter analysis.

Next, Lead Plaintiff claims that Hershberger held the authority and power to control the contents of investor and media presentations, press releases, and SEC filings during the Class Period due to his position as chief financial officer. (Doc. 43 ¶46). Although simply alleging that a defendant must have known the falsity of certain statements based on his or her senior management position and access to inside information is insufficient to plead scienter, *Smith Gardner*, 214 F. Supp. 2d at 1303, Lead Plaintiff includes several additional allegations. Furthermore, as mentioned above, Hershberger and Southwell also executed a "Declaration and Certification" under penalty of perjury with the Illinois Department of Insurance on September 1, 2017, in connection with HIIQ's TPA license renewal application. *Id.* at ¶¶29, 77. Like Southwell, Hershberger answered "no" to the question that asked: "[H]ave you ever been refused a license to act as a [TPA], agent, broker, producer, or solicitor, or has a license to act as such ever been denied, suspended, revoked, or surrendered for regulatory reasons in any state either as an individual or as a member of entity?" *Id.* at ¶77.

Finally, Lead Plaintiff's allegations regarding Hershberger's stock trading plan and stock sales is largely the distinguishing factor between Lead Plaintiff's scienter allegations for Southwell and Hershberger. Lead Plaintiff points to Hershberger's stock trading plan and stock sales during the Class Period to establish scienter. "Stock sales or purchases timed to maximize returns on nonpublic information weigh in favor of inferring scienter; the lack of similar sales weighs against inferring scienter." *Mizzaro*, 544 F.3d at 1253. Lead Plaintiff must allege facts demonstrating that Hershberger's

stock sales were "unusual" or "suspicious" to the extent that he relies on Hershberger's stock sales to infer fraudulent intent. *Durham*, 2009 WL 3783375, at *17. In determining whether the sales were "suspicious" or "unusual," courts examine: "(1) the amount and percentage of shares sold; (2) the timing of the sales; and (3) the consistency between the sales and the insider's prior trading history." *Smith Gardner*, 214 F. Supp. 2d at 1303. "Stock sales completed pursuant to a Rule 10b5-1 trading plan cannot support an inference of scienter unless the trading plan was adopted during the class period and the plaintiff alleges with particularity facts showing that the defendant was aware of an impending price drop at the time the plan was adopted." *Mogensen v. Body Cent. Corp.*, 15 F. Supp. 3d 1191, 1222 (M.D. Fla. 2014).

Hershberger purportedly adopted the trading plan on November 18, 2016, shortly after the commencement of the Class Period, to "conceal the illicit nature of [the] Class Period stock sales[.]" (Doc. 43 ¶14). Thus, Hershberger adopted the trading plan during the Class Period. However, the Complaint does not sufficiently allege that Hershberger knew of an impending price drop at the time the plan was adopted, which lowers the significance of this allegation when conducting the holistic analysis of the factual allegations.

Turning next to Hershberger's Class Period stock sales, Hershberger sold 39,500 shares of his personally-held common stock, which represented approximately one-fifth of his holdings, between November 17, 2016, and November 21, 2016, resulting in $400,000 in proceeds. *Id.* at ¶¶ 14, 117. At the time of this 2016 sale, HIIQ had resubmitted its TPA license to FOIR after FOIR had returned the prior application as

incomplete, (Doc. 58 at 19), and the Montana CSI had recently suspended HIIQ's health insurance producer license, (Doc. 43 ¶69). Additionally, Hershberger received $300,000 from selling 15,000 shares of his HIIQ common stock, allegedly outside the scope of his 10b5-1 trading plan, on May 9, 2017. *Id.* at ¶120. This sale of 15,000 shares represented approximately 10% of his holdings and occurred after HIIQ resubmitted its Florida TPA licensure application, but before FOIR's ultimate denial of the same. *See id.* On August 31, 2017, and September 1, 2017, only a few weeks after HIIQ had filed the 2Q17 Report with the SEC, Hershberger sold 17,769 shares of his HIIQ common stock, resulting in proceeds of $558,384. *Id.* at ¶121. The Complaint does not provide the number of shares Hershberger owned at the time of this sale.

The timing of each sale is significant. The November 2016 sale occurred following (i) the Montana CSI's suspension of HIIQ's health insurance producer license; (ii) FOIR's return of HIIQ's prior TPA license application as incomplete; and (iii) HIIQ's filing of the 3Q16 Report, which included Hershberger's signature and an executed Sarbanes-Oxley certification. A few weeks following this sale, HIIQ withdrew its resubmitted TPA application. *Id.* at ¶14. As for the May 2017 sale, HIIQ had recently resubmitted its TPA application to FOIR after FOIR had advised HIIQ not to transact business requiring such a license in Florida, the Indiana Department of Insurance had expanded the forty-two state investigation months earlier, and FOIR would subsequently deny HIIQ's TPA application less than a month later. *Id.* at ¶¶ 7, 17, 76. Hershberger sold more stock shortly thereafter, once HIIQ's stock price allegedly reached a high of $36.35 per share and just prior to executing the Declaration

and Certification with the Illinois Department of Insurance and the release of the *Seeking Alpha* Report.[13] *Id.* at ¶¶29–30. Whether the Complaint details the full extent of Hershberger's trading history is unclear; instead, the Complaint provides only allegations regarding Hershberger's three sales during the Class Period. Without this information, the Court is unable to compare the Class Period sales with any sales or purchases outside of the Class Period for purposes of determining whether the Class Period sales were "suspicious" or "unusual." Nonetheless, the frequency of the Hershberger's sales during the Class Period, taken together with the details of such sales, sheds some light on whether these sales were "suspicious" or "unusual."

The pleaded facts demonstrate a strong inference that Hershberger acted with the requisite state of mind with respect to each act or omission alleged to violate the Exchange Act. Although some of the allegations offered to demonstrate Hershberger's scienter are far from perfect, viewing the allegation holistically clearly provides a "cogent" and "compelling" inference that overtakes any opposing inference of nonfraudulent intent. *Tellabs*, 551 U.S. at 314. Unlike the scienter allegations for Southwell, the allegations for Hershberger are more closely tied to the actionable

---

[13] In his response in opposition to the Motion, Lead Plaintiff argues for the first time that Hershberger timed his stock sales to occur between HIIQ's resubmission of its TPA application and FOIR's denial. (Doc. 58 at 19). In support, Lead Plaintiff asserts Hershberger knew that FOIR would "delay or deny the TPA license" because FOIR had denied the application "partially due to Hershberger's concealment of information about pending litigation." (Doc. 58 at 19). Lead Plaintiff omits these allegations from the Complaint, however. Lead Plaintiff may not amend the Complaint through his response in opposition to the Motion. *Grandrimo*, 2011 WL 550579, at *5.

misrepresentations and omissions and, overall, are more persuasive for purposes of this stage of the litigation.

#### c.   Kosloske

The Complaint's scienter allegations for Kosloske are scarce and relate to only his stock sales and his signature on certain documents.[14] As previously mentioned, HIIQ filed an application for a TPA license with the Montana CSI on October 31, 2016, for which Southwell and Hershberger signed affidavits indicating that, to their knowledge, they had never been officers of a company that had its license suspended, revoked, non-renewed, canceled, or subjected to an administrative, judicial, regulatory, or disciplinary action. *Id.* at ¶74. Kosloske, on the other hand, answered this question affirmatively, but allegedly failed to provide further details in response to follow-up questioning. *Id.* Furthermore, although Kosloske signed the 2016 Annual Report and the 2017 Registration Statement, neither of these filings contain actionable misrepresentations or omissions.

Lead Plaintiff also relies on Kosloske's sale of shares during the secondary offering in March of 2017. Kosloske received approximately $39.4 million in proceeds in one large sale by him or entities controlled by him in March of 2017 after selling

---

[14] Lead Plaintiff also seeks judicial notice of a Form 8-K filed by HIIQ on June 8, 2018, which announced: (i) the Board of Directors of HIIQ terminated Kosloske's employment agreement without cause on June 7, 2018, but Kosloske would continue to serve as a direct of HIIQ; and (ii) Kosloske informed HIIQ on June 7, 2018, that entities controlled by him "sold an aggregate of 1,300,000 shares of [HIIQ's] Class A common stock in a transaction under Rule 144 under the Securities Act of 1933, as amended." (Doc. 62-1). Lead Plaintiff seeks judicial notice of this filing to strengthen his scienter allegations for Kosloske. *See* (Doc. 61 at 2 n.1). Such request necessarily requires the Court to judicially notice the filing to prove the truth of the contents therein, rather than to determine the statements contained therein, which the Court declines to do at this stage of the litigation. *See Bryant*, 187 F.3d at 1278. Accordingly, the Court declines to judicially notice the June 8, 2018 8-K for the requested purpose.

three million shares of his personally-held common stock, which represented almost 44% of his total holdings. *Id.* at ¶20. This sale of shares resulted from the second offering, which HIIQ announced in the Final Prospectus. *Id.* at ¶99. HIIQ did not sell any shares in this offering, and Kosloske received the net proceeds. *Id.* at ¶100.

While Lead Plaintiff at least attempts to link the actionable misrepresentations or omissions to Southwell, Hershberger, or both individuals, the Complaint is devoid of any attempt to link Kosloske to the actionable misrepresentations or omissions. Even when viewing the allegations holistically, Lead Plaintiff's reliance on an allegation regarding Kosloske's signature on a TPA license application in October 2016, stock sale allegations, and unsupported legal conclusions are insufficient to establish a strong inference that Kosloske acted with severe recklessness or an intent to deceive, manipulate, or defraud with respect any of the actionable misrepresentations or omissions. Consequently, Lead Plaintiff fails to "state with particularity facts giving rise to a strong inference" that Kosloske acted with the required state of mind with respect to his alleged violations of the Exchange Act. 15 U.S.C. § 78u–4(b)(2).

Lead Plaintiff must allege facts demonstrating that Kosloske's stock sales were "unusual" or "suspicious" to the extent that he relies on Kosloske's stock sales to infer fraudulent intent. *Durham*, 2009 WL 3783375, at *17. As previously mentioned, in determining whether the sales were "suspicious" or "unusual," courts examine: "(1) the amount and percentage of shares sold; (2) the timing of the sales; and (3) the

consistency between the sales and the insider's prior trading history." *Smith Gardner*, 214 F. Supp. 2d at 1303.

Here, Kosloske's sale of shares during the secondary offering in March of 2017 is the only sale of shares described in the Complaint. Lead Plaintiff asserts this sale was suspicious based on its timing and amount. *See* (Doc. 43 ¶¶112, 114–115). As detailed above, the March 2017 sale was significant, as it represented almost 44% of Kosloske's total holdings, and the proceeds allegedly went straight to Kosloske. *Id.* at ¶126. As for the timing of the sale, the Final Prospectus Supplement, which was filed on March 8, 2017, announced the secondary offering and the sale of the shares. *Id.* Two days earlier, the commissioner of the Indiana Department of Insurance had issued a Modified Examination Warrant to HIIQ, which allegedly expanded the forty-two-state examination against HIIQ. *Id.* at ¶76. HIIQ allegedly had not disclosed the withdrawal of its Florida TPA licensure application or FOIR's accompanying response. Notably, however, the Complaint does not detail Kosloske's trading history or lack thereof. The Complaint does contain two bewildering paragraphs discussing Kosloske's acquisition of 8,666,667 shares of Class B common stock of Health Plan Intermediaries Sub, LLC, the sole managing member of which was Health Plan Intermediaries, LLC, of which Kosloske was the sole managing member and primary manager. *Id.* at ¶114. The Complaint alleges that these shares of Class B common stock were exchangeable for an equal number of shares of Class A common stock and, *if* Kosloske executed such an exchange, he would "control 65% of the Class A common stock." *Id.* The Complaint adds that, following HIIQ's acquisition of HealthPocket in

July of 2014, HIIQ filed a prospectus regarding the sale of 1,725,00 shares that Health Plan Intermediaries Sub, LLC and Health Plan Intermediaries, LLC owned at a price of $12.15 per share. *Id.* at ¶115. Following HIIQ's initial public offering in February 2013, "no individual identified by the company as a corporate insider sold any stock outside of a 10b5-1 trading plan until March 8, 2016." *Id.* (internal footnotes omitted).

At the outset, these allegations fail to explain both whether Kosloske effected such an exchange and the effect, if any, this arrangement had on the damages allegedly sustained by Lead Plaintiff and putative class members. Similarly, Lead Plaintiff's failure to provide more details regarding this sale merely raises questions and renders the allegations incapable of providing any helpful information for the scienter analysis. For example, there is no mention of how much profit, if any, Kosloske received from the sale. The cursory mention of Kosloske's March 8, 2016 disclosure that "HIIQ had withheld 553 of his shares 'to satisfy tax liability incident to vesting of restricted stock'" is likewise incapable of providing any helpful information for the scienter analysis. *Id.* at ¶115 n.17.

The Court recognizes that prior trading history is merely a factor for consideration, *see Davidco Investors, LLC v. Anchor Glass Container Corp.*, No. 8:04CV2561T-24EAJ, 2006 WL 547989, at *20 (M.D. Fla. Mar. 6, 2006), but it is unclear whether Kosloske's Class Period sale was "routine or extraordinary," *Smith Gardner*, 214 F. Supp. 2d at 1304, which damages the strength of Lead Plaintiff's scienter allegations, given his strong reliance on Kosloske's sale. Lead Plaintiff's failure to provide Kosloske's prior trading history, including the full extent and

frequency of Kosloske's purchase of HIIQ shares, deprives the Court of any basis for analyzing the sale in March of 2017 in context. Lead Plaintiff's heavy reliance on Kosloske's stock sale allegations in combination with the scarcity of other scienter allegations distinguishes Lead Plaintiff's scienter allegations for Kosloske from those for Hershberger.

The Court now conducts a comparative analysis of the inferences of the conclusions arising from the pleaded facts. The inferences favoring Lead Plaintiff tell a tale in which Kosloske avoided providing follow-up answers regarding the Montana TPA license application to avoid further scrutiny of HIIQ. Further, after realizing the previous, continuing, and future adverse regulatory action against HIIQ, Kosloske elected to sell a substantial portion of his holdings in HIIQ before the adverse regulatory actions could be disclosed to the public and cause significant losses to HIIQ. Under this inference, Kosloske performed these actions with the intent to deceive, manipulate, defraud, or with severe recklessness. But, of course, this is just one inference. A competing, plausible inference is that Kosloske did not receive the request for follow-up information or disregarded it as inconsequential to the application and sold his stock for a nonculpable reason, such as a desire to diversify his assets or other personal financial reasons. Given the Complaint's strong reliance on Kosloske's sale without providing prior trading history, the Complaint fails to push the scienter allegations for Kosloske across the line to "cogent and at least as compelling" as opposing inferences of nonfraudulent intent. *Tellabs*, 551 U.S. at 314. Indeed, in assessing whether the factual allegations demonstrate a strong inference of scienter,

ambiguities and omissions count against inferring scienter. *Mizzaro*, 544 F.3d at 1239. The totality of the analysis demonstrates that Lead Plaintiff has not stated facts with particularity "giving rising to a *strong inference* of scienter" that Kosloske acted with severe recklessness or an intent to defraud "with respect to each act or omission" in violation of the Exchange Act. 15 U.S.C. § 78u–4(b)(2)(emphasis added).

Accordingly, Lead Plaintiff's claim against Kosloske for violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder fails.

### 4.    *Loss Causation*

Lead Plaintiff also must plead loss causation, which requires Lead Plaintiff to establish that Defendants' fraud was the but-for cause and proximate cause of Leading Plaintiff's later losses. *FindWhat*, 658 F.3d at 1309. Defendants argue the Complaint must be dismissed because Lead Plaintiff has failed to sufficiently plead loss causation. For the reasons stated below, Lead Plaintiff has sufficiently pleaded loss causation as to only one misrepresentation in the 2Q17 Report.

Preliminarily, Lead Plaintiff must plead loss causation in accordance with only the pleading standards of Rule 8. *See Dura Pharm., Inc.*, 544 U.S. at 346. *See also In re Teco Energy, Inc. Sec. Litig.*, No. 8:04-cv-1948-T-27EAJ, 2006 WL 2884960, at *5 (M.D. Fla. Oct. 10, 2006); *In re: Ebix, Inc. Sec. Litig.*, 898 F. Supp. 2d 1325, 1347 (N.D. Ga. 2012). While Lead Plaintiff need not demonstrate that Defendants' misconduct was the sole and exclusive cause of his injury, he must demonstrate that Defendants' actions were a "substantial" or "significant" cause of the injury. *Id.* Lead Plaintiff alleges that this case is a fraud-on-the-market causation case. (Doc. 43 ¶¶ 148–52). The

fraud-on-the-market theory is based on the efficient market hypothesis, which states that "in an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business." *FindWhat*, 658 F.3d at 1309–10 (citing *Basic*, 485 U.S. at 241) (internal quotations omitted). Under this theory, disclosure of information already known by the market will not result in a change in the stock price because the market has already digested such information and incorporated such information into the price. *Id.* at 1310. Thus, "the market price of shares traded on well-developed markets reflects all publicly available information, and, hence, any material misrepresentations," which leads to the presumption "that an investor relies on public misstatements whenever he buys or sells stock at the price set by the market." *Meyer*, 710 F.3d at 1195 (internal quotations omitted).

"A fraud on the market occurs when a material misrepresentation is knowingly disseminated to an informationally efficient market." *FindWhat*, 658 F.3d at 1310 (internal quotations omitted). In a fraud-on-the-market case, the reliance element of a Rule 10b-5 claim is rebuttably presumed as long as "the defendant's misstatement was material and the market was informationally efficient." *Id.* Loss causation "'provides the bridge between reliance and actual damages.'" *Id.* at 1311 (quoting *In re Cooper Cos. Sec. Litig.*, 254 F.R.D. 628, 638 (C.D. Cal. 2009)).

"Proof of fraudulently inflated purchase price only satisfies reliance; loss causation requires going a step further to supply 'the logical link between the inflated share purchase price and any later economic loss.'" *Id.* (quoting *Dura Pharm., Inc.*, 544

U.S. at 342). Loss causation in fraud-on-the-market cases "requires proof that the fraud-induced inflation that was baked into the plaintiff's purchase price was subsequently removed from the stock price, thereby causing losses to the plaintiff." *Id.* The relevant question in a loss causation analysis in a fraud-on-the-market case is: "even if the plaintiffs paid an inflated price for the stock as a result of the fraud (i.e., even if the plaintiffs relied), did the relevant truth eventually come out and thereby cause the plaintiffs to suffer losses?" *Id.* at 1312.

Lead Plaintiff may circumstantially demonstrate loss causation in this fraud-on-the-market case by

> (1) identifying a "corrective disclosure" (a release of information that reveals to the market the pertinent truth that was previously concealed or obscured by the company's fraud); (2) showing that the stock price dropped soon after the corrective disclosure; and (3) eliminating other possible explanations for this price drop, so that the factfinder can infer that it is more probable than not that it was the corrective disclosure—as opposed to other possible depressive factors—that caused at least a "substantial" amount of the price drop.

*Id.* at 1311–12.

For a disclosure to be a corrective disclosure, it does not need to precisely mirror the earlier misrepresentation, but it must at least relate back to the misrepresentation, rather than some other negative information regarding the company. *Meyer*, 710 F.3d at 1197. To qualify as corrective, "the disclosure must share the same subject matter as the prior misstatement; only then can the disclosure be said to have a 'corrective effect,' rather than merely a 'negative effect.'" *FindWhat*, 658 F.3d at 1312 n.28

(quoting *In re Initial Pub. Offering Sec. Litig.*, 399 F. Supp. 2d 261, 266 (S.D.N.Y. 2005)) (original emphasis removed). A plaintiff is not required to rely on a single complete, corrective disclosure, but may instead demonstrate that a series of partial disclosures resulted in the truth leaking into the marketplace. *Meyer*, 710 F.3d at 1197.

A corrective disclosure is a "release of information that reveals to the market the pertinent truth that was previously concealed or obscured by the company's fraud." *FindWhat*, 658 F.3d at 1311. Significantly, corrective disclosures must present new facts to the market—"that is, [facts] publicly revealed for the first time." *Meyer*, 710 F.3d at 1197–98. Thus, unsurprisingly, an analyst or short seller's mere repackaging of already-public information cannot constitute a corrective disclosure. *Id.* at 1199.

Lead Plaintiff identifies two corrective disclosures in the Complaint: (1) the Final Prospectus;[15] and (2) the *Seeking Alpha* Report. (Doc. 43 ¶¶ 126–35). Defendants argue that neither of these disclosures were corrective disclosures. (Doc. 53 at 8–14). The Court will address each in turn.

> a.   *Final Prospectus Supplement*

The Final Prospectus Supplement, which HIIQ filed with the SEC on March 8, 2017, announced that the selling stockholders identified therein were offering

---

[15] Lead Plaintiff asserts the "March 8, 2017 disclosure" regarding Kosloske's "large insider transaction" was a partial disclosure that proximately caused HIIQ's nearly ten percent share price decline. (Doc. 43 ¶128). Defendants interpret this "March 8, 2017 disclosure" as referring to the Final Prospectus Supplement. (Doc. 53 at 9) (identifying the "March 8, 2017 stock announcement" as a corrective disclosure). Lead Plaintiff does not argue otherwise in his response in opposition to the Motion. (Doc. 58 at 22–25). Based on Lead Plaintiff's allegations, the Court interprets this "March 8, 2017" disclosure as referring to the Final Prospectus Supplement. To the extent that the "March 8, 2017 disclosure" refers to the *Motley Fool* article, the Court sees no indication in the Complaint, as pleaded, how the *Motley Fool* article related back to any material misrepresentation or omission.

3,000,000 shares of their Class A common stock, and allegedly enabled Kosloske and his entities to sell shares of personally-held common stock at artificially inflated prices. (Doc. 43 ¶126). After Kosloske sold three million shares of his personally-held common stock, HIIQ's shares dropped by nearly 10%. *Id.* The *Motley Fool* article followed. *Id.* at ¶127. According to Lead Plaintiff, "[w]*hile not revealing the nature of Defendants' Class Period wrongdoing*, the March 8, 2017 disclosure about Defendant Kosloske's large insider transaction was a partial disclosure that proximately caused [HIIQ's] nearly 10% share price decline, damaging HIIQ's shareholders." *Id.* at ¶128 (emphasis added). Defendant argues that this allegation in the Complaint highlights that the Final Prospectus Supplement cannot serve as a corrective disclosure because it did not disclose information revealing to the market the pertinent truth that was previously concealed or obscured by any alleged fraud. (Doc. 53 at 10).

Defendants' argument is well-taken. Under Eleventh Circuit law, for a disclosure to be corrective, it "need not precisely mirror the earlier misrepresentation, but it must at least relate back to the misrepresentation and not to some other negative information about the company." *Meyer*, 710 F.3d at 1197. Lead Plaintiff is certainly correct that a district court in the Eleventh Circuit recently indicated that "[p]leading loss causation is not a heavy burden." *In re Flowers Foods, Inc. Sec. Litig.*, No. 7:16-cv-222 (WLS), 2018 WL 2190904, at *2 (M.D. Ga. May 10, 2018). Nonetheless, the burden is a crucial one and one that cannot be considered a formality. The Eleventh Circuit described the loss causation element as a "key sentinel in striking" the delicate balance between deterring fraud in the marketplace and not providing broad insurance

against market losses. *Meyer*, 710 F.3d at 1202. Assuming, without deciding, that the Final Prospectus Supplement could qualify as a corrective disclosure, the Court sees no indication in the Complaint how the Final Prospectus Supplement or the sale by Kosloske related back to any material misrepresentation or omission. Therefore, the Complaint fails to plead loss causation sufficiently as to the Final Prospectus Supplement.

### *b.*   Seeking Alpha *Report*

The *Seeking Alpha* Report is where the loss causation issue truly turns. Lead Plaintiff alleges the *Seeking Alpha* Report "widely disseminated information" to the market regarding HIIQ, such as FOIR's denial letter to HIIQ, HIIQ's private letter to FOIR, and certain regulatory documents from Montana and Arkansas that disclosed HIIQ's alleged regulatory and compliance failures and penalties. (Doc. 43 ¶129). Lead Plaintiff further alleges the *Seeking Alpha* Report "demonstrated to the Market that Defendants had fraudulently concealed the risks flowing from the TPA process and ultimate denial." *Id.* As for the specific information that the *Seeking Alpha* Report allegedly revealed to the market, Lead Plaintiff points only to the previously undisclosed private letter from HIIQ to FOIR, which included: (i) HIIQ's statement regarding the TPA denial triggering a duty to report in states where HIIQ held a license and the allegedly devastating "domino effect" of FOIR's denial of the TPA application; and (ii) HIIQ's assertion that stating the denial would substantially affect its interests would be a radical understatement. *Id.* at ¶¶ 130, 133. Lead Plaintiff alleges this previously undisclosed information, together with "Montana's findings that

[HIIQ] had engaged in a 'scheme' to defraud customers, constituted a substantial or significant cause of HIIQ's share price decline of approximately 22% on September 11, 2017. *Id.* at ¶133. The previously undisclosed private letter from FOIR "also listed material information about HIIQ that [HIIQ] repeatedly failed to provide to [FOIR] in its three application filings over a period of eight months, along with the basis for the denial." *Id.* at ¶134. According to the Complaint, HIIQ's share price fell $6.55 per share upon the release of this information, from a closing price of $29.90 per share on September 8, 2017, to a closing price of $23.35 per share on September 11, 2017. *Id.* at ¶135. On September 12, 2017, HIIQ's share price fell an additional 15%. *Id.*

Lead Plaintiff has successfully pleaded loss causation as to only the alleged misrepresentation in the 2Q17 Report. As previously emphasized, one of the hallmarks of a corrective disclosure is that the disclosure must relate back to an earlier misrepresentation, rather than some other negative information about the company. *Meyer*, 710 F.3d at 1197. Indeed, the disclosure must reveal the pertinent truth to the market, which the company's fraud previously concealed or obscured. *Id.* at 1197–98. Thus, an analysis of whether Lead Plaintiff has sufficiently pleaded loss causation necessarily involves an examination of the extent to which the *Seeking Alpha* Report related back to the actionable misrepresentations and revealed information previously concealed or obscured by such misrepresentations.

Turning first to the 3Q16 Report, Lead Plaintiff sufficiently pleaded actionable misrepresentations as to two statements therein: (1) the statement that there were no material changes to the risk factors disclosed in the 2015 Annual Report; and (2) the

statement that Montana was among the states reviewing the sales practices and unlicensed sale of insurance by HIIQ's third-party distributor call centers. The Complaint alleges the *Seeking Alpha* Report "widely disseminated information" to the market, including "regulatory documents from the states of Montana and Arkansas disclosing [HIIQ's] regulatory and compliance failures and penalties," but this simple allegation fails to demonstrate how the *Seeking Alpha* Report related back to the earlier misrepresentations in the 3Q16 Report. (Doc. 43 ¶129). Without relating back to the misrepresentations in the 3Q16 Report, and given that the 2016 Annual Report disclosed the Montana CSI's suspension of HIIQ's insurance producer license, these allegations at best merely demonstrate the release of some negative information about HIIQ, which is insufficient to plead loss causation.

Similarly, the Complaint briefly alleges "Montana's finding that [HIIQ] had engaged in a 'scheme' to defraud customers," together with previously undisclosed information pertaining to HIIQ's TPA licensure application, constituted a substantial or significant contributing cause for the decline in HIIQ's share price. *Id.* at ¶133. The Complaint fails to allege whether the *Seeking Alpha* Report disclosed this finding to the market for the first time, thereby constituting a substantial or contributing cause for the decline in HIIQ's share price, however; instead, the Complaint lacks any explanation for which information, if any, the "regulatory documents" from Montana and Arkansas revealed to the market and whether such documents included this finding. Additionally, the Complaint avoids describing the Montana CSI's finding as "new, previously-undisclosed information," despite describing HIIQ's private

statements to FOIR as such in the same sentence before proceeding to allege that the statements and the Montana CSI's finding constituted a substantial or significant contributing cause for HIIQ's decline in share price. *Id.* at ¶133. These allegations are insufficient to plead loss causation as to the actionable misrepresentations in the 3Q16 Report. Furthermore, as Lead Plaintiff's only actionable misrepresentation in the March 2017 8-K likewise pertains to the Montana regulatory action, the allegations are also insufficient to plead loss causation as to the actionable misrepresentation in the March 2017 8-K.

As for the 2Q17 Report, Lead Plaintiff alleged actionable misrepresentations as to the following statements therein: (1) the statement that FOIR had denied HIIQ's TPA license application based on FOIR's determination that HIIQ had not yet provided the requisite information to process the application; and (2) the statement that HIIQ was cooperating with FOIR to reach a resolution of FOIR's denial of HIIQ's TPA license application, including exploring whether FOIR would even require HIIQ to hold a TPA license at all. While several of Lead Plaintiff's allegations regarding the *Seeking Alpha* Report's disclosures are conclusory or do not relate to the actionable misrepresentations in the 2Q17 Report, Lead Plaintiff alleges the *Seeking Alpha* Report contained the previously undisclosed, private denial letter from FOIR to HIIQ, which "listed material information about [HIIQ] that [HIIQ] repeatedly failed to provide to FOIR in its three application filings over a period of eight months, along with the basis for the denial." (Doc. 43 ¶134). Thus, the *Seeking Alpha* Report revealed the previously undisclosed reasons for FOIR's denial, which relates back to the misrepresentation in

the 2Q17 Report that FOIR had denied the application based on its determination that HIIQ had not yet provided all the information required to process the application. Defendants' argument that FOIR's denial letter was available to investors simply because it was accessible on the Florida Division of Administrative Hearings' website is unpersuasive. (Doc. 53 at 11 n.11). Lead Plaintiff further alleges that HIIQ's stock price subsequently dropped following the release of the *Seeking Alpha* Report, asserting that HIIQ's share price declined by $6.55 per share, from the closing price of $29.90 on September 8, 2017, to a closing price of $23.35 per share on September 11, 2017, thus representing a drop of approximately 21.91%. (Doc. 43 at ¶135). Significantly, Lead Plaintiff also eliminates other possible explanations for this price drop, alleging that the NASDAQ Composite Index declined by merely 0.6% and the average share price of HIIQ's main competitors increased by 0.23% on September 11, 2017. *Id.* at ¶132.

These allegations sufficiently establish loss causation as to the misrepresentation in the 2Q17 Report that FOIR had denied HIIQ's TPA license based on its determination that HIIQ had not yet provided all required information to process the TPA application. The Complaint, as currently pleaded, lacks allegations relating back to the other actionable misrepresentations.

Therefore, Lead Plaintiff's Section 10(b) and Rule 10b-5 claim survives dismissal only as to the misrepresentation within the 2Q17 Report regarding FOIR's

basis for denial, and the Court will dismiss this claim against Southwell and Kosloske.[16]

### B.     Section 20(a) Claim

In addition to his Section 10(b) and Rule 10b-5 claim, Lead Plaintiff also brings a claim under Section 20(a) of the Exchange Act against the Insider Defendants. Section 20(a) of the Exchange Act provides:

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a). "This statute 'imposes derivative liability on persons that control primary violators of the [Exchange] Act.'" *Mizzaro*, 544 F.3d at 1237 (quoting *Laperriere v. Vesta Ins. Group, Inc.*, 526 F.3d 715, 721 (11th Cir. 2008) (per curiam)). Where a Section 20(a) claim is "predicated upon the same alleged unlawful conduct

---

[16] Lead Plaintiff also claims HIIQ failed to disclose material developments and uncertainties regarding its Florida TPA licensure application, "including, *inter alia*, that (ii) FOIR had returned its application to [HIIQ] as incomplete; and (ii) HIIQ had withdrawn its TPA application" in violation of Item 303 of Regulation S-K, 17 C.F.R. § 229.303, and an accompanying SEC Interpretive Release. (Doc. 43 ¶160–62). "Item 303 is not a magic black box in which inadequate allegations under Rule 10b-5 are transformed, by means of broader and different SEC regulations, into adequate allegations under Rule 10b-5." *Carvelli*, 2018 WL 4941110, at *22 n.3 (citing *Ash v. PowerSecure Int'l, Inc.*, No. M-21-67, 2015 WL 5444741, at *11 (E.D.N.C. Sept. 15, 2015)). The Eleventh Circuit Court of Appeals has not directly addressed whether the failure to comply with a duty to disclose pursuant to Item 303 may give rise to an actionable omission under Section 10(b). *Mich. Carpenters' Pension Fund*, 2019 WL 1429667, at *19 n.12. Thus, despite Lead Plaintiff's urging, the Court declines to apply the Second Circuit Court of Appeals' approach in *Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 101–102 (2d Cir. 2015). Therefore, this "bootstrapped" allegation, to borrow the terminology of District Judge Robin L. Rosenberg, is unavailing and, to the extent Lead Plaintiff seeks to assert a claim based on Item 303 of Regulation S-K, the Court dismisses such claim. *Carvelli*, 2018 WL 4941110, at *22 n.3.

relevant to" an accompanying Section 10(b) and Rule 10b-5 claim, the Section 20(a) claim cannot survive dismissal of the underlying Section 10(b) and Rule 10b-5 claim.

Because the Court will dismiss Lead Plaintiff's Section 10(b) and Rule 10b-5 claim as to Southwell and Kosloske, Lead Plaintiff's Section 20(a) claim against Southwell and Kosloske fails. *See Garfield*, 466 F.3d at 1255 (stating the success of the plaintiff's Section 20(a) claim against individual defendants depends on the resolution of the claims under Section 10(b) and Rule 10b-5 where the Section 20(a) claim is "predicated upon the same alleged unlawful conduct relevant to" the Section 10(b) claims); *Kinnett v. Strayer Educ., Inc.*, 501 F. App'x 890, 894 (11th Cir. 2012) ("Because a primary violation of the securities laws constitutes an essential element of a § 20(a) derivative claim, a plaintiff adequately pleads a § 20(a) claim only where the plaintiff adequately pleads a primary violation.").

At this point, the Court would generally analyze the plausibility of Lead Plaintiff's Section 20(a) claim as to Hershberger. However, Defendants fail to provide any argument or citation to legal authority for their request that the Court dismiss Lead Plaintiff's Section 20(a) claim (other than their assertion that the Section 20(a) claim fails entirely because the Section 10(b) and Rule 10b-5 claim fails). (Doc. 53 at 25). The Court will not analyze arguments not briefed. Therefore, the Motion necessarily fails as to Lead Plaintiff's Section 20(a) claim against Hershberger, and the Court will deny the Motion as to that claim.

## IV.  **Conclusion**

Accordingly, it is **ORDERED** that Defendant's Motion to Dismiss the Consolidated Complaint, (Doc. 53), is **GRANTED IN PART** and **DENIED IN PART** as follows:

1. Lead Plaintiff's Section 10(b) and Rule 10b-5 claim (Count I) against Southwell and Kosloske is **DISMISSED**. Lead Plaintiff's Section 10(b) and Rule 10b-5 claim (Count I) against HIIQ and Hershberger survives with respect to the actionable misrepresentation contained in the 2Q17 Report, as identified herein;

2. Lead Plaintiff's Section 20(a) claim (Count II) against Southwell and Kosloske is **DISMISSED**. Lead Plaintiff's Section 20(a) claim (Count II) against Hershberger survives; and

3. Within twenty-one (21) days of the date of this Order, Lead Plaintiff and the remaining defendants to this action shall confer for the purpose of preparing their case management report. Such case management conference may be held telephonically. In preparing their case management report, the parties shall use the case management report form included with the Notice of Designation. (Doc. 3). Within fourteen (14) days of the date of the case management conference, the parties shall file their case management report on the Court's docket.

Case No.: 8:17–cv–2186–T–17SPF

**DONE** and **ORDERED** in Chambers in Tampa, Florida this 28th day of

June, 2019.

ELIZABETH A. KOVACHEVICH
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record

83